**NATIONAL BROADCASTING COMPA-
NY, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents,**

**Accuracy in Media, Inc., Intervenor.**

**No. 73–2256.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 21, 1974.

Decided Sept. 27, 1974.

Order Vacating Opinion Dec. 13, 1974.

Orders March 18 and 19, 1975.

Dissenting Opinion June 2, 1975.

Judgment Vacated July 11, 1975.

Floyd Abrams, New York City, with whom Dean I. Ringel and Howard Monderer, Washington, D. C., were on the motion for petitioner.

John W. Pettit, Gen. Counsel, Washington, D. C., with whom Joseph A. Marino, Associate Gen. Counsel, and Lawrence W. Secrest, III, Washington, D. C., were on the motions for respondent.

Timothy B. Dyk, Washington, D. C., with whom J. Roger Wollenberg, Washington, D. C., were on the brief for Columbia Broadcasting System, Inc., as amicus curiae.

J. Laurent Scharff, Washington, D. C., was on the brief for Radio Television News Directors Assn. and the Society of Professional Journalists, Sigma Delta Chi, as amicus curiae.

Ellen S. Agress, New York City with whom Earle K. Moore, New York City, was on the brief for the Office of Communication, United Church of Christ, as amicus curiae.

Stanley H. Kamerow, Washington, D. C., was on the motion for intervenor, Accuracy In Media, Inc., Thomas F. Ragan also entered an appearance for intervenor, Accuracy In Media, Inc.

John B. Summers, Washington, D. C., was on the brief of National Assn. of Broadcasters, as amicus curiae.

Douglas Caddy, Washington, D. C., was on the brief for the Center for the Public Interest of the Robert M. Schuchman Memorial Foundation, Inc., as amicus curiae.

Ellen S. Agress, New York City, was on the brief for National Citizens Committee for Broadcasting, as amicus curiae.

Henry Geller, Washington, D. C., was on the brief for the Rand Corp., as amicus curiae.

Alexander Greenfeld, New York City, was on the brief for New York Times Co., as amicus curiae.

Carl D. Lawson, Atty., Dept. of Justice, entered an appearance for respondent United States.

Before FAHY, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

On September 12, 1972, the television network of the National Broadcasting Company broadcast its documentary entitled "Pensions: The Broken Promise," narrated by Edwin Newman. On November 27, 1972, Accuracy in Media (AIM) filed a complaint with the Federal Communications Commission charging NBC had presented a one-sided picture of private pension plans. The handling of this case by the Commission will be discussed in more detail subsequently (section II). For introductory purposes it suffices to say that on May 2, 1973 —as it happens, the same day NBC re-

ceived the George Foster Peabody Award [1] for its production—the Commission's Broadcast Bureau advised NBC that the program violated the Commission's fairness doctrine.[2] That decision was upheld by the Commission. We reverse.

## I. THE PROGRAM

The "Pensions" program is the heart of the case, and for that reason it is set out in Appendix A to this opinion.

For convenience, we will summarize the main outlines of the program—with notation that certain aspects are dealt with more fully subsequently.

The "Pensions" program studied the condition under which a person who had worked in an employment situation that was covered by a private pension plan did not in fact realize on any pension rights. Its particular focus was the tragic cases of aging workers who were left, at the end of a life of labor, without pensions, without time to develop new pension rights, and on occasion without viable income.

The program had no set format, but its most prominent feature was a presentation of tragic case histories, often through personal interviews with the persons affected.

One group of workers lost pension eligibility when their company decided to close the division in which they had worked. The first of these was Steven Duane, who after 17 years with a large supermarket chain, lost his job as foreman of a warehouse when the company closed the warehouse and discharged all its employees, leaving them with no job and no pension rights. Now in his fifties, starting again with another company, he felt ill-used and frightened of the future.

There were a number of other specific examples of employees terminated by closing of plants or divisions. The program also focused on the problems of vesting, the years of service with the company required for a worker to become eligible under its pension plan. NBC interviewed employees with many years of service who were suddenly discharged just prior to the date on which their pension rights were to have become vested. Thus Alan Sorensen asserted that he was the victim of a practice—a "very definite pattern"—under which his employer, a large department store chain, fired men just prior to vesting, assigning "shallow" reasons to men who had served with records beyond reproach.

A similar account was given by Earl Schroeder, an executive fired by Kelly Nut Company, after he more than met his 20 years of service requirement but was six months shy of the age 60 condition.

The program also set forth abuses in the literature given employees ostensibly explaining their plans—pictures of contented retirees and words comprehensible only to the most sophisticated legal specialist. It took up examples where the company had gone bankrupt prior to their date of retirement, leaving the employees without pension funds.

The documentary gave instances of pensions lost for lack of portability, citing plans that required the employee be a member of the same local for the requisite period. NBC interviewed a number of teamsters who had worked for the same employer for over twenty years, but who later found that certain changes in work assignment entailed changes in union local representation and ultimately loss of pension.

Much of the program was a recount of human suffering, interviews in which aging workers described their plight without comment on cause or remedy.

---

1. In addition to the Peabody Award, the program was awarded a Christopher Award, a National Headliner Award, and a Merit Award of the American Bar Association. It was also an Emmy nominee. See Schmerler Affidavit ¶10, JA 121–22.

2. See Letter of FCC to NBC, May 2, 1973, JA 55, 66–67.

They told of long years of working in the expectation of comfortable retirements, finding out that no pension would come, having to work into old age, of having to survive on pittance incomes. Interspersed with these presentations by workers were comments by persons active in the pension field, public officials, and Mr. Newman.

None of those interviewed—and these included two United States Senators, a state official, a labor leader, a representative of the National Association of Manufacturers, a consumer advocate, a bank president, and a social worker—disputed that serious problems, those covered by the documentary, do indeed exist. Some of the comments related to the overall performance of the private pension system. We shall discuss these later (section VI B). In addition to comments on the private system generally, there were isolated expressions of views on the related but nonetheless quite distinct issue of the wisdom of reliance on private pensions, regardless of how well they function, to meet the financial needs of retirees.[3] Finally, several speakers gave broad, general views as to what could be done.[4]

There were also comments on legislative reforms that might be taken to cope with problems. These will be discussed separately in part VI D of this opinion.

*Concluding Remarks*

It may be appropriate to quote in full the concluding remarks of narrator Edwin Newman, since the FCC considered them "indicative of the actual scope and substance of the viewpoints broadcast in the 'Pensions' program." He said:

NEWMAN: This has been a depressing program to work on but we don't want to give the impression that there are no good private pension plans. There are many good ones, and there are many people for whom the promise has become reality. That should be said.

There are certain technical questions that we've dealt with only glancingly, portability, which means, being able to take your pension rights with you when you go from one job to another, vesting, the point at which your rights in the pension plan become established and irrevocable.

Then there's funding, the way the plan is financed so that it can meet its obligations. And insurance, making sure that if plans go under, their obligations can still be met.

Finally, there's what is called the fiduciary relationship, meaning, who can be a pension plan trustee? And requiring that those who run pension funds adhere to a code of conduct so that they cannot enrich themselves or make improper loans or engage in funny business with the company management or the union leadership.

These are matters for Congress to consider and, indeed, the Senate Labor Committee is considering them now. They are also matters for those who are in pension plans. If you're in one, you might find it useful to take a close look at it.

Our own conclusion about all of this, is that it is almost inconceivable that this enormous thing has been allowed to grow up with so little understanding of it and with so little protection and such uneven results for those involved.

The situation, as we've seen it, is deplorable.

Edwin Newman, NBC News.

*Success of Program*

Like many documentaries, "Pensions" was a critical success (*supra*, note 1)

---

3. *See* Dennenberg Statement, Tr. at 4; Kramer Statement, Tr. at 13–14.

4. *See* Dennenberg Statement, Tr. at 5; Newman description of Nader position, Tr. at 18; Hubbard Statement at 18; Anderson Statement, Tr. at 18–19; Gotbaum Statement, Tr. at 18; Schweiker Statement, Tr. at 19.

but not a commercial success. We shall consider the television reviews in more detail subsequently, but it may be observed here that they were generally enthusiastic. Critics called it, "A potent program about pitfalls and failures of some private pension plans . . .," "a harrowing and moving inquiry . . .," and "a public service."[5] Dissenting notes were also struck.

As to the viewing public, "Pensions" ran in competition with a popular medical drama and a crime movie, and ran a poor third, garnering only a 16% share of the viewing audience. In fact, NBC was able to sell only two-and-one-half minutes of advertising time out of an available six.[6]

## II. COMMISSION PROCEEDING

Watching the program with particular interest was Accuracy in Media ("AIM"), a "nonprofit, educational organization acting in the public interest"[7] that seeks to counter, in part by demanding aggressive enforcement of the fairness doctrine, what it deems to be biased presentations of news and public affairs. On November 27, 1972, the Executive Secretary of AIM wrote to the FCC complaining of the following:

> Our investigation reveals that the NBC report gave the viewers a grotesquely distorted picture of the private pension system of the United States. Nearly the entire program was devoted to criticism of private pension plans, giving the impression that failure and fraud are the rule. . . . The reporter, Mr. Newman, said that NBC did not want to give the impression that there were no good private pension plans, but he did not discuss any good plans or show any satisfied pensioners.[8]

In subsequent correspondence, AIM added the accusations that NBC was attempting "to brainwash the audience with some particular message that NBC is trying to convey"[9] and that the program was "a one-sided, uninformative, emotion-evoking propaganda pitch."[10] Thus AIM not only claimed that the program had presented one side of an issue of public importance, the performance of private pension plans, it also charged that NBC had deliberately distorted its presentation to foist its ideological view of events on the viewing public.

In its reply, NBC rejected the allegations of distortion. It asserted that the "Pensions" broadcast had not concerned a controversial issue of public importance:

> The program constituted a broad over-view of some of the problems involved in some private pensions plans. It did not attempt to discuss all private pension plans, nor did it urge the adoption of any specific legislative or other remedies. Rather, it was designed to inform the public about some problems which have come to light in some pension plans and which deserve a closer look.[11]

Since, in the view of NBC, there was no attempt to comment on the overall performance of private pension plans, no controversial issue had been presented, for all agreed that the examples of suffering depicted were not themselves subject to controversy. Even so, NBC pointed out that it had presented the view that the system as a whole was functioning well; consequently, it asserted, even if it had inadvertently raised the issue of the overall performance of private pension plans, the side generally supportive of the system had been heard.[12]

---

5. See summary of reviews, Appendix B.

6. Frank Affidavit, JA 125–26.

7. Letter of AIM to FCC, July 2, 1973, JA 143.

8. Letter of AIM to FCC, November 27, 1972, JA 1.

9. Letter of AIM to FCC, February 20, 1973, JA 48.

10. Letter of AIM to FCC, April 11, 1973, JA 54.

11. Letter of NBC to FCC, February 14, 1973, JA 41.

12. Id., JA 45–46.

In a letter to NBC,[13] the Broadcast Bureau of the Commission rejected AIM's allegations of distortion as being unsupported by any evidence but upheld the fairness doctrine complaint. The staff took issue with "the reasonableness of your [NBC's] judgment that the program did not present one side of a controversial issue of public importance" and concluded that the program's "overall thrust was general criticism of the entire pension system, accompanied by proposals for its regulation."[14] The staff opinion included extensive quotation from the transcript of the documentary, but little explanation as to how the quoted portions sustained the staff's conclusion. Only four brief statements were singled out as containing "general views" on the overall performance of the private pension system. NBC appealed the Broadcast Bureau ruling to the entire Commission.[15]

On December 3, 1973, the Commission issued a "Memorandum Opinion and Order" affirming the decision of its staff.[16] Although it acknowledged that the broad issue upon review was "whether the Bureau erred in its ruling that NBC's judgment on these matters was unreasonable," it emphasized that:

> The specific question properly before us here is therefore not whether NBC may reasonably say that the broad, overall "subject" of the "Pensions" program was "some problems in some pension plans," but rather whether the program did in fact present viewpoints on one side of the issue of the overall performance and proposed regulation of the private pension system.[17]

The Commission found that "Pensions" had in fact presented views on the overall performance of the private pension system. It took note of the "pro-pensions" views expressed during the documentary, but concluded that the "overwhelming weight" of the "anti-pensions" statements required further presentation of opposing views. The Commission commended NBC for a laudable journalistic effort, but found that the network had not discharged its fairness obligations and ordered it to do so forthwith. This petition for review followed.

NBC petitioned the Commission for a stay, but was informed that the Commission "expects prompt compliance with its ruling." NBC filed a motion in this court for an expedited appeal, a stay, and expedited consideration. That motion was heard and granted on February 14, 1974, and the case was heard on the merits on February 21, 1974. AIM has intervened on the side of the Commission. The stay that has been in effect during the pendency of this appeal reflected, in part, an estimate of the likelihood of success by NBC as petitioner. We now set forth the reasons why we have decided that the case should be determined in favor of NBC.[18]

## III. THE FAIRNESS DOCTRINE: GENERAL CONSIDERATIONS

Petitioners urge that the Commission's decision be set aside as a misapplication of the fairness doctrine and a violation of the First Amendment. Since we reverse on the former ground, we have no occasion to consider the latter.

13. Accuracy in Media, Inc., 40 FCC 2d 958 (1973).

14. *Id.* at 963, 966.

15. By letter of July 2, 1973, AIM replied to NBC's appeal and appended as an exhibit an article about pensions appearing in the Washington Post of November 26, 1972, written by Mr. Spencer Rich. AIM stated

that this article "exemplifies good journalism." JA 155.

16. 44 FCC 2d 1027 (1973), JA 201.

17. 44 FCC 2d at 1034–35, JA 210.

18. This opinion also serves to explain the continuation of the February 14, 1974, stay order during the preparation of the opinion on the merits. *See* note 88 *infra.*

■ Now twenty-five years old, the fairness doctrine imposes a double obligation on the broadcast licensee. First, he must devote a substantial portion of available time to the discussion of "controversial issues of public importance."[19] When he presents such an issue, the licensee has a further duty to present responsible conflicting views.[20] The doctrine, particularly as applied to newscasts and news documentaries, has been given statutory recognition in section 315 of the Communications Act,[21] and has been held to inhere in the "public interest" standard governing the grant of license applications and renewals.[22]

■■ The essential task of the fairness doctrine is to harmonize the freedom of the broadcaster and the right of the public to be informed. Except for limited areas like libel and obscenity, the First Amendment generally forbids government regulation of the content of journalism. Not only is state censorship forbidden, so also is the government prohibited from compelling editors to include state approved material. Even a carefully limited statute giving political candidates attacked on a newspaper's editorial page the right to reply in kind was recently invalidated by the Supreme Court as an unconstitutional encroachment upon journalistic discretion. In Miami Herald Publishing Company v. Tornillo,[23] a "right to reply" law—analogous to the personal attack rule that is part of the fairness doctrine—was ruled unconstitutional. The "benign" purposes of the state statute were deemed irrelevant:

[T]he Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors. A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size of the paper, and content, and treatment of public issues and public officials—whether fair or unfair—constitutes the exercise of editorial control and judgment. It has yet to be demonstrated how governmental control of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

418 U.S. at 258, 94 S.Ct. at 2839–2840.

■ But almost from the beginning, the broadcasting press has been treated differently. Congress created the Federal Communications Commission and its predecessor, the Federal Radio Commission, because the available space on the electromagnetic spectrum was far exceeded by the number of those who would use it.[24] It was necessary to ration this scarce resource, for "[w]ithout government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard."[25]

Scarcity required licensing in order to bring order to chaos, but the dangers of control in the hands of a relative few were early recognized. The public interest did not countenance delegation to a

19. In the Matter of Editorializing by Broadcast Licensees, 13 FCC 1246, 1249 (1949).

20. *Id.* This duty extends to making free time available if those holding responsible conflicting views are unable to purchase air time. Cullman Broadcasting Co., 40 FCC 576, 577 (1963).

21. 47 U.S.C. § 315(a) reads in part: Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news

events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

22. Red Lion v. FCC, 395 U.S. 367, 379–386, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

23. 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

24. National Broadcasting Company v. United States, 319 U.S. 190, 210–214, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

25. Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at 376, 89 S.Ct. at 1799.

few licensees to pursue their purely private interests at the expense of listeners and viewers, and instead the broadcaster was held to have an obligation to serve and inform the public.[26]

Under the fairness doctrine the public is not to be confined to hearing only the views approved by those licensees, but is entitled to be informed of the diversity of opinion in the land, to have that presented by appropriate spokesmen for its consideration and judgment.

The salutary intent of the fairness doctrine must be reconciled with the tradition against inhibition of the journalists' freedom. That tradition, which exerts a powerful countervailing force, is rooted in the constitutional guarantee of freedom of the press, a guarantee that has vitality for broadcast journalists, though not in exactly the same degree as for their brethren of the printed word.[27] And the same statute that provides authority for the FCC to implement the fairness doctrine for its licensees contains a clear provision (in section 326) disclaiming and prohibiting censorship as part of the legislative scheme. In construing the fairness doctrine, both the Commission and the courts have proceeded carefully, mindful of the need for harmonizing these often conflicting considerations.

In Red Lion Broadcasting Company v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court approved the Commission's personal attack and political editorializing rules,[28] which are relatively narrow

---

**26.** Other responses to the dangers of placing control over the broadcast media into the hands of a relative few include: the obligation of the licensee to operate in the public interest, *see* 47 U.S.C. §§ 307(a), 309(a) and 312(a)(2), the chain broadcasting and multiple ownership rules, *see* National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) and 47 C.F.R. §§ 73.131, 73.240, and the prime time access rule, 47 C.F.R. § 73.658(k) (1973). *See also* Columbia Broadcasting System v. Democratic National Committee, 412 U.S. 94, 112 n. 10, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

**27.** *See id.* at 117–118, 122, 93 S.Ct. 2080.

**28.** Red Lion v. FCC, 395 U.S. at 373–375, 89 S.Ct. at 1798:

"Personal attacks; political editorials.

"(a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than 1 week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities.

"(b) The provisions of paragraph (a) of this section shall not be applicable (1) to attacks on foreign groups or foreign public figures; (2) to personal attacks which are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign, on other such candidates, their authorized spokesmen, or persons associated with the candidates in the campaign; and (3) to bona fide newscasts, bona fide news interviews, and on-the-spot coverage of a bona fide news event (including commentary or analysis contained in the foregoing programs, but the provisions of paragraph (a) of this section shall be applicable to editorials of the licensee).

"NOTE: The fairness doctrine is applicable to situations coming within [(3)], above, and, in a specific factual situation, may be applicable in the general area of political broadcasts [(2)], above. See section 315(a) of the Act, 47 U.S.C. § 315(a); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance. 29 F.R. 10415. The categories listed in [(3)] are the same as those specified in section 315(a) of the Act.

"(c) Where a licensee, in an editorial, (i) endorses or (ii) opposes a legally qualified candidate or candidates, the licensee shall, within 24 hours after the editorial, transmit to respectively (i) the other qualified candidate or candidates for the same office or (ii) the candidate opposed in the editorial (1) notification of the date and the time of the editorial; (2) a script or tape of the editorial; and (3) an offer of a reasonable opportunity for a candidate or a spokesman of the candidate to respond over the licensee's facilities: *Provided, however,* That where

corollaries of the general fairness obligation. Under the personal attack rules a licensee must afford reply time to "an identified person or group" whose "honesty, character, integrity, or like personal qualities" are attacked in the course of presentation of views on a controversial issue of public importance. The political editorializing rule imposes a reply obligation where the licensee endorses or opposes a candidate for public office.

These rules were the target of sharp attack. The essence of the challenge was that no matter how slight, how narrow, or how precise, any limitation on the freedom of the licensee to broadcast what he chooses perforce violates the First Amendment. Rejecting this contention, a unanimous[29] Supreme Court reminded the broadcaster of the essential difference between the print and broadcast media: the physical limitations of the latter restrict the number of those who would broadcast whereas expression by publication is, at least in theory, available to all. To posit a First Amendment restriction on government action taken to enhance the variety of opinions available to the viewer is to protect those fortuitous enough to obtain broadcast licenses at the expense of those who were not. In now-famous language the Court stated:

> Because of the scarcity of radio frequencies, the Government is permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium. But the people as a whole retain their interest in free speech by radio and their

collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.[30]

This has become the guiding principle of the fairness doctrine: limitations on the freedom of the broadcaster—even those that would be unacceptable when imposed on other media—are lawful in order to enhance the public's right to be informed.[31] The Court's opinion, written by Justice White, reflects the circumspection of this principle of decision. While rejecting as unfounded claims that the personal attack and political editorializing rules would induce self-censorship by licensees in order to avoid the rigors of compliance with their requirements, the Court cautioned that its judgment might be different "if experience with the administration of those doctrines indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage.[32] . . ." And the Court expressly stated that in approving the personal attack and political editorializing rules, it did not "approve every aspect of the fairness doctrine.[33] . . ." . . . "

Four years later, in Columbia Broadcasting System v. Democratic National Committee,[34] the Court again discussed the fairness doctrine. The Commission had held that licensees could impose a blanket ban on all editorial advertising. An intermediate court ruling that such a

such editorials are broadcast within 72 hours prior to the day of the election, the licensee shall comply with the provisions of this paragraph sufficiently far in advance of the broadcast to enable the candidate or candidates to have a reasonable opportunity to prepare a response and to present it in a timely fashion." 47 CFR §§ 73.123, 73.300, 73.598, 73.679 (all identical).

29. Justice Douglas did not participate, and said in *CBS*: "I did not participate in that decision and, with all respect, would not support it." 412 U.S. at 154, 93 S.Ct. at 2112.

30. 395 U.S. at 390, 89 S.Ct. at 1806.

31. "Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act." *CBS, supra,* 412 U.S. at 110, 93 S.Ct. at 2090.

32. 395 U.S. at 393, 89 S.Ct. at 1808.

33. *Id.* at 396, 89 S.Ct. at 1809.

34. 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

ban, even if consistent with the fairness doctrine, violated the First Amendment,[35] was reversed by the Supreme Court, in an opinion by Chief Justice Burger.

In *CBS* the Court reaffirmed the principle that scarcity requires that the broadcast media be treated differently than other forums of expression, but observed that this is not a principle without bounds, that not all regulation can be justified in the name of scarcity. Overzealous invocation of rules such as the fairness doctrine could cause an "erosion of the journalistic discretion of broadcasters in the coverage of public issues."[36]

Journalistic discretion, the Court emphasized, is the keynote to the legislative framework of the Communications Act.[37]

■ The limitations of broadcasting both spawned the fairness doctrine and establish that it is dependent primarily on licensee discretion. Perfect compliance is impossible. No broadcaster can present all colorations of all available public issues. 412 U.S. at 111, 93 S.Ct. 2080. Choices have to be made and, assuming that the area is one of protected expression, the choices must be made by those whose mission it is to inform, not by those who must rule. In the words of Chief Justice Burger:

> For better or worse, editing is what editors are for; and editing is selection and choice of material. That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but that is not reason to deny the discretion Congress provided.

Calculated risks of abuse are taken in order to preserve higher values. The presence of these risks is nothing new; the authors of the Bill of Rights accepted the reality that these risks were evils for which there was no acceptable remedy other than a spirit of moderation and a sense of responsibility—and civility—on the part of those who exercise the guaranteed freedoms of expression.[38]

There are no other decisions on the fairness doctrine from the Supreme Court, but this court has had occasion to consider the doctrine in several cases and it has endeavored to maintain the balance between broadcaster freedom and the public's right to know. Commercial advertising cases present different considerations than those before us and we need not reexamine the doctrine as there applied.[39] More related to the present issue is the public service announcement discussed in Green v. FCC,[40] where we refused petitioners' request to require a licensee to present a point of view on the Vietnam conflict that had already received extensive coverage. In *Green,* as in the instant case, there was some initial difficulty in defining the issue allegedly presented in the offending broadcast. We stated that this determination, as well as the decision as to the number of views to be presented and the manner in which they are portrayed, is one initially for the licensee, who has latitude to make all pertinent judgments and is not to be overturned unless he forsakes the standards of reasonableness and good faith.[41] Reliance on the rea-

35. Business Executives' Move for Peace v. FCC, 146 U.S.App.D.C. 181, 450 F.2d 642 (1971).

36. 412 U.S. at 124, 93 S.Ct. at 2097.

37. *Id.* at 110–111, 93 S.Ct. 2080.

38. *Id.* at 124–125, 93 S.Ct. at 2097. This same thought appears in the *Tornillo* case, 418 U.S. at 258, 94 S.Ct. at 2840 and is obviously an abiding constitutional consideration.

39. Neckritz v. FCC, 163 U.S.App.D.C. 409, 502 F.2d 411 (1974); Friends of the Earth

v. FCC, 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

40. 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

41. The Commission has said:

> The fairness doctrine deals with the broader question of affording reasonable opportunity for the presentation of contrasting viewpoints on controversial issues of public importance. Generally speaking, it does not apply with the precision of the

sonableness standard, "which is all that is required under the fairness doctrine"[42] preserves licensee discretion and serves the essential purposes of the fairness doctrine "that *the American public must not be left uninformed.*"[43]

In Democratic National Committee v. FCC,[44] we faced knotty problems in sorting out the fairness obligations generated by a radio and television address by the President and a reply by the opposition political party. In upholding the Commission decision that the licensees had not abused their discretion, Judge Tamm, writing for the court, stressed the importance of reliance on licensee judgment:

> By its very nature the fairness doctrine is one which cannot be applied with scientific and mathematical certainty. There is no formula which if followed will assure that the requirements of the doctrine have been met. Procedurally, *the doctrine can only succeed when the licensee exercises that discretion upon which he is instructed to call upon in dealing with ·coverage of controversial issues.*[45]

Finding no abuse of discretion, we affirmed.

■ ■ In Healey v. FCC,[46] petitioner claimed to be within the ambit of the personal attack rule, which requires the licensee to afford opportunity to reply to an individual attacked in the course of a discussion of a controversial issue of public importance. As in the case now before us, the critical question was whether the broadcast involved a controversial issue of public importance. Petitioner, an American Communist, claimed that her role as a Communist within her community was such an issue. Judge Wilkey, the author of the *Green* opinion, pointed out that there is a substantial difference between what is newsworthy, *i. e.,* that which is interesting to the public, and what is controversial:

> Merely because a story is newsworthy does not mean that it contains a controversial issue of public importance. Our daily papers and television broadcasts alike are filled with news items which good. journalistic judgment would classify as newsworthy, but which the same editors would not characterize as containing important controversial public issues.[47]

Converting every newsworthy matter into a controversial issue of public importance and requiring editors to "balance" every presentation creates a danger. Again in the words of Judge Wilkey:

> To characterize every dispute of this character as calling for rejoinder under the fairness doctrine would so inhibit television and radio as to destroy a good part of their public usefulness. It would make what has already been

"equal opportunities" requirement. Rather, the licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation—as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present the viewpoints, and all the other facets of such programming. See par. 9, *Editorializing Report.* In passing on any complaint in this area, the Commission's role is not to substitute its judgment for that of the licensee as to any of the above programming decisions, but rather to determine whether the licensee can be said to have acted reasonably and in good faith. There is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the "equal opportunities" requirement.

In re Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 FCC 598, 599 (1964).

42. 144 U.S.App.D.C. at 360, 447 F.2d at 330.

43. *Id.* at 359, 447 F.2d at 329 (emphasis in original).

44. 148 U.S.App.D.C. 383, 460 F.2d 891, cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972).

45. *Id.* at 392, 460 F.2d at 900 (emphasis added).

46. 148 U.S.App.D.C. 409, 460 F.2d 917 (1972).

47. *Id.* at 414, 460 F.2d at 922.

criticised as a bland product disseminated by an uncourageous media even more innocuous.[48]

The principle of deference to licensee judgments, unless the licensee has simply departed from the underlying assumptions of good faith and reasonable discretion, is an integral part of the fairness doctrine, and a fixture that has been reiterated and applied with fidelity by the courts.[49] It is the backdrop against which Judge Tamm's opinion for the court in the *Democratic National Committee* case takes note, that

> in opinion after opinion, the Commission and the courts have stressed the wide degree of discretion available under the fairness doctrine. . . .[50]

The question is whether NBC has been shown to have exceeded its "wide degree of discretion" in its "Pensions" documentary.

## IV. ABSTENTION FROM PRELIMINARY ISSUE—WHETHER FAIRNESS DOCTRINE SHOULD BE RESERVED FOR LICENSE RENEWALS

A preliminary issue has been presented to us by amicus curiae Henry Geller, Esquire, formerly general counsel of the Commission, and a serious student of the fairness doctrine.[51] Mr. Geller's view is that under the law the FCC could not properly issue the ad hoc fairness ruling on this program, but was limited to consideration of the matter only in connection with NBC's application for renewal of license, and then only to determine if some flagrant pattern of violation of the fairness doctrine is indicated by NBC's overall operation, with a renewal standard, comparable to that voiced in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 110, 11 L. Ed.2d 686 (1964), requiring a showing of "malice"—either bad faith, or "reckless disregard" of fairness obligations.

Initially, it appears, it was the FCC's procedure to refer complaints to the station as received, obtain its response, and then consider the matter definitively at renewal in connection with the overall showing of the station.[52] This practice was being followed in 1959, when the Communications Act was amended to codify the standard of fairness.[53] In 1962, the Commission changed its procedure to resolve all fairness matters as they arose and, if the station were found to have violated the doctrine, to direct it to advise the Commission within 20 days of the steps taken "to assure compliance with the fairness doctrine."[54]

48. *Id.* at 415, 460 F.2d at 923.

49. Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). Judge Tamm's opinion restated that "[t]he cornerstone of the doctrine is good faith and licensee discretion." That opinion sustained the denial of the application to renew the license only on the ground that the record of the licensee was "bleak in the area of good faith . . . [and] . . . shows an utter disdain for Commission rulings and ignores its own responsibilities as a broadcaster and its representations to the Commission." 153 U.S. App.D.C. at 333, 335–336, 473 F.2d at 44, 46–47 (1972).

50. 148 U.S.App.D.C. at 395, 460 F.2d at 903.

51. *See* H. Geller, The Fairness Doctrine in Broadcasting: Problem and Suggested Courses of Action (The Rand Corporation, R–1412–FF, Dec. 1973).

52. *See* Testimony of Mr. Joseph Nelson, Chief, FCC Renewal and Transfer Division, Hearings before the Senate Freedom of Communications Subcommittee, March 27, 1961, 87th Cong., 1st Sess., Report 994, Pt. 5, p. 21; *see e. g.*, Dominican Republic Information Center, 40 FCC 457, 457–588 (1957).

53. *See* Section 315(a), 47 U.S.C. § 315(a); Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at pp. 380–385, 89 S.Ct. 1794.

54. *See* Tri-State Broadcasting Co., Inc., 40 FCC 508, 509 (1962). This change apparently occurred in connection with personal attack cases, and was extended without discussion to all fairness cases. The only FCC treatment is in Honorable Oren Harris, 40 FCC 582 (1963). Chairman Harris of the House Interstate and Foreign Commerce Committee criticized this new approach, and urged that fairness " . . . be applied periodically (i. e., at the time of renewal) and upon an overall basis." *Id.* at p. 583. In

Mr. Geller puts it that the resulting series of ad hoc fairness rulings "have led the Commission ever deeper into the journalistic process, and have raised most serious problems."[55] The effect, particularly on the small broadcaster, has been to inhibit the promotion of robust, wide-open debate. Thus, in a case where the FCC found that a licensee had afforded reasonable opportunity for opposing viewpoints,[56] the FCC process was long (decision 21 months after broadcast) and arduous. The licensee's burden included not only substantial legal (about $25,000) and other expenses (e. g., travel), but also required top-level station personnel to devote substantial time and attention, with attendant dislocation of regular operational functions. In sum, Mr. Geller says that a substantial inhibiting effect derives not merely from any rulings adverse to the broadcaster, but the strain, time and resources involved in coping with particular challenges even if they are unsuccessful.

Amicus cites expressions in Columbia Broadcasting System v. Democratic Na-

tional Committee, *supra,* rejecting a contention (right of access for editorial advertisements) that would involve the government too much in the "day-to-day operations of broadcasters' conduct," and stating the fairness doctrine, in terms of the legislative scheme and purpose, in these terms, 412 U.S. at 127, 93 S.Ct. at 2098:

Under the Fairness Doctrine the Commission's responsibility is to judge whether a licensee's overall performance indicates a sustained good faith effort to meet the public interest in being fully and fairly informed. The Commission's responsibilities under a right-of-access system would tend to draw it into a continuing case-by-case determination of who should be heard and when.

We have stated the amicus position at some length because we do not wish our opinion to be misunderstood as inadvertent on the point. The position is a serious one, and it deserves serious consideration.[57] The fact that *Red Lion*

its response, the Commission gave three reasons for its policy of resolving fairness questions at time of complaint rather than awaiting renewal: (1) It is not fair to the licensee to wait; he should have a chance to contest the fairness ruling by appealing to the courts; (2) awaiting renewal is unfair to the public, which then does not have the opportunity to hear contrasting views, such as in programs dealing with ballot issues; and (3) similarly, it would be unfair to candidates in political campaigns.

55. Amicus Brief at 3–5. These problems, which are under FCC consideration, may be grouped as follows:

(a) Defining balance or reasonable opportunity to afford contrasting viewpoints on an issue.

(b) The stopwatch problem. Apparently, the FCC has on occasion literally used a stop-watch to time the presentations made on the various sides on an issue. *See* Concurring Statement of Chairman Burch in Complaint of the Wilderness Society against NBC (ESSO), 31 FCC 2d 729, 735–739 (1971). *See also* Sunbeam TV Corp., 27 FCC 2d 350, 351 (1971).

Even an apparently mechanical stop-watch approach involves sensitive judgments in de-

termining whether particular segments of a program tilt for or against, or are neutral on a particular issue.

(c) The "stop-time" program. During the period of FCC consideration, the licensee may offer additional broadcasts (perhaps, to cover new developments). And these may affect the FCC's judgment on whether reasonable opportunity has been presented. Complaint of Wilderness Society against NBC (ESSO), *supra.*

56. Sherwyn M. Heckt, 40 FCC 2d 1150 (1973). Licensee KREM-TV editorialized in favor of an Expo 74 for Spokane, and a supporting bond issue. There was a disparity in the time offered for anti-bond viewpoints. The station rejected an anti-bond spokesman, and was held to have a reasonable explanation (the spokesman did not appear to represent groups for which he claimed to speak). The station showed it had actively sought to obtain the views of leading spokesmen for the opposition, and did present them.

57. The specter of renewal jeopardy for failure to comply fully with the fairness doctrine can have a serious inhibiting effect, as the Commission recognized in saying that it

reviewed a particular ruling is no bar, for this point was not raised. Indeed, even as to points that were raised, the Court was careful to say that it would be alert to reexamine its assumptions upon an appropriate showing.

We do not think, however, that the present case is an appropriate vehicle for determination of the contention presented by amicus. It is resisted by petitioners, who seek reversal but not on this basis, which might enhance their risk. Moreover, it was not expressly considered by the Commission. While amicus states that a copy of the underlying study, see footnote 51, *supra*, was distributed to each Commissioner prior to the Commission's consideration of this case, that is not the same thing as putting the matter in issue in the proceeding. The proposal is one that merits consideration by the Commission before it can be discussed by this court as a legal imperative.[58] We abstain, then, from any determination in this case concerning the merits of the proposition put by amicus curiae.

## V. APPLICATION OF THE FAIRNESS DOCTRINE TO NEWS DOCUMENTARIES

Our assumption of the propriety of the FCC's current practice that it may make rulings whether particular programs violate the fairness doctrine does not lessen our concern as to those rulings; it rather enhances the need for careful scrutiny, particularly where, as here, a ruling is challenged on the ground that it displaces the judgment entrusted to the broadcast journalist.

### A. *The Function of the FCC*

The principal controversial issue the Commission identified for the "Pension" program is "the overall performance of the private pension plan system." In NBC's submission, the focus of the program was the existence of abuses, of "some problems in some pension plans." While one understands NBC's point as made, it might be refined as a statement that NBC was engaged in a study in abuses and did not separately examine how pervasive those abuses were. On what basis did the Commission reject NBC's position, and accept AIM's view that the point of the program was the performance of the common run of pension plans?

The staff ruling of May 2, 1973, said this (p. 11):

> The Pensions program thus did in fact present views which were broadly critical of the performance of the entire private pension system and explicitly advocated and supported proposals to regulate the operation of all pension plans. Your judgments to the contrary, therefore, cannot be accepted as reasonable.

One is struck by the palpable flaw in the staff's reasoning. The staff actually put it that because the staff found as a fact that the program was broadly critical of the entire private pension plan system, NBC's contrary judgment "therefore" cannot be accepted as reasonable. The flaw looms the larger, in that it appears in the ruling of the staff of an agency operating under the Rule of Administrative Law. Under that Rule, agencies daily proclaim that their findings of fact must be upheld if reasonable and if supported by substantial evidence, even though there is equal and even preponderant evidence to the contrary, and even though the courts would have found the facts the other way if they had approached the issue independently.

would consider refusing renewal only when a most substantial and fundamental issue is presented. *See* Hunger in America, 20 FCC 2d 143, 150 (1969).

58. Amicus himself recognizes the desirability of particular rulings for the personal attack and political editorializing rules. *See* Amicus Brief at 14 n. 28: "[T]hese are specific rule situations which do not involve any 'stop-time' or 'stop-watch' considerations. There is also a need for prompt rulings as to political broadcasts."

The Commission's opinion of December 3, 1973, corrected the staff's error of logic, but it made a mistake of law. It stated (see para. 17, JA 210):

> The specific question properly before us here is therefore *not whether NBC may reasonably say* that the broad, overall "subject" of the "Pensions" program was "some problems in some pension plans," but rather whether the program did *in fact* present viewpoints on one side of the issue of the overall performance and proposed regulation of the private pension system. [emphasis added.]

Thus the Commission ruled that even though NBC was reasonable in saying that the subject of "Pensions" program was "some problems in some pension plans," in determining that this was the essential subject of the program, its dominant force and thrust, nevertheless NBC had violated its obligation as a licensee, because the Commission reached a different conclusion, that the program had the effect "in fact" of presenting only one side of a *different* subject.

The Commission's error of law is that if failed adequately to apply the message of applicable decisions that the editorial judgments of the licensee must not be disturbed if reasonable and in good faith. The licensee has both initial responsibility and primary responsibility. It has wide discretion and latitude that must be respected even though, under the same facts, the agency would reach a contrary conclusion.

The pertinent principle that the Commission will not disturb the editorial judgment of the licensee, if reasonable and in good faith, is applicable broadly in fairness doctrine matters. It has distinctive force and vitality when the crucial question is the kind raised in this case, *i. e.*, in defining the scope of the issue raised by the program, for this inquiry typically turns on the kind of communications judgments that are the stuff of the daily decisions of the licensee. There may be mistakes in the licensee's determination. But the review power of the agency is limited to licensee determinations that are not only different from those the agency would have reached in the first instance but are unreasonable.[58a]

---

58a. Subsequent to the preparation of this opinion, a recent notice setting forth the FCC's present views on the fairness doctrine came to our attention. Fairness Doctrine and Public Interest Standards: Fairness Report Regarding Handling of Public Issues, 39 Fed.Reg. 26372 (1974). That order is presently being challenged on appeal in National Citizens Committee v. FCC, No. 74–1700 (D.C.Cir., filed July 3, 1974). In paragraphs 32–35, the Commission considers the problems in "the determination of the specific issue or issues raised by a particular program." The Commission states: "This would seem to be a simple task, but in many cases it is not. Frequently, resolution of this problem can be of decisional importance. . . . [A] broadcast may avoid explicit mention of the ultimate matter in controversy and focus instead on assertions or arguments which support one side or the other on that ultimate issue. [The Commission offers a hypothetical instance of a heated community debate over a proposed school bond, with the broadcast referring to conditions stressed by advocates of the bond although the spokesman does not explicitly mention or advocate passage of the bond.] [We] would expect a licensee to exercise his good faith judgment as to whether the spokesman had in an obvious and meaningful fashion presented a position on the ultimate controversial issue [approval of a bond]. . . . If a licensee's determination is reasonable and arrived at in good faith, however, we will not disturb it." *Id.* at 26376.

We find this exposition congruent with—and indeed supportive of—the approach taken in this opinion. The Commission also states, in a preceding section, that on the question whether an issue is "controversial" and of "public importance" it has not been able to develop detailed criteria, and continues (par. 29): "For this very practical reason, and for the reason that our role must and should be limited to one of review, we will continue to rely heavily on the reasonable, good faith judgments of our licensees in this area." *Id.* at 26376.

While the Supreme Court's recent opinions in non-broadcast areas do not undercut a role for the Commission in the fairness doctrine, the underlying principles underscore the appropriateness of confining that role.

In Columbia Broadcasting System v. Democratic National Committee, *supra*, the Court stressed the wide latitude entrusted to the broadcaster. See 412 U.S. at 110–111, 93 S.Ct. at 2090–2091:

. . . . . .

Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations.

\* \* \* \* \* \*

The broadcaster, therefore, is allowed significant journalistic discretion in deciding how best to fulfill the Fairness Doctrine obligations, although that discretion is bounded by rules designed to assure that the public interest in fairness is furthered.

While the government agency has the responsibility of deciding whether the broadcaster has exceeded the bounds of discretion, the Court makes clear that any approach whereby a government agency would undertake to govern "day-to-day editorial decisions of broadcast licensees" endangers the loss of journalistic discretion and First Amendment values. (412 U.S. at 120–121, 93 S.Ct. at 2095)

What is perhaps most striking and apt for present purposes is the figure used by Chief Justice Burger wherein the licensee is identified as a "free agent" who has *initial and primary* responsibility for fairness, balance, and objectiv-

ity," with the Commission serving as an "overseer" and "ultimate arbiter and guardian of the public interest." [59] [Emphasis added.]

Our own decisions [60] amplify these basic propositions. Judge Tamm's opinion for the court in Democratic National Committee v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891 (1972) serves as a compendium and a wrap up. That opinion refers to:

(1) Mid-Florida Television Corp., 40 FCC 2d 620, 621 (1964), that the mechanics of achieving fairness "is within the discretion of each licensee, acting in good faith."

(2) Applicability of the Fairness Doctrine, 29 Fed.Reg. 10416, 40 FCC 598, 599 (1964):

[T]he licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation—as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present such viewpoints, and all the other facets of such programming.

(3) The concept that the Commission will "exercise substantial restraint in this area." *Id.*:

[T]he Commission's role is not to substitute its judgment for that of the li-

---

In addition to *Tornillo*, quoted above, see e. g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 345–346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), referring to the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not."

59. *See* 412 U.S. at 117, 93 S.Ct. at 2094:
 The regulatory scheme evolved solely, but very early the licensee's role developed in terms of a "public trustee" charged with the duty of fairly and impartially informing the listening and viewing public. In this structure the Commission acts in essence as an "overseer," but the initial and primary responsibility for fairness, balance, and objectivity rests with the licen-

see. This role of the Government as an "overseer" and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic "free agent" call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a "tightrope" to preserve the First Amendment values written into the Radio Act and its successor, the Communications Act.
 While this part (III) of the opinion of Chief Justice Burger was written for himself and Justices Stewart and Rehnquist, this particular paragraph is not contrary to the views of the other justices.

60. See Part III, *supra*.

**1120**

censee as to any of the above programming decisions, but rather to determine whether the licensee can be said to have acted reasonably and in good faith.

(4) This court's other opinions [61] and such references therein as "the permissive 'reasonableness' standard of the fairness doctrine." The court therefore concluded (460 F.2d at 903):

> Thus, in opinion after opinion, the Commission and the courts have stressed the wide degree of discretion available under the fairness doctrine.
>
> . . .

The range of journalistic discretion is not limited to the issue of how to comply with the fairness doctrine in the details of presenting both (or more) sides of an issue when the issue has been subsequently defined by the Commission. This would be narrow and artificial. In CBS, the Court, in discussing the broadcaster's "significant journalistic discretion" under the fairness doctrine pointed out that the licensee must consider "such questions as whether the subject is worth considering" (412 U.S. at 111 & n. 9, 93 S.Ct. at 2091).[62] And the Court cited with approval a passage, as old as the fairness doctrine itself, wherein the Commission stated that the licensee "is called upon to make reasonable judgments in good faith on the facts of each situation—as to whether a controversial issue of public importance is involved." [63]

■ Where the Commission has relatively specific rules under the fairness doctrine, as in the personal attack and political editorializing rules, it has a more ample role in determining whether the licensee was in compliance with his obligations. But when the claim is put

in terms of the general obligation concerning controversial issues of public importance, there is primary reliance on the journalistic discretion of the licensee, subject to supervision by the government agency only in case he exceeds the bounds of his discretion. This yields as a corollary that if the broadcast licensee was reasonable in his premise, and his projection of the subject-matter of the program, he cannot be said by the supervising agency to have abused or exceeded his sound discretion.

■ The FCC's function becomes that of correcting the licensee for *abuse* of discretion, as our function on judicial review is that of correcting the agency for *abuse* of discretion.

■ The Commission in this case agreed that there was wide latitude of journalistic discretion in regard to news and news documentary programs. It said (par. 25), that it "cannot uphold a patently unreasonable exercise of that discretion which would deny the right of the public to be informed as to both sides of a controversial issue which in fact has been presented by such programming." The Commission's reference to "patently unreasonable exercise of discretion" by the licensee, as the standard that warrants agency intervention, captures the spirit of the scope of discretion entrusted to the licensee. We need not dwell on abstract issues such as whether a licensee whose exercise of discretion is unreasonable may validly claim it was not "patently" unreasonable; this is more a matter of mood than rule. In this case, we think it plain that the licensee has not been guilty of an unreasonable exercise of discretion. Where the Commission may have started on the wrong path in its approach is the

61. *E. g.*, in Green v. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323, and in BEM for Vietnam Peace v. FCC, 146 U.S.App.D.C. at 187, 450 F.2d at 648.

62. Quoting Report on Editorializing by Broadcast Licensees, 13 FCC 1246, 1251–2 (1949). *See also* L. Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv.L.

Rev. 768, 772 (1972). "[T]he broadcaster has considerable discretion in operating the doctrine. He is to decide whether a question raises an issue of public importance."

63. Applicability of the Fairness Doctrine, *supra*, 40 FCC at 599, approved by the courts in *e. g.*, DNC v. FCC, *supra*, 148 U.S.App. D.C. at 392, 460 F.2d at 900.

place where the Commission undertook to determine for itself as a fact whether "the program did in fact present viewpoints on one side of the issue of the overall performance and proposed regulation of the private pension system." This is not a sufficient basis for overturning the licensee. It is not clear from the Commission's opinion that it also appreciated the need for a finding of abuse of discretion by the licensee in concluding that no controversial issue had been presented. In any event, we are clear that the licensee's discretion was not abused in this respect.

On this issue, whether there was an abuse of discretion in NBC's determination concerning the subject matter of the "Pensions" documentary, the staff —which did see that this was the real issue—proceeded to resolve it adversely to the licensee by concluding that NBC was unreasonable in determining that the subject of the program was some problems of private pension plans. The Commission backed away from that staff conclusion.

A substantial burden must be overcome before the FCC can say there has been an unreasonable exercise of journalistic discretion in a licensee's determination as to the scope of issues presented in the program. Where, as here, the underlying problem is the thrust of the program and the nature of its message, whether a controversial issue of public importance is involved presents not a question of simple physical fact, like temperature, but rather a composite editorial and communications judgment concerning the nature of the program and its perception by viewers. In the absence of extrinsic evidence that the licensee's characterization to the Commission was not made in good faith, the burden of demonstrating that the licensee's judgment was unreasonable to the point of abuse of discretion requires a determination that reasonable men viewing the program would not have concluded that its subject was as described by the licensee.[64]

Here the Commission concluded that the program involved a controversial issue, namely the overall performance of the private pension plan system. If the agency had free rein to make the critical finding we might well support this conclusion as a reasonable exercise of agency discretion. But here the primary discretion was not vested in the government agency but in the licensee. And the agency could not premise any order on a conclusion contrary to that of the licensee unless it was willing and able to take the additional step—which it deliberately avoided—of finding the licensee's conclusion to be unreasonable. "A conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." [65]

The situation here is unlike the case of an agency's review of a fact finding proposed by its hearing officer. In that situation, it is the agency that has the primary discretion, and it may differ with its hearing officer even though his finding is supported by substantial evidence.[66] Even there, where the agency has primary discretion, its "departures from the Examiner's findings are vulnerable if they fail to reflect attentive consideration to the Examiner's decision." [67] Certainly in a situation where it is the licensee that has primary discretion, and his judgment as to dominant impact is substantially supported by responsible persons skilled in

64. In this regard, see the discussion of the conclusions of professional reviewers, part VI. A, *infra.*

65. Western Airlines v. CAB, 161 U.S.App.D. C. 319, 326, 495 F.2d 145, 152 (1974).

66. *Id.* at 327, 495 F.2d at 153. Lorain Journal Co. v. FCC, 122 U.S.App.D.C. 127, 351 F.2d 824 (1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

67. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), and case cited.

judging these matters, this must be given attentive consideration before determining the licensee's judgment was unreasonable.

## B. *The Function of the Reviewing Court*

 When an agency purports to exercise regulatory discretion conferred by Congress, a court reviewing its order generally accords wide latitude to the agency. The court has responsibilities and restraints. Its responsibility is. to assure that the agency has not abused or exceeded its authority, that every essential element of the order is supported by substantial evidence, and that the agency has given reasoned consideration to the pertinent factors.[68] The restraint arises out of the consideration that industry regulation has been entrusted by Congress "to the informed judgment of the Commission, and not to the preferences of reviewing courts." [69] If an agency has "genuinely engaged in reasoned decision-making . . . . the court exercises restraint and affirms the agency's action even though the court would on its own account have made different findings or adopted different standards." [70]

 In the case of the fairness doctrine, a reviewing court is under the same injunction against injecting its own preferences as the rule of decision. And so when the Commission, in the exercise of its discretion, affirms the licensee's exercise of its discretion, the rôle of the court is most restricted.[71] But the court has a greater responsibility than is normally the case, when it reviews an agency's fairness rulings that upset the licensee's exercise of journalistic discretion, both because the area is suffused with First Amendment freedoms [72] and because Congress has determined that the interest of the public, and its right to know, is furthered by giving primary discretion not to the government agency but instead to the regulated licensee. Congress has sharply narrowed the scope of agency discretion—which the court must see is not exceeded—to a government intervention permissible only for abuse of the licensee's journalistic judgment. If the Commission can claim wide latitude in and deference for its exercise of prerogative to overrule and discard the journalistic judgments of the broadcast licensees, the very premise of the legislative structure is undermined.

In Judge Tamm's phrase, in another case involving a Commission determination that the licensee violated the fairness doctrine, and aspects of intrusion on the licensee's journalistic freedoms: "Not only must the Commission take a hard look at the case in this light but so must this court." [73]

To restate, even in a fairness doctrine case the court is not given carte blanche or an authority to interpolate its own discretion or judgment as to what should be done by the agency or what should have been done by the licensee.

---

68. Mobil Oil Co. v. FPC, 417 U.S. 283, 94 S. Ct. 2328, 41 L.Ed.2d 72 (1974) ; *see also* Permian Basin Area Rate Cases, 390 U.S. 747, 791–792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

69. 390 U.S. at 767, 88 S.Ct. at 1360.

70. Greater Boston TV Corp. v. FCC, *supra,* 143 U.S.App.D.C. at 393, 444 F.2d at 851.

71. *E. g.,* DNC v. FCC, *supra,* 148 U.S.App. D.C. at 404, 460 F.2d at 912; Neckritz v. FCC, 446 F.2d 501 (9th Cir. 1971), citing American Tel. & Tel. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

72. *Compare* WAIT Radio v. FCC, 135 U.S. App.D.C. 317, 418 F.2d 1153 (1969).

73. Brandywine-Main Line Radio, Inc. v. FCC, *supra,* 153 U.S.App.D.C. at 341, 473 F.2d at 52 (1972). Judge Wright did not consider the fairness doctrine ruling. Chief Judge Bazelon, dissenting, stated that the Commission's application of the fairness doctrine violated constitutional safeguards.

The general "hard look" doctrine of the Rule of Administrative Law originated in a case reviewing an FCC action, *see* WAIT Radio v. FCC, *supra,* though it has been extended to other areas, *see e. g.,* Natural Resources Defense Council v. Morton, 148 U. S.App.D.C. 5, 458 F.2d 827 (1972).

But a court is properly exercising the high judicial function of assuring that agencies respéct legislative mandates [74] when it studies the record to make certain that the Commission has not interpolated its own judgment and wrested the primary discretion Congress placed in the licensee, without making the requisite showing of abuse of the licensee's journalistic discretion.

C. *The Need for Selection Latitude of Broadcast and Investigative Journalism*

The doctrine that respects licensee determination, if not unreasonable, concerning the issues tendered in a news broadcast, is a matter of concern for the vitality of broadcast journalism generally, and for investigative journalism in particular.

The Commission's opinion in this case reaffirmed—

> our recognition of the value of investigative reporting and our steadfast intention to do nothing to interfere with or inhibit it. See WBBM–TV, 18 FCC 2d 124, 134 (1969); Hunger in America, 20 FCC 2d 143, 150 (1969).

In *Hunger in America, supra,* it not only commended CBS "for undertaking this documentary on one of the tragic problems of today" but it undertook to clarify its policy as to a claim that a licensee deliberately distorted the news, to avoid concern lest its inquiry in that case "may tend to inhibit licensees' freedom or willingness to present programming dealing with the difficult issues facing our society." 20 FCC 2d at 150. It reiterated the ruling of ABC, 16 FCC 2d 650 (1969), that it would require extrinsic evidence of *e. g.,* a charge that a licensee staged news events. "Otherwise, the matter would again come down to a judgment as to what was presented, as against what should have been presented —a judgmental area for broadcast journalism which this Commission must eschew." 16 FCC 2d at 657–58.

In the world of news documentaries, there is inherently an area of "judgment as to what was presented." And if its judgment is not unreasonable, the licensee cannot fairly be held faithless to fairness doctrine responsibilities.

Investigative reporting has a distinctive role of uncovering and exposing abuses. It would be undermined if a government agency were free to review the editorial judgments involved in selection of theme and materials, to overrule the licensee's editorial "judgment as to what was presented," though not unreasonable, to conclude that in the agency's view the expose had a broader message in fact than that discerned by the licensee and therefore, under the balancing obligation, required an additional and offsetting program.

The field of investigative exposures, as the Commission has noted, is one in which "[p]rint journalism has long engaged [and] been commended," [75] and to which broadcast journalism, also part of the press is "no less entitled." Even for print journalism, not subject to the extreme time coverage limitations of broadcasters, a requirement like the Commission's would be considered a "millstone" burdening investigative reporting. We refer to the affidavit supplied to the Commission by J. Edward Murray, associate editor of the Detroit Free Press and immediate past president of the American Society of Newspaper Editors. These are representative excerpts:

> The whole process of investigative reporting is a complex and sensitive equation involving editors with high purpose and intuition, reporters with skill and courage, and publishers willing to incur heavy expense and the risk of offending both public opinion and advertisers. This equation, as I said, is powered by the drive to correct evils in the society.
>
> If we weight the equation with the requirement that the press look for,

---

74. National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 281, 443 F.2d 689, 696 (1971).

75. WBBM-TV, 18 FCC 2d 124, 134 (1969).

and report, good wherever it finds and reports evil, we might as well forget investigative reporting. We will have overwhelmed it with the deadly commonplace of things as they are.

\* \* \* \* \* \*

[I]t would be commonplace newspaper procedure that if an editor decided that some private pensions are flawed or useless, and published a typical expose to this effect, the expose would simply assume that the majority of private pension plans were more or less in acceptable shape. Otherwise, the forces of both law and business would have corrected so obvious a deficiency.

\* \* \* \* \* \*

The investigative reporter's thrust is against presumed evils in society. If he must always give an equivalent weight to the good (which is now presumed) in the situation he is investigating, his thrust would become so dulled as to be boring—and unread. Newspapers, including the Detroit Free Press, investigate and expose policemen who are on the "take" in the dope rackets. If an equivalent weight or time must be given to policemen who are not on the "take", the whole campaign becomes so unwieldy. and pointless as to be useless.

\* \* \* \* \* \*

The suggestion of a positive non-expose, in the wake of an original negative expose, falls of its own weight. No one would read it. It would thus be a waste of space. And it would add one more millstone to the already considerable burden of legitimate investigative reporting. (JA 140–42.)

To like effect are affidavits in the record from broadcast journalists.[76]

The basic point merits emphasis: A report that evils exist within a group is just not the same thing as a report on the entire group, or even on the majori-

ty of the group. An expose that establishes that certain policemen have taken bribes, or smoked pot, or participated in a burglary ring, is not a report on policemen in general. It may be that the depiction of particular abuses will lead to broader inferences. Certainly severe deficiencies within an industry may reflect on the industry as a whole. When one bank fails, others may suffer a run. But the possible inferences and speculations that may be drawn from a factual presentation, are too diverse and manifold—ranging, as they inevitably must, over the entire span of viewer predilections, characteristics and reactions—to serve as a vehicle for overriding the journalistic judgment.

There is residual latitude in the Commission to condemn the journalist's vision as an unreasonable exercise of discretion. But if the Commission is to condemn a journalist's vision as excessively narrow, it must show that its own vision is broadgauged. Yet here we are reviewing a Commission opinion that says: "It is difficult to see why a network would devote its time and effort to a program with no broad impact or value." (Par. 20). But abuses in an industry are of interest to the public, and merit a documentary, if they exist in any significant amount, even though they are not the general rule. Failures on automobiles are an example. Yet this obvious underpinning for an editorial judgment to run a limited expose was not referred to by the Commission.

The Commission simply neglected our caution in Healey v. FCC, *supra*, 460 F. 2d at 922:

Petitioner's basic misapprehension here is a confusion of an issue over newsworthiness with a "controversial issue of public importance." Merely because a story is newsworthy does not mean that it contains a controversial issue of public importance.

---

76. An apt example appears in Mr. David Brinkley's affidavit concerning a program he narrated on highway construction: "I did not think at that time that I was obliged to recite (or find someone to recite) that not all highway construction involves corruption, that many highways are built by honorable men, or the like." JA 132–33.

The point is fundamental. In a case where NBC has made a reasonable judgment that a program relates to, and the public has an interest in knowing about, the "broken promise" abuses that its reporters have identified in various private pension plans, and there is no controversy concerning the existence in fact of such abuses, then the balancing of the fairness doctrine cannot permit the intrusion of a government agency to make its own determination of the subject and thrust of the program as a report that such abuses feature private pensions generally, and with such enlargement to a controversial status to burden the reporting with the obligation of providing an opposing view of the escalated controversy.

## VI. THE PRESENT RECORD SUSTAINS THE LICENSEE'S EDITORIAL JUDGMENT AGAINST A CHARGE OF REQUISITE BAD FAITH OR UNREASONABLENESS

This is the first case in which a broadcaster has been held in violation of the fairness doctrine for the broadcasting of an investigative news documentary that presented a serious social problem. We have already stated that the Commission used an unsound legal standard in reviewing the licensee's exercise of discretion. What result ensues —on the record before us—from application of the sound legal standard?

### A. The Issue As to the Issue

In law, as in philosophy, the task of ascertaining the sound rule or precept often turns significantly on rigor in the statement of the problem. Nowhere is this more the case than in the application of the fairness doctrine, for in regard to the determination that a program raised a "controversial issue of public importance," the first and often most difficult step is "to define the issue." [77]

In holding that "Pensions" presented views advocating only one side of a controversial issue of public importance, the Commission defined that issue in these terms: "that issue being the overall performance of the private pension system and the need for governmental regulation of all private pension plans." (Par. 19).

In so defining the issue, the Commission overruled NBC's judgment. NBC was called to answer AIM's complaint that NBC had given a one-sided view of a controversial issue of public importance—in its "picture of the private pension system of the United States." [78] NBC responded that "Pensions" was primarily designed to expose failures found in some private plans rather than to evaluate the overall performance of the private pension system and that the program did not urge any specific legislative or other remedies. [79]

The controversial "issue" identified by the Commission reflects a compound of issues—one, whether problems exist in private pension plans generally, and two, whether overall legislation should be enacted to remedy those problems. In aid of analysis, these issues will be discussed separately.

█ In our view, the present record sustains NBC as having exercised discretion, and not abused discretion, in making the editorial judgment that what was presented, in the dominant thrust of the program, was an expose of abuses that appeared in the private pension industry, and not a general report on

---

77. Green v. FCC, 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971) ; Healey v. FCC, 148 U.S.App.D.C. 409, 412, 460 F.2d 917, 920 (1972).

78. AIM also said this was a "distorted" picture, but the FCC dropped the "distortion" charge out of the case. See text accompanying notes 10–13, supra.

79. Letter of February 14, 1973 to FCC (JA 40), recording NBC's judgment that the program "constituted a broad overview of some of the problems involved in some private pension plans" and "did not attempt to discuss all private pension plans, nor . . . urge the adoption of any specific legislative or other remedies." JA 41.

**1126**

the state of the industry. If this judgment of NBC may stand, there is no showing of a controversial issue. The staff's ruling that NBC was unreasonable in this judgment was not sustained by the Commission. And in our view, the present record does not establish a basis for the conclusion that the licensee's judgmental conclusion may be set aside as unreasonable and as constituting an abuse rather than a permissible exercise of discretion.

1. *The description of the program in TV columnist reviews.*

NBC offered the Commission an exhibit showing the appraisal of some 25 television critics who reviewed the program, appraisals made contemporaneously, in September, 1972, immediately or shortly after the broadcast. Typically, the critical comments were favorable, reporting that the program was an important and worthwhile public news service, "superlative investigative reporting." Many noted that most viewers were likely glued elsewhere, as was apparently the case, though perhaps one may take heart from Clarence Peterson's observations in the Chicago Tribune: "Most viewers will have watched Marcus Welby instead but it takes only a few hard-nosed skeptics to rattle the cage."

More important for present purposes are the reviewers' descriptions of the program. These appear in Appendix B to this opinion. In general, the reviewers' appraisals of the nature of the program are consistent with NBC's editorial judgment. Examples include the Philadelphia Daily News: "A potent program about pitfalls and failures of some private pension plans of business and unions . . . it was an angry, incisive study that focused on some people who felt cheated by their blind faith in Pensions." More succinct was UPI: "Tough study of the failure of some private pension systems."

The note that the program undercut a "blind faith" in pensions program was struck in a constructive way in reviews like that in the Chicago Tribune: "Pen-

sion administrators may face some hard questions from employees when they get to work this morning. If so, NBC Reports will have done its job."

Other comments cut from a different angle. Thus, the review in Business Insurance put it: "The program was by no means objective; it could not have been . . . there was just not enough time to do it thoroughly. [Newman did] point out that there were many good pension plans." The Denver Post said the documentary had "a disorganized approach" and added: "Likewise nothing was said about what makes good pension systems work . . . but NBC should be commended for publicizing a condition of social anarchy." And intervenor AIM brings to our attention that John J. O'Connor in the New York Times has written: "The NBC program strongly implied that 90 per cent were failures. The title was, 'Pensions: The Broken Promise,' not 'Pensions: Broken Promises.'" AIM stresses that reviews in the Boston Globe, Chicago Today and Hollywood Reporter, reflected reactions to the program as commenting on the private pension system as a whole.

The Commission's opinion dismissed the newspaper reviews. It stated its determination of the question must rest with the program itself, and added (fn. 4): "Such brief and general one-line summaries provide no information as to what particular views on the subject of pensions may have been presented in the one-hour documentary, and hence are of little value in determining the applicability of the fairness doctrine. . . ."

██ Obviously, television reviews cannot be conclusive, for the obligation of licensees and the Commission to determine fairness doctrine questions is not delegable. The opinion of this court does not depend in any critical measure on television reviews. Yet we are here concerned not with some broad question of fairness doctrine responsibility, but with something that is not only closer to a question of fact—the description of the program—but is a matter on which

the reviewer is expected to make an accurate report to the public as his primary task. Even if the Commission believed the reviewer to be wrong, it should have considered whether the review did not have more than minimal value on the issue of the NBC's reasonableness in saying that the subject of the program was that of abuses discovered, of some problems in some pension plans. If this was the primary thrust of the program, as discerned by persons trained to view such programs attentively and report their description to the public, it is a substantial factor—though, we repeat, not a conclusive one—to an agency exercising its surveillance role under correct standards of review. As for the Commission's comment that the brief format itself undercuts any significance for these newspaper reviews, this is belied by the quite different reactions recorded in the different newspaper reviews.

2. *Application of the correct standard.*

Had the Commission applied the correct standard of review, the consequence clearly would have been an acceptance of NBC's position as a reasonable statement of the subject of the "Pensions" broadcast. There were a few explicit statements of views on the overall performance of private pension plans that are of no consequence in terms of fairness doctrine, as will be presently seen.* Otherwise, the plain heft of the program was the recitation of case histories that identified shortcomings of private pensions, and various interviews that identified the abuses in more general terms. But effective presentation of problems in a system does not necessarily generate either comment on the performance of the system as a whole, or a duty to engage in a full study. This is plain from our discussion of investigative journalism.

█ The licensee does not incur a balancing obligation solely because the facts he presents jar the viewer and

cause him to think and ask questions as to how widespread the abuses may be.

█ The licensee's judgment on an issue of investigative journalism is not to be overturned unless the agency sustains a heavy burden and makes a clear showing that the licensee has been unreasonable, that there has been an abuse of journalistic discretion rather than an exercise of that discretion. We have been presented no basis for sustaining the view that there is such unreasonableness on the part of a licensee who presents undisputed facts—and no party has contended that the abuses identified by NBC do not exist—because it has failed to treat them as a general indictment of a system.

B. *Comments on the "Overall" Performance of the Private Pension Plan*

In previous sections of this opinion we have identified the dangers to broadcast journalism, and investigative reporting in particular, if descriptions of abuses in a system are converted inferentially into a broadside commenting adversely on the overall system.

A separate question is presented, however, by the comments in the program that differs from the description of particular evils.

1. *Adverse comments on overall performance.*

We examine, seriatim, those passages of the "Pensions" program that may be taken as adverse comments on overall performance. We need not refine whether a fairness doctrine obligation is generated by this kind of comment, either alone or with some kind of FCC determination. For in this case, as we shall see, NBC provided offsetting material on the overall performance of pension plans. But this discussion will at least identify our concern with some of the problems. As we shall see, some statements are unquestionably to be given a different reading.

---

\* In Part V–B.

(1) The short passage spoken by a MAN (Tr. 1), who begins that the pension system is essentially a consumer fraud, and ends by saying it is "an insurance contract that can't be trusted." *Overall-Adverse.*

(2) Edwin Newman's statement (p. 2) that the availability of annual reports filed in the Labor Department "is a meager protection for the twenty-five million Americans who are in private pension plans."

Neither this nor the next sentence, that "very many of the hopes will prove to be empty" says that all, or even most, of the 25 million Americans will be unprotected. The statement that the mere filing of the reports is meager protection hardly seems controversial, as to the "very many" whose pension hopes will be lost by e. g., inability to meet stringent vesting provisions.

(3) Herbert Dennenberg, at Tr. 4: Paragraph ending "most pension funds are inadequate." This is *Overall-Adverse—Arguable.*

(a) Mr. Dennenberg says that those who retire under the plans typically receive only a thousand dollars a year, which is inadequate even with social security. This is a general comment, but we do not see what has been identified as a controversial issue. AIM's complaint of November 27, 1972, stresses:

> More than 5 million retired employees are receiving benefits from them [the plans] to the tune of about $7 billion a year.

This datum in AIM's complaint palpably confirms rather than contradicts $1,000 as a typical figure.[80] But if there is a controversial issue here which requires reference to AIM's datum, then it should be noted that this very fact was brought out on the "Pensions" program by Mr. Russell Hubbard of the National Association of Manufacturers (see Tr. 18).

(b) Whether a $1,000 annual amount is "adequate even with social security," is a value question.

The complaint of inadequacy of pensions is also, perhaps, one meaning that might be given to the caption of "broken promise"—if one posits that there was a promise of an "adequate" retirement income. There is plainly no unreasonable abuse of discretion for the licensee to determine that the complaint of "inadequacy," though surfacing in the program, is simply not the main thrust of the program, which basically turns on whether pension plans do pay out the amounts that were held out to the employees when their work was done, and if not, why not. The FCC, disagreeing with its staff, has held the fairness doctrine would be both unworkable, and an intolerably deep involvement in broadcast journalism, if every single statement, inference, or sub-issue, could be built up into a requirement of countering presentation.[81]

(c) Mr. Dennenberg also says that over half the people will have nothing at all from pension plans. See also Tr. 5: "There have been studies that indicate that most people won't collect." Under current plans, pension rights depend on a combination of longevity, endurance in specified employment for a minimum vesting period, and lack of termination of the plan, and Mr. Dennenberg describes this as "an obstacle course."

Again AIM does not contradict the basic fact asserted by Mr. Dennenberg. Its complaint compares 5 million receiving pensions with 30 million workers now covered. But it does not assert that the number who worked under pension plans but have failed to qualify for pensions stands below 5 million. And Mr. Dennenberg's statement is not too different in impact from one in a Washington Post article that AIM lauds as balanced journalism.[82] Obviously a

---

80. And AIM later cited with approval a Washington Post article that quoted Mr. Donald Landay of the Bureau of Labor statistics as saying: "The median benefit being paid is slightly over $100 a month."

81. In re NBC (Fairness ruling re Aircraft Owners and Pilots Assn.), 25 FCC 2d 735, 736 (1970).

82. After referring to instances of pensions lost by Mr. Duane, and by an employee

greater burden would have to be met by the FCC in identifying the existence and nature of a controversial issue of importance.

(4) Senator Harrison Williams (Tr. 4–5). Following a statement by Mr. Newman that many plans have restrictions and exlusions buried in fine print, comes Senator Williams' comment that the plans "suggest the certainty of an assured benefit upon retirement" which gives "a sense of false security."

> Newman: Senator, the way private pension plans are set up now, are the premises real?

> Williams: The answer is, they are not.

Senator Williams enlarges that he wants descriptions of the realities of plans that are clear and that do not require a lawyer.

Here again we have a general comment on the plans, that the eligibility requirements are not clearly identified. But we do not see wherein this comment has been identified by AIM, the Commission or its staff, as inaccurate, or as presenting a controversial issue.

(5) Victor Gotbaum (Tr. 12).

In these four lines appears: "Pensions in the private area are a mockery." *Overall-Adverse.*

(6) Edward Kramer (Tr. 12–13): Mr. Kramer and Mr. Gotbaum identify the feelings of people who have retired only to find they are living in squalor. These people, says Mr. Kramer, feel "cheated by the pension system, cheated by social security." This is essentially a complaint of the inadequacy of amounts of payments, rather than denial of pensions. See comment as to Mr. Dennenberg under (3).

(7) Mr. Ralph Nader (at Tr. 18): "I think time is running out. On the private pension systems. And it [sic] its

abuses continue to pile up, and if its enormous popular disappointments begin to be more and more revealed, it might collapse of its own weight, and social security will have to take up the slack." *Overall-Adverse.*

2. *Favorable comments on overall performance.*

Toward the conclusion of the program, comments were made, by Messrs. Hubbard, of the National Association of Manufacturers, and Anderson of the Bank of America, which the Commission recognized as generally favorable to the performance of the private pension plan system:

HUBBARD: Over a good number of years, the track record is excellent. It's unfortunate that every now and then some of the tragic cases make the newspapers and the headlines. But it's a question of perspective and balance. When you consider that there are thirty million people covered by the plans, that there are five million people receiving about seven billion dollars in benefits. I think that's a pretty good record. That's not to say that there aren't a few remaining loopholes that need closing but we ought to make sure that we don't throw out the baby with the wash water. (Tr. at 18.)

ANDERSON: You must remember that the corporation has set this plan up voluntarily. They have not been required by law to set it up. (Tr. at 18.)

ANDERSON: These pension plans are a part of a fringe benefit package. Like hospitalization insurance and so forth, but it's still a voluntary thing on the part of the corporation. (Tr. at 19.)

NEWMAN: This has been a depressing program to work on but we

---

whose company went out of business, the Post article states:

> These are not simply isolated horror stories. Experts say up to half the 30 to 35 million people now in jobs with pension plans may never receive a cent, because of

shifts to another job, company shutdowns or employer bankruptcy—a prospect that threatens millions of Americans with economic insecurity in old age.

The Post article is discussed further in fn. 86 and text thereto.

don't want to give the impression that there are no good private pension plans. There are many good ones, and there are many people for whom the promise has become reality. That should be said. (Tr. at 19.)

Moreover, Mr. Newman, earlier in the program, made specific reference to some generally good pension programs operated by Teamsters Unions:

> NEWMAN: . . . [I]n most respects, the pension programs run by the Chicago teamsters union locals are among the best. Benefits are generous and a teamster can retire as early as age fifty-seven. (Tr. at 9–10.)

### C. *Reasonable Balance*

 As the foregoing shows, there were a handful of comments on "overall performance" of the private pension plan system. Some were favorable, more were adverse, but there was adequate balance of both sides of that issue and a reasonable opportunity for presentation of both sides of that issue. The fairness doctrine "nowhere requires equality but only reasonableness." Democratic National Committee v. FCC, *supra*, 148 U.S.App.D.C. at 397, 460 F.2d at 905. On this aspect of the program, the FCC did not say, and in our scrutinizing review we do not consider it could rightfully say, that the licensee had failed to provide a reasonable opportunity for the presentation of contrasting approaches.

We repeat that Mr. Hubbard of N.A. M. brought out the fact given primary stress in AIM's complaint—that 5 million retirees were receiving $7 billion under private pension plans. As for AIM's notation that only 1 percent of pension plans have been terminated, while this precise statistic was not mentioned by Mr. Hubbard, he made the basic point that the overall track record is excellent, and the question is one of perspective and balance.

### D. *The Non-Controversial Nature of the Issue Whether Some Reform Legislation Should Be Enacted.*

The FCC concluded that the "Pensions" program "supported proposals to regulate the operation of all private pension plans." NBC does not deny, and it would be patently unreasonable for NBC to deny, that it broadcast its view that there was a need for legislative reform. We refer to Edwin Newman's concluding paragraph, in which he capped his notation that the situation involved various technical problems (portability, funding, insurance, fiduciary relations) by saying (Tr. 20):

> These are matters for Congress to consider and, indeed, the Senate Labor Committee is considering them now. They are also matters for those who are in pension plans. If you're in one, you might find it useful to take a close look at it.
>
> Our own conclusion about all of this, is that it is almost inconceivable that this enormous thing has been allowed to grow up with so little understanding of it and with so little protection and such uneven results for those involved.
>
> The situation, as we've seen it, is deplorable.

An entirely different problem is presented by the Commission's conclusion that there was a controversial issue in "the need for governmental regulation of all private pension plans." The Commission stressed (para. 19) that at the time of the program "Congress was engaged in a study of private pension plans and considering proposed legislation for their regulation—legislation which was opposed in whole or in part by various private and public groups and spokesmen."

 The fairness doctrine would require that when a controversial bill is pending, if advocates of its passage have access to a licensee's facilities, so must opponents.[83] But the Commission whol-

---

83. In the Matter of Editorializing by Broadcast Licensees, 1–3 F.C.C. 1246, 1250–51 (1949).

ly failed to document its premise that there is a controversial issue in the assertion that there is a need for some remedial legislation applicable generally to pension plans. The record does not support the Commission's statements in its opinion (at para. 16, 23):

> . . . NBC does not dispute the Bureau's finding that at the time the "Pensions" program was broadcast the overall performance and proposed regulations of the private pension system constituted a controversial issue of public importance within the meaning of the fairness doctrine.[3]
>
> 3. The Bureau based this finding on AIM's uncontradicted submissions that proposals for the regulation of all private pension plans were pending before the Congress and that such proposals were opposed in whole or in part by "various groups and spokesmen including the National Association of Manufacturers, several labor unions, the Chamber of Commerce of the United States, and the Nixon administration." 40 F.C.C.2d 958, at 967.

\*　\*　\*　\*　\*　\*

NBC does not dispute that there are many private and public groups and spokesmen who oppose the view that the overall performance of the private pension system is so "deplorable" as to require remedial legislation.

There was no occasion for NBC to reply to a claim that was never made. AIM's complaint to the FCC dated November 27, 1972, made no reference whatever to a stand on legislation as a controversial issue; it said criticism of pension plans was such an issue. AIM's letter to NBC dated December 6, 1972, stated that it was struck by a reference in NBC's letter to the FCC that it had concluded that a program on pensions would be timely in view of Senate Reports 92–1150 and 92–1224. AIM added

that this bill was opposed by some labor unions, the Chamber of Commerce and the NAM. AIM added: "While your program did not endorse any specific legislative proposal, it did emphasize the need for new regulatory legislation and it pointed out that the Senate Labor Committee had the matter under consideration." From this circumstance, and the fact that Senator Schweiker had inserted the transcript of the Pensions program in the Congressional Record for October 3, 1972, as dramatically showing the need for pension reform,[84] AIM evolved a contention this was a program "inspired by a contested legislative proposal" and presenting one side of that contest. Neither the staff nor the Commission supported AIM's efforts at such extrapolation or extreme conjecture.[85]

This case does not involve any controversial issue derived from favoring certain specific proposals under consideration by Congress.[86] And AIM did not contend before the FCC that at the time of the broadcast there were any significant groups opposed in principle to the idea of remedial legislation. Since NBC was not called on to dispute what was not asserted, the staff's statement is lacking in support and too lifeless to be a basis for a key Commission premise.

AIM transmitted a Washington Post article on pensions as one "exemplifying good journalism." In certain respects, the Post article, which recites the case of Stephen Duane (A&P) and others, and states these are not simply isolated horror stories (see fn. 82, *supra*) resembles the NBC program. In other respects it is different, for the Post article does undertake to examine and analyze the different specific legislative proposals made, and the arguments for and against, including "strong business and

---

84. 118 Cong.Rec., S 16,599 (daily ed. Oct. 3, 1972). Senator Schweiker stated: "This outstanding television special portrayed vividly the plight of the individual worker who is faced with the loss of expected pensions because of situations totally beyond the worker's control."

85. AIM's pleading in this court goes so far as to say: "AIM has suggested that NBC produced the documentary in collaboration with the promoters of this legislation with the intention of arousing public opinion in favor of the legislation in question." AIM's Opposition to Motion for Expedited Appeal at 3.

**1132**

Nixon administration opposition to some of the more stringent reform proposals." But the fact that the Post ran an article on specific legislative proposals, their pros and cons, does not mean NBC was obligated to do so. In NBC's program Edwin Newman said that the question of particular approaches was difficult, beyond the scope of the program and "matters for Congress to consider."

We know as judges, as we knew as lawyers, that there is a profound difference between the kind of materials that can be presented effectively in oral form (on argument) and in written form (in briefs).

NBC specifically pointed out to the Commission on appeal that the Post article esteemed by AIM had stated: "The problem, then, is not whether there will eventually be pension reform legislation, but what kind." [86]

NBC's letter of July 13, 1973, called the Commission's attention to the wide span of sources supporting some form of remedial legislation.[87] And NBC specifically emphasized that there was no indication of any meaningful view opposing the concept of some reform legislation (JA 163, 171–172):

> In the 786 page transcript of the most recently published Congressional hearings with respect to pensions, in which 35 witnesses testified on all sides with respect to pensions, *not one* took the position that some kind of meaningful reform (usually mandated by legislation) of the pension system was unwarranted or should not be instituted. (Hearings of Subcommittee on Labor or of the Senate Comm. on Labor and Public Welfare, US Senate, 93rd Cong., 1st Sess., 1973.) Nor is that view attributed to anyone in the

*Washington Post* article on pensions annexed to Mr. Kalish's letter, the article that has apparently been awarded the AIM *imprimatur* for "good" journalism (p. 13). (Emphasis in original.)

In the light of this record, it is plain that while the "Pensions" program recommended that legislation regulating pension plans be passed, it did not address controversial issues, and there is no reasonable basis for invoking the fairness doctrine on this ground.

## VII. CONCLUSION

The First Amendment is broadly staked on the view that our country and our people—rich in diversity of strains and viewpoint—is best served by widest latitude to the press, as broadening input and outlook, through a robust and uninhibited debate that is subject only to minimum controls necessary for the vitality of our democratic society.

The Court has sustained the fairness doctrine in broadcasting as an instance of a necessary control in the public interest. The broadcaster cannot assert a right of freedom of press that transcends the public's right to know. But application of the doctrine must still recognize the enduring values of wide latitude of journalistic discretion in the licensee. And when a court is called on to take a "hard look" whether the Commission has gone too far and encroached on journalistic discretion, it must take a hard look to avoid enforcing judicial predilections.

And so it is that a natural judicial tendency to respond to such conditions as conciliation, and recognition of the other's viewpoint in the broad interest

---

86. What the Post article indicated were controversial issues in regard to legislative matters related to items as to which no sides were taken in The "Pensions" broadcast—such as issues as whether regulation should be by the Labor Department, a new agency, or through the Internal Revenue Code; details of eligibility, vesting formulae, funding, portability, fiduciary duties and disclosure standards.

87. The letter noted, *inter alia*: "Support for some form of remedial legislation has come, for example, from the American Bankers Association, American Life Insurance Association, American Society for Personnel Administration Members, American Society of Pension Actuaries, Chamber of Commerce of the United States, Investment Counsel Association of America and the National Association of Manufacturers."

of fairness, must yield to a vigilant concern that a government agency is not to intervene or burden or second-guess the journalist given primary discretion and responsibility, unless there is documentation of unreasonableness on the part of the licensee.

The foregoing observations are supported by, and indeed are a distillate of, pertinent decisions—including notably the opinions of the Supreme Court in CBS v. DNC, *Tornillo,* and *Red Lion*—all of which have been carefully studied and discussed.

Their application to this case convinces us that the Commission did not guide itself by the appropriate restrictive standards. The Commission has not acted in a rigidly bureaucratic manner, and it has in good faith sought to meet its responsibilities under the Act. There are areas where the Commission's duty of surveillance is considerable, and where there have been abuses on the part of licensees. But we are here concerned with the area of investigative journalism, there there is greatest need for self-restraint on the part of the Commission, and for keen awareness of the inhibitory dimension of impermissible intrusion of a government agency. Investigative journalism is a portrayal of evils, and there may be a natural tendency to suspect that the evils shown are the rule rather than the exception. But the question is not the Commission's view of what was broadcast, and what would have been reasonable if it were the Commission's role to determine what should be broadcast, but whether the licensee, who had this rule, had been demonstrated to have maintained an approach that was an abuse rather than an exercise of its discretion.

We find no basis for the Commission's conclusion that the need for reform legislation in the pensions field was a controversial issue. There are controversies as to specific proposals, but they were not the subject of the Pensions broadcast.

The complaint is made that a more balanced presentation was made in a newspaper article that did consider specific proposals and their various pro's and con's. But there are different strengths and weaknesses in printed and oral presentation, as lawyers and judges well know, and it would be an impermissible intrusion on broadcast journalism to insist that it adopt techniques congenial to newspaper journalism. This approach might well undercut the particular values, of intensity of communication through interviews, that make broadcast journalism so effective in enhancing public awareness. The fairness doctrine —which rests, says *Red Lion*, on the distinctive characteristic of broadcasting— cannot be applied by the government to alter broadcasting's distinctive quality.

We have analyzed the various segments of the "Pensions" broadcast, and have not found them to justify the Commission's invocation of the fairness doctrine. We also take account of the Commission's statement that its decision was based upon the "overall impact" of the program. In some fields, the whole may be greater than the sum of its parts—according to the precepts of Gestalt Psychology. In general, however, the evils of communications controlled by a nerve center of Government loom larger than the evils of editorial abuse by multiple licensees who are not only governed by the standards of their profession but aware that their interest lies in long-term confidence. The fairness doctrine requires a demonstrated analysis of imbalance on controversial issues. This cannot be avoided by recourse to a subjective and impressionistic recording of overall impact.

This has not been an easy case to decide. But after sorting out all the strands of decision, we conclude that the Commission has not presented a justification sufficient to sustain its order under review.[88] The case will be remanded

88. We conclude our opinion on the merits with a brief comment explaining that it has

not been mooted by the passage of the Employment Retirement Income Security Act of

to the Commission with instructions to vacate its order adopted November 26, 1973.

So ordered.

## APPENDIX A
### NBC REPORTS
### PENSIONS: THE BROKEN PROMISE
September 12, 1972
NBC

ANNOUNCER: Tonight NBC reports on Pensions: The Broken Promise.

MAN: I figure I had twenty-three years seniority filled up, possibly last up until I was in my forty year sometime at least before I retired and then to look back and see it all fallen away. Everything that you planned on. Just seems like a waste of time.

WOMAN: There must be thousands maybe millions of them that's getting the same song and dance that my husband got. When they reach their time for retirement there is no funds to pay them.

MAN: This man, Hoffa, on there, retired with a one point seven million dollar lump sum pension. And I can't get three hundred dollars a month out of them on there for my retirement.

MAN: Where does all this money go that's been paid into these pensions.

MAN: The pension system is essentially a consumer fraud, a shell game and a hoax. As a matter of fact, when

you say it's a consumer fraud, you pay it an undue compliment, because typically you think of consumer frauds in terms of short transactions, the purchase of an automobile, the purchase of a pair of pants, but with the pension system you really have a long term contract that may run fifty or a hundred years that's designed to guarantee the security of our population. Essentially, you have an insurance contract that doesn't perform. You have an insurance contract that can't be relied on. You have an insurance contract that can't be trusted.

[Tr. 2]

MAN: And I think it's a terrible thing in this country where men who work forty-five years have to eat yesterday's bread. And I don't want to compete on my old age against other old men on old age running down a supermarket aisle to get dented cans and stale breads. I don't want to look forward to it. So I really have nothing to look forward to at sixty-five.

(DANCE MUSIC)

EDWIN NEWMAN: This is a story about ordinary people with the modest hope to finish their working careers with enough money to live in dignity. That is a modest hope but it's one that is all too often not realized.

\* \* \* \* \* \*

NEWMAN: There is a widely held belief in this country that public disclosure is a good thing that it inhibits misconduct and helps to keep people honest.

---

1974 (Public Law 93–406) signed by the President on Labor Day, September 2, 1974, while this opinion was being distributed to our colleagues for information, and readied for publication. First, the passage of the act does not technically moot any aspect of this case because legislation is always subject to reconsideration and modification. Second, we think the principle of Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515–516, 31 S.Ct. 279, 55 L.Ed. 310 (1911) on recurring controversies is properly invoked.

Third, this opinion sets forth the reasons for maintenance of the stay pending appeal (*see* note 18 and text thereto). The case

was expedited because the pensions bill was on a current legislative time table. Following oral argument on the merits the panel voted, with one dissent, that it would vacate the Commission's order, and continue the stay pending preparation of the opinion. All votes are subject to reconsideration, and if in the course of preparation of the opinion it had become evident that an opinion for reversal "would not write," the court would have reversed course. But the court continued to adhere to its vote, and this opinion on the merits is also, therefore, an opinion explaining why the court continued its stay in effect.

That's why these files are full of pension plans, private pension plans. Under the law, all such plans must submit annual reports on their activities to the Department of Labor. And these annual reports wind up here, roughly thirty-four thousand of them in a building in Silver Spring, Maryland, just outside Washington.

The Labor Department has the right to audit them and to a limited extent, where wrongdoing is discovered, the government may prosecute. Also, the reports are available to anybody who asks to see them, but as it works out that is a meager protection for the twenty-five million Americans who are in private pension plans.

There are millions of hopes and dreams in these files. If experience is any guide, very many of the hopes will prove to be empty and dreams will be shattered and the rosy promises of happy and secure retirement and a vine covered cottage will prove to be false.

Understandably, there's a good deal of bewilderment about this and bitterness among those who find nothing where they thought that pension plan payments were going to be. The Labor Department therefore receives in addition to the annual reports of pension plans complaints about them and appeals for help. A lot of these are passed along by members of Congress.

For example:

WOMAN: I understood that I was covered under a very good pension plan to which I did not contribute. It was a hundred [Tr. 3] percent paid by the company. But it did mean a lot to me and I had several other job offers which I refused or didn't even consider because I knew I had security to build up for the future.

MAN: I started when I was nineteen years old.

NEWMAN: Steven Duane (?) used to be a warehouse foreman for the A&P supermarket people in New Jersey. Eighteen months ago the A&P closed the warehouse and discharged the men who worked there. Duane lost all his years of pension credits.

DUANE: . . . in my old age I would be happy and secure in the pension and the benefits that I thought I had with the A&P.

WOMAN: At the end of these fifteen years, the company was bought out and the new owners decided to close down the air (?) division so I had less that a week's notice and I was let go as well as everybody else in the air division with no severance pay, nothing, absolutely out in the street, after fifteen years with nothing.

DUANE: When the time came to talk about the pension, we were (UNCLEAR) . . . we did have books but nobody took bother in looking at the book, so you feel you're going to be pensioned and that's it. So when they finally told us that the men had to be fifty-five years and over to collect a pension, I was the big loser. I had a brother the same time as me down there. We were the big losers. Thirty-two years of our life was given up and we had nothing, absolutely nothing to show for it.

NEWMAN: Duane discovered what a lot of other people have, that it's not easy for a man in his fifties to find a new job. He wound up as a laborer in another warehouse, where he has to compete with much younger men. But no matter how hard Duane works, it's almost certainly too late for him to start building pension credits again.

DUANE: It's a terrible experience, an experience I would never like to see anybody else go through. That is why I feel so deep about this pension so that future men won't feel like I do. You wake up in the middle of the night, in a cold sweat, knowing all your work, all your life has gone down the drain. I was just number, number seventy-two was my number. No Steven Duane or a worker. I worked, I remember, I had seventeen years with only four days out. But what does that mean to them?

That means nothing. They just turn you out in the street because it's an economy move. [Tr. 4] I personally wrote a letter to the president of the A&P, not yelling at him, I want to discuss some kind of moral obligation. Just me and him, how does he feel, how does he put his head on the teller (?) knowing that you have men walking the streets. I don't know. It's very— It's a deep emotional thing with me. Sometimes I'm ahead of it. Sometimes I'm not. That's my feelings on the thing.

RALPH NADER: We've come across in our questionaires and other surveys, some of the most tragic cases imaginable. Where people who worked for twenty-five thirty years and just because of a tiny quirk in the pension plan's fine print, they don't get anything.

HERBERT DENNENBERG: When you get to be sixty-five, you're out of work and you need a source of money and that's what a pension plan is supposed to do. Unfortunately, it's woefully inadequate. Over half the people have nothing at all from pension plans and those that do typically have only a thousand dollars a year so even if you have social security, most pension funds are inadequate.

SAM ZAGORIA: And there are a lot of people who just believe because something is printed and because they've heard some glowing words about it, that that means it's a lead pipe thing, that they're actually going to have it when they need it. It may not be so.

NEWMAN: Many employees form their ideas about pensions by reading the slick brochures that their company or union gives them. Most of these booklets do make a pension seem a sure thing. The many restrictions and exclusions are buried in fine print or concealed by obscure language.

The Senate Labor Committee has been looking at these brochures as part of its general study of the pension problem. Senator Harrison Williams is chairman of the committee.

SENATOR WILLIAMS: I have all kinds of descriptions of plans here and all of them just suggest the certainty of an assured benefit upon retirement. Here's a man—this was from a brewery, sitting relaxed with a glass of beer and checks coming out of the air; well, you see, this gives a false hope, a sense of false security.

NEWMAN: Senator, the way private pension plans are set up now, are the promises real?

WILLIAMS: The answer is, they are not.

[Tr. 5]

NEWMAN: So you want to get some reality behind the premise, Senator?

WILLIAMS: Exactly. We don't want just these golden general descriptions of what can be expected under the plan; we want clear and precise and understandable descriptions of the reality. The worst example that I've seen is this description that is wholly unintelligible to anybody but an advanced lawyer.

NEWMAN: If an employee makes the election provided for, is that the one?

WILLIAMS: Yes.

NEWMAN: If an employee makes the election provided for in Subparagraph Two of Paragraph B of this Section Six, his monthly pension is determined under either Section Three or Subparagraph One of Paragraph A of Section Four whichever applies, shall be reduced by the percentage set forth in Paragraph C of this Section Six as if the employee has made the election provided for in Subparagraph One of Paragraph B of this Section Six and shall be further reduced actuarily on the basis of the age of the employee and his spouse at the time such election shall become effective. The sex of the employee and the spouse and the level of benefits in the election provided in Subparagraph One of Paragraph B of this Section Six.

Maybe I didn't read it very well.

WILLIAMS: Well, of course, you understood it though.

DENNENBERG: It's almost an obstacle course and the miracle is when someone actually collects with the plan. There have been studies that indicate that most people won't collect. I think we need controls of the same type we apply to insurance companies, your money should be funded so it's going to be there at age sixty-five. Today, it's almost a miracle if it's there at age sixty-five.

You have to go to work for an employer, you have to stay with him, you have to stay in good health, you have to avoid layoffs, you have to take your money, turn it over to the employer, hope that he invests it safely and soundly, you have to hope that when you're age sixty-five the employer is still around and he's likely to be in terms of the high mortality of business, so there's almost a sequence of miracles which you're counting on.

[Tr. 6]

SENATOR RICHARD SCHWEIKER: In one study made by our subcommittee of fifty-one pension plans, covering six point nine million workers since 1950, ninety-two percent of the workers in these plans left without any benefits whatsoever.

Workers are losing their pension rights when their companies go bankrupt, merge with other companies or simply go out of business. Workers are losing their pension rights when they are forced to leave one job to find another. We will hear testimony from five retired employees at Horn and Hardart, men and women in their sixties and seventies who have worked an average of forty years or more for the company. Today they are retired and forced to keep working because the company has hit financial difficulty and has had to give up its pension plan.

MAN: They called me into the office, they say, Grimes you almost about time for you to go ahead. I say, is that so, well, I said, go out for what. I heard of people retiring, I mean, but they say, well, you know, everybody got to retire. And I say, I didn't know that. I say I'm not ready to retire. I have no money. I say, I owe everybody in Philadelphia which I did. I said,—I told them, I'm not ready to retire.

WOMAN: They made me retire on account of the age. They call me in and Mr. Downey(?) was the man over the place at the time. And he said, (UNCLEAR) . . . what I would get and after taking out other compensation, I got fifty dollars and forty-eight cents a month.

MAN: They claim that this plan would make us financially independent along with our social security and whatever income we might have saved. They said that this plan, you will not have to worry about anything. Then all of a sudden, they said, we can't pay you anymore, cause the funds has run out. And we have to sell some properties in order to recuperate and get some more funds into this . . .

SCHWEIKER: And then that was cut off in October of '71 when they went into bankruptcy.

WOMAN: That's right. As Mr. Grimes said, we stop and then we started it again. And they finished it in November 1971 and that was it. I don't get anything at all. Nothing at all. For all those years.

MAN: When I retired in '56, I was getting fifty-five dollars in pension money. I could make it with my social security.

SCHWEIKER: Had you expected to get a full pension for the rest of your life?

MAN: Yes, sir. At the time the pension plan was established, [Tr. 7] we got literature stating what we were going to get and I was satisfied with my share at that time I was satisfied with social security. I suppose I knew I could sort of make it like that. But when it collapsed, I collapsed with it.

SCHWEIKER: I have here a booklet called Horn & Hardart Retirement Pension Plan. I assume this was something that was passed out to the employee. No doubt you all have one. I'm sure that it spells out what you expected to get in terms of your benefits. I think significant on the inside back cover, it says: Happy Retirement to you when your turn comes.

(LAUGHTER AND APPLAUSE)

ANNOUNCER: Pension: The Broken Promise will continue after this message.

\*　　\*　　\*　　\*　　\*　　\*

NEWMAN: This was the Baldwin-Lima-Hamilton Heavy Equipment plant near Philadelphia where thirteen hundred men used to work. They were the sort of people who thought security was important and they had passed up bigger wage increases in favor of a better pension plan.

When the plant closed in April, many of the men discovered their pension rights had disappeared.

MAN: I heard a lot of guys say, the only reason I stayed with it, for my pension. Now there is no pension. So in order to have all this go down the drain, let's face it, it affected every one of us in one way or another.

MAN: What's going to happen to me? Here I am. I'm now fifty-nine years old. When people get up in age and the bottom drops out, like what happened to us. It's a crime. After thirty years and I've got nothing. I mean, it's gone down the drain, thirty years of service. Now I can make up—I can get up into another place and I'll get fifteen years, but that's not going to amount to anything.

MAN: So there goes my future plans. I mean, I figure, well, I'd like to put the boys through college, but what can I do now? I'm afraid to.

MAN: A younger person does have some chance to do it but at my age, you've made that round, there's no more. In other words, I missed the pension here by about four months.

MAN: Everybody was just relying on a pension and if they knew today all the stuff, they would have never stayed there.

MAN: Yeah, but George, you realize that there's so many [Tr. 8] people, working people under the impression that they've got a pension coming they don't even realize it they could be in the same fix . . .

MAN: . . . complacency. They don't realize that this can happen. They think, oh, I'm doing all right, I've got my paycheck and I've got a pension but he didn't read the fine print.

MAN: Well, we felt that way ourselves two years ago.

MAN: This is where I thought I had it. I thought when I reached the age of sixty-five or even sixty-two, I'd have approximately forty-five to forty-seven years with the company. And I could turn around and retire at six dollars a month (sic) for every year of service.

(CROSS TALK)

MAN: As the years went on, that figure would have increased.

MAN: I lose faith in a government that allows things like this. Not long ago I was in New York and I saw that inscription on the Statue of Liberty. And it sounded wonderful, you know. Give us your tired and so on. But what it actually said was, give us your labor; get these honkies here where we can put them to work for nothing. That's what it amounted to.

NEWMAN: An employee becomes much more expensive to a company once he has been vested, that is guaranteed a pension. This man, Alan Sorenson says he helped to prove that point in a study he did for a large department store chain. After the study was made, so Sorensen says, the company got rid of many long service employees before they could achieve vested pension rights.

Sorenson himself was transferred out of company headquarters winding up in Salt Lake City as a store manager, that is Sorenson was a store manager until he was fired last year after twenty-two

years of service. He now works as a check-out clerk in this Salt Lake City store.

Sorenson told us he had been only a few months away from his vested pension rights.

ALAN SORENSON: I definitely feel that I was terminated because I was approaching an age when I would have vesting and they had terminated so many long service employees just prior to terminating me that it all seemed to fall into a very definite pattern.

[Tr. 9]

INTERVIEWER: And the reasons you were given for being let go? How did they seem to you?

SORENSON: They seemed very shallow. Because my past record was such that it was above reproach. I had never had a serious shrinkage in the total time that I had been a store manager. Within the last two or three years before I was terminated they terminated a great many store managers with long service with the company.

INTERVIEWER: People who would be approaching the . . .

SORENSON: Approaching the age of vesting and retirement. See, by terminating these people before they reached age sixty-five, this cuts their pension benefits back drastically.

EARL SHROEDER: Out in Chicago, I worked for twenty-four years for the Kelly Nut Company. And . . .

NEWMAN: Earl Schroeder was a corporate executive in a company that had been taken over by a large conglomerate. Several other executives had been fired and Schroeder was worried about what promised to be a substantial pension.

He was only six months away from his vested pension rights.

SCHROEDER: . . . a retirement plan at age sixty by having put twenty years service with the company. I had put in my twenty years, in fact twenty-four years with the company, but I did not have the age requirement of sixty. I was called from my office to a lunch with one of the executives of Kelly Nut Company, Corn Products Company, our vice president for finance. And informed that henceforth I would no longer be with the company.

And I said, Walter, what do you mean? He says, well, Earl, I hired you twenty-four years ago, today I'm firing you. Why? Well, we decided you're too good for the company. And we have no other spot for you.

I was at the time assistant secretary of the company, the secretary of the company he was lopped off at thirty years' service. I had a warehouse manager in Albany, George, Howell Free, who was lopped off two months before he would be vested in the plan; he had his time, he had his age, this poor individual became so ill and upset over it that he shot himself, took his own life.

NEWMAN: Driving a truck in Chicago wears a man down fast, so the truckdrivers have always been concerned about pensions. And in most respects, the pension programs run by the Chicago teamsters union locals are among the best. Benefits are generous [Tr. 10] and a teamster can retire as early as age fifty-seven. Many feel that after twenty or thirty years behind the wheel, retirement can't come soon enough.

MAN: When I was young, I was like a bull, I thought I was big and tough. When I started in the taxicab driving a cab. You sit. Your kidneys, your back, everything just goes. When you get older, same thing, only worse.

MAN: Every truck driver I think thinks forward to the day that they're going to retire. And if you got the seniority you think you're well established. You're not thinking about somebody cutting, shooting you down or something. About cutting your pension off.

NEWMAN: The trouble is, every teamster local in the Chicago area runs its own pension plan. And it's common practice for a man to be forced to transfer from one local to another, every time he changes his job. From driving to the

loading dock, for example. Or from loading to checking weight(?) bills. Or from an outside to an inside job.

Sometimes, different groups of teamster members working for the same company or even in the same garage will be in different teamster locals.

A teamster must have twenty years of membership in one local to draw a pension. His pension rights are not portable. He cannot take them with him from one local to another.

A lot of drivers don't know that until it's time for them to retire. And when they do find out, they can't understand why it should be so.

MAN: When they started up this pension plan, I don't think they were strictly honest with the people. I mean, with the people, I mean the truck drivers. They didn't come out in detail and say, you got to have twenty years in this local only that you can get a pension.

MAN: As far as I'm concerned, with the amount of years that I have with the company, I should get a full pension. I've got my twenty years with the company, but you got ten years over here, I got eleven years over here.

MAN: It's the same thing on there as you would put money in one bank and then go on the west side and put another part of your money into another bank on there and when it comes time to draw it out down there, they tell you, we're sorry out there. You put your money in two banks. We refuse to give it to you. This is the same principle. I have money in two different locals.

MAN: Almost twenty-one years with one outfit and I can't [Tr. 11] see why one local can't get together with the other local which I'm in and there's nothing to it, this one has to give me half, the other one gives me half and they make a whole out of it. We'll take care of it. They don't.

MAN: The union was to me a brother. And that they wouldn't sell me down the river. They wouldn't deprive me of something on there that was paid

for that I was looking forward to be a little technicality on there.

MAN: They're taking away by lying to the men, they're taking away by pulling out the fine print in their pension programs. They're taking away by keeping the man ignorant of these pension programs. Of these pension rules.

MAN: You cannot change unions. So what do you do then? If you can't change unions, if you have to get another job and you have to go in another union, what are you going to do then? Do you start all over again? Are you going to go ahead and build up time time time? You can't do it . . .

INTERVIEWER: What are your plans for the future?

MAN: I have no plans. What can I do? I'm just going to have to live out my time and do the best I possibly can with (CROSS TALK) . . . from social security.

WOMAN: And what we have in the bank.

MAN: That's all I can look forward to. Nothing else.

MAN: You've got people driving those trucks that are as high as sixty-eight years old. Sixty-eight years old driving a seventy-two or seventy-three thousand pound unit. With such commodities as explosives, jet fuels, gasolines, oils, plastics, sixty-eight year old man driving this truck. They're not going to last. Somebody's going to get killed. They should have been pensioned about ten or twelve years ago.

MAN: That's the way I figured it was going to be. And that's the way we all figured. All the old timers, we figured that if we put in twenty or twenty-five years, when we retired, we would get a pension. But no, because they got cheated they still have to work. But can you imagine a sixty-eight year old man on an interstate with anywhere from seventy-two to seventy-three thousand pounds coming at you?

ANNOUNCER: Pensions: The Broken Promise will continue after this message.

NEWMAN: The flaws in the private pension system have hurt [Tr. 12] middle class and working class people most. Rich people don't need pensions and the very poor never build up any pension rights they can lose.

People don't get the pensions they expect for many reasons. One is that most plans require you to work in the same place for twenty-five or thirty years or more. A lot of people lose their pensions because the plan runs out of money. At this moment the Coal Miners Fund is operating in the red and the Railway Retirement System is running an annual deficit.

It's also common for workers to get smaller pensions than they expect, partly because many plans treat highly paid executives much better than lower and middle level employees.

Woman get the worst treatment. They seldom work in one place long enough to qualify. And the wife of a pensioner usually gets nothing after her husband dies.

What's wrong with the system is most evident to the social worker helping the aged and to a few labor leaders who take an interest in retirement problems.

VICTOR GOTBAUM: In the United States we have a magnificent ability to cover up our own diseases especially the disease of big business. Pensions in the private area are a mockery. They're a national disgrace. We know this.

MAN: The place where it gets very difficult is with your fairly average middle income class person. Who arrives somewhere between sixty-two and sixty-five at retirement, finds their income cut sometimes as much as seventy percent. These are the folk that I think have the most difficult time. They're sometimes our most difficult client because they're bitter. They're resentful. Our society being what it is, they postpone thinking about old age and its

problems. And all of a sudden, they find themselves old and poor.

EDWARD KRAMER: These people feel who worked all their lives and let's say they worked thirty-five, forty years, and many of them have worked for one employer for all these years, are, they feel that now that they've retired, they're going to live a better life. They won't have to get up early in the morning. They won't have to work and they'll be able to do all the things that they couldn't do when they were working. And then they find themselves in the position that they have no money, they have no friends. And they live in squalor and they can't do these things. So what—they've really been cheated, cheated by the pension system, cheated by social security, cheated by their employer and they feel very angry at themselves because I think in the back of their mind, they knew this was going to happen. They knew that when the day came that they would retire, they would be [Tr. 13] worse off than when they were working. But they're afraid to admit it.

GOTBAUM: They don't eat meat. It's soup. It's lower economy. When they go into the supermarket, something of a thing you discover is that they're special hunters. Their housing situation is an atrocity. We know this. We've now discovered them so we're trying to build housing for the aged. And there's a thrust in this direction. The aged poor. Well, there's not enough housing, there's not enough housing for the aged poor. So that, you'll find that the ghettos, interestingly enough, fascinating areas, the ghettos are composed mainly of the black and Puerto Rican poor and then you'll find spotted throughout aged whites as well as the black and Puerto Rican. This is integration of the poor, integration based on lower economic status.

KRAMER: They're kind of waiting around. See, what we've done in our country is create God's waiting rooms all over the country. In Miami, New

York and Boston, and Los Angeles, and Philadelphia, where old people kind of wait around for the day to come when they're going to die.

MAN: We're living too long. In some area if we could just disappear, it would be very nice to the community at large. But we are not disappearing, we're still here. And we're growing older and older. The age now are ninety and ninety-five is not too uncommon. Even a hundred is not too uncommon. And the result is this, that we have made no plans to retire.

MAN: You can't make it on social security, maybe after that twenty percent increase we can. Far as I'm concerned, if you had just say a hundred and half more a month, we could make it pretty good. But now when a bill comes up, you gotta figure how you're gonna meet it. See, if the car breaks down for a hundred dollars, you gotta start skimping or go to the bank—you got two, three hundred left in there and draw one of them out. And that's like pulling teeth.

WOMAN: We'll get by, we'll just have to get by, we'll have to eat less. If we had any indebtedness at all, we'd never make it. Makes you feel bad and a lot of times you just sit there and think, at my age, what am I going to do, where am I going to go? (UNCLEAR) . . .

MAN: The average person—elderly person who lives on social security, old age assistance and perhaps some money they've been able to save, income runs about a hundred and eighty dollars a month. They've literally got to watch every nickel and penny.

KRAMER: Going to a movie is a big expense, taking a bus to a clinic to visit a doctor is a big expense, buying a new pair of shoes is a big expense, getting ill and having to get medicine [Tr. 14] is a big expense. This is where, if there was an adequate pension system in the United States along with social security, some of these problems could be avoided.

NEWMAN: Retired people like to live in places that are warm and cheap. There are towns in California and Florida where more than half the adult population is retired. Years ago, older people lived with their working age children. Now, in our mobile society, the elderly have taken to living in trailer parks filled with other retired people.

That means retirement is a lot more expensive than it used to be. And the elderly are complaining much more about needing money.

The average retired person depends on social security for most of his income, so the big day is the third of the month, the day the social security checks arrive.

MAN: Everybody's out, they're standing at the door for the mailman, they grab this little check and they haul off to the bank with it. And we get in line up there to get your check. And we try to let it go till the next day because it takes too much of your time standing there. And then you run off to the grocery store. And the grocery stores all run big sales. On the day they're going to have this—you can get yourself a steak, if you're lucky, for a dollar and a half. But retirement's not, unless you can adapt yourself, it's not for the lively person, somebody that's sickly, he can't enjoy it, there's nothing to enjoy about it. But if you can prepare yourself to accept a quiet life and you and your wife figure what you want to do with yourself during the day, then you can make it.

We have fishing and take an umbrella and a couple of chairs and go down to the beach and sit there for the early part of the day before it gets too hot and then we come back and turn the air conditioner on, spend the afternoon in the house. We have a couple of friends around here we visit with, but it's nothing exciting. And you don't have the money to get exciting, I mean, the wife likes to go and I would love to go too but you can't afford to drop ten or twenty dollars. You go down to these

restaurants, none of them have a meal less than threee dollars. But they got some beautiful malls and one thing and another, you can loaf around in air conditioning. We went in one yesterday, Ha's I think it was, and . . . pull about four bolts of material there . . . how do you like this and I go through the routine, it's a little loud, or a little conservative and she throws them back in the pile and walks on. And the girls follow around (UN-CLEAR)

But that keeps them busy, you know, they got something to do. I imagine all these old people do that, I don't know.

[Tr. 15]

NEWMAN: The crux of the matter now is that increasing numbers of Americans are reaching retirement age, they should not be expected to live in poverty or near poverty or a cut or two higher, lead a drab, pennypinching sort of existence. Nor, obviously, is that anything the rest of us would want to look forward to. The refrain that runs through what we've been hearing is a kind of incomprehension. What emerges over and over again is that these people played the game. They did what Americans are expected to do; they worked and met their obligations. But at the end of their working lives, they found that they were in trouble. Put simply, they did not have enough money. The pension plans that they thought were going to take care of them didn't. How, it may be that some of them did not save as much money as they might have. The urge to consume in American life is very strong. Also inflation played its part and maybe they were careless about what the pension plans they were in actually could do.

In any case, at the end of their working lives, they feel cheated and cast aside.

ANNOUNCER: Pensions: The Broken Promise will continue after this message.

\* \* \* \* \* \*

FRANKLIN D. ROOSEVELT: This social security measure gives at least protection to fifty millions of our citizens who will . . .

NEWMAN: Most people didn't have any sort of steady retirement income until the first social security law was passed. Social security was to take care of working people when they got old. At least that was the impression given by this government publicity film but no one who ever had to live on social security alone has ever considered the monthly benefit to be enough. It was enough perhaps where people also saved money for their old age, or got help from their children.

The private pension system really got started when wage controls were put into effect during World War II. Fringe benefits were exempt from controls and since labor and management couldn't talk about much else, they began to negotiate pension plans. Companies also started using pension plans as a way to keep skilled employees. The idea was that a man would not be tempted to look for another job if he had a paid retirement to look forward to.

Today labor unions consider pension benefits to be part of the wage package, higher income workers now want more insurance that they'll actually get their pensions. Lower income workers think they have a right to better pensions than they get [Tr. 16] now.

For that matter, major league baseball players struck last spring for improved pensions.

In New York, not long ago, angry municipal workers paralyzed the city by opening drawbridges and blocking highways. They wanted their pensions improved to match the gains made by policemen and firemen. And by some workers in private industry.

If there is a pension crisis, it is, at least, in part, a crisis of rising expectations.

Another crisis of sorts involves the vast amounts of pension fund invest-

ments. James Hoffa was convicted of criminally mishandling pension fund investments. So was the leader of a Chicago barber union.

Pension funds have outgrown the laws regulating them. No government agency has enough staff or authority to control them. The Justice Department's labor section believes it's common for the pension money to be incompetently or dishonestly invested.

RICHARD BENVINISTI: Well, we've prosecuted cases involving embezzlement of pension funds, misuse of pension funds, for the personal benefit of the labor union officials who are charged with administering these funds. We've also prosecuted cases involving the receipt of kickbacks by pension fund employees and trustees for the granting of loans and for the use of this pension fund money.

BENJAMIN SCHENCK: It could be something as simple as using the money to buy a new vacation home for one of them, it could be the more complex, more subtle situations where the money in the trust fund is for example, loaned to the employer, to build him a new factory or loaned to the union to finance a new recruitment campaign.

CHARLES RUFF: We have no real idea of how much fraud there may be in the pension plan area. But you're talking about institutions, the pension plan area, generally, that deals in hundreds of billions of dollars. And when you have that much money involved, the federal government ought to take a more active role than it does.

DENENBERG: We regulate insurance completely. We regulate the agent, the contract, reserve, the policies, the sales technique, the investment, we regulate insurance companies from birth to death. And yet we have a gigantic pension system, almost the size of the insurance industry, a hundred and fifty billion dollar business that's essentially unregulated.

Can you imagine what would happen if we would let insurance [Tr. 17] companies do whatever they wanted to? We can't even protect the public with full regulation in insurance, but essentially we have a pension system which is precisely an insurance plan and which is almost unregulated.

NEWMAN: This is where most of the pension money now goes. To Wall Street. To be invested.

It's estimated that private pension fund assets now amount to something like a hundred fifty-three billion dollars. They way they're growing, they very likely will amount to two hundred fifty billion dollars by the end of this decade.

Pension funds are now the largest institutional investors in the country; they've passed the mutual funds and there is no end in sight.

Typically, the management of pension fund money is handed over to banks, mostly very big banks. Banks for the piling up of pension fund money. A few banks may administer significant and even controlling amounts of the common stock of very big corporations.

An example:

More than ten percent of such companies as IBM, Ford, IT&T, J.C. Penney, Westinghouse, and Boise-Cascade is held by three banks. Fifteen percent of Trans-World Airlines is held by two banks. Morgan Guaranty Trust and Chase Manhattan.

MAN: We remain confident beyond 1973 on a . . .

NEWMAN: There is so much pension fund money to invest, that just finding productive uses for it can be a problem.

This is something few outsiders see, an investment meeting at Bankers Trust Company in New York.

MAN: One of our major concerns is to protect our accounts against risk, risk being defined as underperforming the market in a down market which it is true we do nor forecast. My question is, how do you think the chemical stocks would fare in the event we do have a weak market over the next six months?

MAN: Jerry, I was just talking this morning . . .

NEWMAN: Critics of the big banks claim that they stick too much to safe investments in a big corporation. The bankers insist that their industry is competitive and that all banks seek the highest return with the least risk.

Bankers and critics agree that the trust fund investing industry has grown tremendously. The institutions managing trust [Tr. 18] funds have become so big that they often prefer to trade large blocks of stocks among themselves by computer, rather than using the stock exchange.

Pension fund money has become so important to the economy that nobody knows what would happen if the system were to be drastically changed. Incorporated in social security, for example.

Ralph Nader opposes that. Nader wants to take pension funds away from the banks and have the government set up a new set of institutions, responsible only to the pensioners.

Other critics would concentrate on insuring pension benefits and making it possible to take pension rights from one job to another. But almost everybody agrees that some changes are needed.

RALPH NADER: I think time is running out. On the private pension systems. And it [sic] its abuses continue to pile up, and if its enormous popular disappointments begin to be more and more revealed, it might collapse of its own weight, and social security will have to take up the slack.

RUSSELL HUBBARD: Over a good number of years, the track record is excellent. It's unfortunate that every now and then some of the tragic cases make the newspapers and the headlines. But it's a question of perspective and balance. When you consider that there are thirty million people covered by the plans, that there are five million people receiving about seven billion dollars in benefits. I think that's a pretty good record. That's not to say that there aren't a few remaining loopholes that need closing but we ought to make sure that we don't throw out the baby with the wash water.

VICTOR GOTBAUM: The solutions in the wealthiest country in the world is not do what they've been doing in terms of pensions. You fund a pension. You fund it on the basis of man's ability to live. You tie it into cost of living. The wealthiest country in the world ought to be able to do it.

KENNETH ANDERSON: You must remember that the corporation has set this plan up voluntarily. They have not been required by law to set it up.

INTERVIEWER: So that it gets from the employer to the employee?

ANDERSON: That's what it amounts to.

DENENBERG: I say it's the employee's money and I think that is the economic fact of life and I think in terms of the morals [Tr. 19] of the problem and in terms of the economics of the problem, that anyone would conclude that it does belong to the employee and yet it's not being used for his benefit.

ANDERSON: These pension plans are a part of a fringe benefit package. Like hospitalization insurance and so forth, but it's still a voluntary thing on the part of the corporation.

GOTBAUM: So, all I can say is my God how can you hold to that view? Do you mean, people are supposed to starve, that people are supposed to .ve on a subsistence money because they are not unique, and that, by the way, is the same attitude. That gives top management stock options, gives them retirement after a small serving period whereas the middle worker, the lower economic worker t kes a terrible beating.

SENATOR SCHWEIKER: What we re proposing to do a little bit what was done with the bank failure problem. We didn't go in and take over the banks but we did, by means of insurance and federal deposit insurance corporation come in and guarantee that no depositor would lose his savings under a certain

point. And I think that's what we're saying here, that once a worker has put in eight years time, once he's reached a certain age, once his company's reached a certain point, then he doesn't lose it, regardless of what happens to his company or the country.

MAN: What are they waiting for? What the hell are they waiting for? Do they have to give us a certain quota, a certain number of people that have to be victims? Do they have to give us a certain amount of money? How many billions must it take before they do something about this? How many people have to starve? How many people have to lay on the sidelines and just hope and pray. How much misery do they want before they actually act upon it?

NEWMAN: This has been a depressing program to work on but we don't want to give the impression that there are no good private pension plans. There are many good ones, and there are many people for whom the promise has become reality. That should be said.

There are certain technical questions that we've dealt with only glancingly, portability, which means, being able to take your pension rights with you when you go from one job to another, vesting, the point at which your rights in the

pension plan become established and irrevocable.

Then there's funding, the way the plan is financed so that it can meet its obligations. And insurance, making sure that if plans go under, their obligations can still be met.

Finally, there's what is called the fiduciary relationship, [Tr. 20] meaning, who can be a pension plan trustee? And requiring that those who run pension funds adhere to a code of conduct so that they cannot enrich themselves or make improper loans or engage in funny business with the company management or the union leadership.

These are matters for Congress to consider and, indeed, the Senate Labor Committee is considering them now. They are also matters for those who are in pension plans. If you're in one, you might find it useful to take a close look at it.

Our own conclusion about all of this, is that it is almost inconceivable that this enormous thing has been allowed to grow up with so little understanding of it and with so little protection and such uneven results for those involved.

The situation, as we've seen it, is deplorable.

Edwin Newman, NBC News.

APPENDIX B

Summary of Description of "Pensions" Program
Appearing in Reviews in Newspaper TV
Columns Shortly After Broadcast

| Name of Newspaper | Date of Article | Description of Program |
|---|---|---|
| The Boston Globe | 9/18/72 | "[T]he private pension industry . . . is an unholy mess and last week some of the details were bared in a television documentary. . . . It was about time." |
| Business Insurance Chicago (by Patrick Thomas) | 9/25/72 | ". . . was by necessity, sketchy but revealed nothing new to anyone who spends any of his [time] in the pension area. . . . The program was by no means objective; it could not have been . . . there was just not enough time to do it thoroughly. [Newman did] point out that there were many good pension plans." |
| Chicago Sun-Times (by Ron Powers) | 9/13/72 | ". . . a hard look at failures in the pension system in the United States." |
| Chicago Today (by Bruce Vilanch) | 9/13/72 | ". . . dealt with the terrifying pension plan racket . . . As with all news documentaries, the accent was on hardship and sadness." |
| Chicago Tribune (by Clarence Peterson) | 9/13/72 | "Pension administrators may face some hard questions from employees when they get to work this morning. If so, NBC Reports will have done its job." |

| Name of Newspaper | Date of Article | Description of Program |
|---|---|---|
| The Christian Science Monitor (by Richard L. Strout) | 9/22/72 | ". . . concentration of funds provides a pension system that is often imperfect, sometimes tragic, and almost wholly uncoordinated. . . . An hour long documentary . . . presented this situation vividly." |
| Daily News (by Kay Gardella) | Undated but prob. 9/20/72 | ". . . it did a hard-hitting job of examining a system that doesn't always pay back long-time workers." |
| Daily Variety Television Review | 9/14/72 | "was a penetrating, albeit depressing probe of pension plans, or, to be more specific, the victims of such plans. . . . It was a superior bit of investigative reporting." |
| | | "No one was knocking pension plans; the knock was over the fact that supposed recipients were often deprived of them." |
| The Denver Post On the Air (by Barbara Haddan Ryan) | 9/14/72 | "The presenting of tragic case histories, experts' opinions and Newman's clarifications seemed a disorganized approach to a critical issue that's widely misunderstood or ignored. Likewise nothing was said about what makes good pension systems work . . . but NBC should be commended for publicizing a condition of social anarchy. . . ." |

| Name of Newspaper | Date of Article | Description of Program |
|---|---|---|
| The Evening Sun Baltimore | 9/13/72 | "NBC Reports opened its season . . . with a long needed look at the many faults of private pension plans. . . . It heard a brief defense of the way private pension systems are run and examined possible remedies and alterations to correct the more glaring flaws in the system." |
| Hollywood Reporter Television Review (by Glenn Lovell) | 9/14/72 | "NBC reports into the world of old-age security was, as commentator Edwin Newman summed up 'a depressing program' which revealed a shockingly fraudulent American pension program. The report deals with its subject completely and sounds out many startling revelations." |
| | | "But . . . the investigation is most effective when it is least objective. While this makes for touching and sincere glimpses into the shattered dream of the retired without benefits, it makes one wonder if we are seeing the entire truth." |
| Houston Chronicle | 9/13/72 | "Edwin Newman said in summation and in all fairness he should have said it sooner —'I don't want to leave the impression that there are no good pension plans. Indeed there are many.'" |
| | | ". . . an informative and provocative show." |

| Name of Newspaper | Date of Article | Description of Program |
|---|---|---|
| The Indianapolis Star | 9/12/72 | "What [NBC Reports] attempts to do is pinpoint the existing problems in our private pension systems. . . ." |
| Kansas City Star | 9/12/72 | "Victims of the private pension systems will describe its failures through their own bitter experiences in an investigative report that will initiate NBC Reports. . . ." |
| Morgantown, N.C. News-Herald (Ed. F. Reading) | 9/19/72 | ". . . there was a blockbuster of a documentary on NBC Reports last week treating with the abuse of pension funds." |
| The Newark Star Ledger | 9/13/72 | "The program pulled no punches . . . ." |
| N.Y. Post (by Bob Williams) | 9/13/72 | "NBC Reports lived up to its promise last night in warning all contributors to pension plans to check the fine print in the contracts." |
| Philadelphia Daily News The New Season . . . in review (By Rick DuBrow) | 9/13/72 | "A potent program about pitfalls and failures of some private pension plans of business and unions . . . it was an angry, incisive study that focused on some people who felt cheated by their blind faith in Pensions." |
| The Pittsburgh Press | 9/13/72 | ". . . premiered with a probing look at retirement pensions." |
| Portland Oregonian (by Francis Murphy) | Undated | ". . . Edwin Newman examined how millions of Americans are cheated out of pensions which they expected to receive upon retirement." |

| Name of Newspaper | Date of Article | Description of Program |
|---|---|---|
| The Star-Ledger | 9/12/72 | "What it attempts to do is pinpoint the existing problems in our private pension systems by talking to middle class and working people . . . and then offering explanations about such flaws in those pension plans by . . . experts. . . ." |
| Toledo Blade | 9/13/72 | " 'NBC Reports' made an auspicious debut with a harrowing and moving inquiry into 'Pensions: The Broken Promise.' " |
| Variety | 9/20/72 | "No one can fault NBC News for exposing the national scandal of private pension frauds and the inhuman practices of big business and reckless practices of unions as regards pensions but even reporter Ed Newman, summing it up said this had been a depressing show to work on and one wonders why the network chose it to premiere the new telementary series when it is a sure bet that sales will be screaming about those nothing numbers soon enough." |
| Rick DuBrow— UPI Correspondent | 9/13/72 | "Tough study of the failures of some private pension systems." |

FAHY, Senior Circuit Judge:

I concur in the well reasoned and comprehensive opinion of Judge Leventhal for the court. The opinion upholds the wide latitude to be accorded the press as essential to the mandate of the First Amendment, notwithstanding the limitation upon complete freedom imposed by the Fairness Doctrine which is applicable to broadcasting licensed under the standards of the Communications Act. One may hope that this latitude will not encourage in a different context abuses which, even though protected by the First Amendment, should be discouraged,[1] or lead to claims of such protection which could not be sustained.

LEVENTHAL, Circuit Judge, supplemental concurring statement:

I append a concurring statement in which I speak for myself, even though I have authored the opinion for the court, because I find that this device, which I have used in other cases,[1] gives reasonable latitude to offer comments that occurred to me in the course of my researches and reflections on the subject under consideration, but which for one reason or another are not appropriate for the opinion of the court.

\* \* \*

A judge confronted with a problem like this one has a natural tendency, born of his years of lawyering and judging, to try to strike a middle ground between the antagonists—here, between NBC and AIM.

The Commission's recognition of latitude to NBC as to how to give access to an opposing viewpoint tempts a judge to be swayed by the submission of Commission counsel that the "cost of presenting an opposition spokesman should be minimal."[2]

It is doubtless tempting not only to the judge but to counsel for a licensee—particularly if the problem should arise not for a network but as to a station owner—to say: "See if you can't run something that will satisfy the government officials."

---

1. An example of abuses in an important area of national concern is documented in the well-balanced treatment of the relation of television broadcasting to the violence afflicting the nation contained in the *Report of the President's National Commission on the Causes and Prevention of Violence* (1969). This Commission was composed of an exceptional group of men and women under the Chairmanship of Dr. Milton Eisenhower, distinguished brother of the late President. The Report states in part:

> We do not suggest that television is a principal cause of violence in society. We do suggest that it is a contributing factor. Television, of course, operates in a complex social setting and its effects are undoubtedly mitigated by other social influences. But it is a matter for grave concern that at a time when the values and the influence of traditional institutions such as family, church, and school are in question, television is emphasizing violent, anti-social styles of life.
> \* \* \* \* \*
> The television industry has consistently argued that its standards for the portrayal of violence and its machinery for enforcement of these standards are adequate to protect the public interest. We do not agree. . . .
> \* \* \* \* \*

> We believe that the television networks, network affiliates, independent stations, and other members of the broadcasting industry should recognize the strong probability that a high incidence of violence in entertainment programs is contributing to undesirable attitudes and even to violence in American society. It is time for them to stop asserting "not proved" to charges of adverse effects from pervasive violence in television programming when they should instead be accepting the burden of proof that such programs are not harmful to the public interest. Much remains to be learned about media violence and its effects, but enough is known to require that constructive action be taken at once to reduce the amount and alter the kind of violent programs which have pervaded television.

pp. 199–202.

The matter of course is aggravated by the lack of adequate control of firearms.

1. United States v. Poole, 161 U.S.App.D.C. 289, 495 F.2d 115 (1974); United States v. Ammidown, 162 U.S.App.D.C. 28, 497 F.2d 615 (1973); Bellei v. Rusk, 296 F.Supp. 1247 (D.D.C.1969) (3-judge court), reversed, 401 U.S. 815, 91 S.Ct. 1060, 28 L. Ed.2d 499 (1971).

2. Opposition to Motion for Stay, at 16.

What is overlooked is the stultifying burden on journalism. Even the monetary burden is not inconsequential, as the record indicates, and it is no answer to say that the license is profitable, because the problem is that the incremental burden will lead a licensee to acquiesce in the Government's instruction as to what he should broadcast. More important, however, is the unquantified burden, the bureaucrat peeking over the journalist's shoulder.

In the context of the fairness doctrine, the twin principles of latitude for the licensee and narrow review for the Federal Communications Commission merit special vigilance when the question is whether the "issue" in a program of investigative reporting is one of evils described or a broad subject canvassed, because government latitude to redefine the issue enfleshes the specter of a subtle and self-serving government censorship impeding the ventilation of abuses.

While journalists on the public airwaves are subject to fairness doctrine responsibilities, the risks of government interference are so oppressive as to require a plain showing of journalistic abuse before a government official can issue a direction that the journalist's report must be supplemented with a codicil. The danger of intrusion on journalistic discretion is no less real and profound because it rests, at base, in the spirit, in the way men carry on their functions. Journalism in America has had its evils and abuses, but in the large they are outweighed by its achievements in liberating the questioning mind and spirit. The public interest pulses in the investigative reporting that depicts whatever evils are seen wherever they are seen, and asks provocative questions.

Journalists may be stifled if they are steered from the way in which their profession looks at things, and channeled to another way, which however congenial to men of the law, dampens the investigative spirit.

3. B. Manning, If Lawyers Were Angels: A Sermon in One Canon, 60 ABAJ 821, 822 (July, 1974). Mr. Manning is focusing on

The major item in the diet of the press is controversy and confrontation. Lawyers are usually working to compose and accommodate differences. The press must try to make simple that which in fact is complex and to suppress factual detail in favor of the emotional jugular. The lawyers pull exactly the other way.[3]

The First Amendment freedoms established in the interest of an informed citizenry "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

TAMM, Circuit Judge (dissenting):

This case presents us squarely with questions arising from the head on collision of First Amendment rights of freedom of the media and the right of the people to know. It requires again "an expression of the pervasive precept of fairness between government and governed that runs thru American jurisprudence. . . ." Trailways of New England, Inc. v. C.A.B., 412 F.2d 926, 931 (1st Cir. 1969). Involved is not the so called "on the spot reporting" which makes up a substantial portion of television newscasts but a documentary type of presentation referred to in these proceedings as investigative reporting. The editorial supervision and selectivity frequently approved in judicial decisions was not herein discharged under the pressure of time considerations essential to the preservation of news values, but permitted, according to representations made to us, the digesting of eighty thousand feet of film into a two thousand foot final product. Most importantly we are not dealing with a printed publication utilizing its private property to disseminate its news and views in the exercise of that freedom of the press which is the central freedom of the whole democratic process. Our petitioner, the Na-

the lawyer advising the client as distinguished from the litigating lawyer.

tional Broadcasting Company, Inc. is the temporary licensee of a right to utilize the public's airways in the public interest and for the public welfare. To me this is the dominant element in distinguishing the rights and obligations of a telecaster from those of the press, which under controlling Supreme Court opinions has an unlimited freedom to report events in the public domain.

No right is absolute. It is elementary that each right carries with it an obligation. In accepting the right to use the public airways our petitioner, willingly or reluctantly, assumed the obligation of utilizing those airways in the public interest. The public interest in television programming expressed in fundamentals is to know the facts.

Petitioner argues that investigative reporting is somehow a special specie to which the application of a fairness requirement is constitutionally repugnant. The majority opinion supports in substance this position and capsulized into its basic and ultimate holding concludes that fairness, meaning a presentation of both sides of a question of public interest, is not a practically enforceable obligation of a licensee of the public airways. This position means that a telecaster's presentation under the label of investigative reporting of a few factual bones covered with the corpulent flesh of opinion and comment fulfills the obligation of the network to give a fair picture to the public and to assist the public in knowing the facts essential to a determination of basic policies. The majority opinion fails to recognize that as a practical matter there is no real distinction between this type of so called investigative reporting and propaganda. The investigative reporter, regardless of his initial motivation, too often reaches a point where objectivity disappears and he becomes an ardent advocate for a particular position or viewpoint. Developing a feeling for what might or should be, rather than awareness of what is, he produces a manipulated and selective presentation which ignores all viewpoints and positions other than his own. There

is no doubt but that embellishment, color and opinion often prove to be more interesting than objective presentation of both sides of an issue of public interest but is such a production a discharge of the responsibility of the telecaster to give a fair picture and a presentation of all points of view?

The history of democracy is a record of the fear and distrust by the people of unrestrained power. This is the womb in which was gestated the constitutional amendments which we identify as the Bill of Rights. First Amendment guarantees were and are designed to afford the people an effective weapon against the existence or use of destructive and abusive power. Does anyone doubt that a tremendous reservoir of power exists today in the radio and television industry? Are not television and radio newscasters and commentators dominant in the shaping of the public's viewpoints and opinions? Does not their ability to capture the public attention arm them with a weapon of such magnitude that public officials are too often completely subject to their influence? Is it an exaggeration to say that the telecasting industry constitutes a power system comparable if not superior to government itself but basically free of the restraints imposed on government power? We proudly proclaim that in our democracy all power is in the people, but is this power impartially exercised today upon a full knowledge of all facts which affect the public order? The answer is obviously dependent upon the public's ability to learn the facts and again we are face to face with the use which is made of the public airways by the licensees.

I recognize and will readily defend the constitutionally mandated right of the licensed media to exercise its choice of what to report and what not to report. Beyond this the right to editorialize with properly descriptive identification is judicially recognized, but confining my position to the record before us, in the presentation of a so called investigative or documentary report I believe that

there is a legally enforceable obligation on broadcasters to present a report in which all conflicting positions and viewpoints are fairly portrayed. To require less in my view is to permit an abuse of the public's right to know, and a desecration of the license to use the public airways in the public interest.

"Freedom of the Press" as a generic term has long been prominent in the lexicon of judicial opinions. It will never be fully defined because it is not a static phrase with final and permanent meaning. It defines a continuously evolving phenomenon with changing, disappearing, materializing and sometimes almost mystifying significance. Rapid development of the utilization of the public airways as a means of informing the public has placed tremendous power in these media. The fairness doctrine, as the Federal Communications Commission has exercised it in this case, is not a censorship, is not a prior (or subsequent) restraint, is not a usurpation of what the majority describes as "Journalistic Discretion" but is merely a policy that requires in the public interest all viewpoints be presented in factual matters of public interest. The doctrine, as it has been utilized here, is the yeast of fairness in the dough of the telecaster's right to exercise his journalistic freedom. The resulting problem of the Commission is then the securing of responsibility in the exercise of the freedom which the broadcasting industry enjoys. We are asked to rule that on the traditional scales of justice the right of the people to know is outweighed by the claimed right of the telecasters to exercise a constitutional infallibility in determining what the public is entitled to know. I cannot so hold. I would affirm the Commission's action.

Before: Bazelon, Chief Judge; Fahy, Senior Circuit Judge; Wright, McGowan, Tamm, Leventhal, Robinson, MacKinnon, Robb and Wilkey, Circuit Judges.

## ORDER

On consideration of intervenor's petition for rehearing and/or suggestion for a hearing *en banc*, it is

ORDERED by the Court *en banc* that the above entitled case shall be reheard by the Court sitting *en banc*, and accordingly the opinions and judgment filed herein on September 27, 1974 are hereby vacated. It is

FURTHER ORDERED and ADJUDGED by the Court *en banc* that the stay heretofore granted by a division of this Court shall remain in effect pending further order of this Court.

Petitioner and *Amici Curiae* supporting the position of petitioner shall file briefs within 40 days from the date of this order. Respondent, Intervenor and *Amici Curiae* supporting their positions shall file briefs within 30 days thereafter. Reply briefs, if any, shall be filed within 14 days from the date Respondent's and Intervenor's briefs are filed.

Counsel are requested to address themselves in the briefs to the issues raised in the opinions filed by the members of the panel on September 27, 1974, in addition to any other contentions counsel may wish to present.

Argument is hereby scheduled before the Court sitting *en banc* on Wednesday, April 2, 1975, at 10:00 A.M.

*PER CURIAM*

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

On consideration of Respondents' suggestion of mootness and of the responsive pleadings filed with respect thereto, it is

Ordered by the Court, *en banc,* that the order filed herein on December 13, 1974 granting rehearing *en banc* is hereby vacated, and it is

Further ordered by the Court, *en banc,* that the opinions and judgment of the panel are hereby reinstated, and it is

Further ordered by the Court, *en banc,* that the suggestion of mootness and all responsive pleadings filed with respect thereto are referred to the panel for its consideration.

Chief Judge BAZELON and Circuit Judge LEVENTHAL did not participate in the foregoing order.

Before BAZELON, Chief Judge.

## ORDER

It is Ordered, *sua sponte,* that the order filed herein on March 18, 1975, vacating the order of December 13, 1974 and reinstating the opinions and judgment of the panel, is hereby further amended to reflect that I dissent from the order vacating the order of December 13, 1974 and dissent from the denial of rehearing *en banc,* and that I reserve the right to file a statement of reasons in support of my vote.

Statement of Chief Judge BAZELON, dissenting from the order vacating the previous order granting rehearing *en banc.*

BAZELON, Chief Judge, dissenting from the order vacating the previous order granting rehearing en banc:

For better or worse, the propriety of some governmental intervention into broadcast journalism under the Fairness Doctrine has been declared constitutional and there seems to be no serious effort under way to reconsider the assumptions of that declaration. This case, however, stirs large questions concerning the administration of the Fairness Doctrine now that some governmental intervention has been authorized. The court I think has attempted to find a path through the existing body of Fairness obligations that both recognizes the constitutionality of some obligations and limits that intervention to the precise extent necessary to achieve defined public interests. The path it has chosen, however, suffers from many difficulties and appears to me, upon reflection, as not the most efficacious method of combining the elements of constitutional review of Fairness obligations with administration of those obligations found to be permissible. Indeed, as I will argue, the court's method creates rather insurmountable problems in the traditional relationship between administrative agencies and appellate courts and in the proper protection of the legitimate constitutional interests that permeate this area of the law. The subject is conceptually slippery, but discussion of it is no less necessary for that reason. I, therefore, in this statement attempt to point out the error of the court's way and to suggest a better institutional posture for appellate courts in their role as overseer of the Fairness Doctrine. This discussion is necessitated by the court's unexplained action in reversing its earlier decision that ordered the case reheard *en banc.*

The first part of this statement is devoted to establishing that under current FCC practice, the "Pensions" broadcast of petitioner NBC did raise a controversial issue of public importance. This encompasses (A.) an argument that the Commission properly applied the established legal standard to the "Pensions" broadcast (170 U.S.App.D.C. pp. —— ——, 516 F.2d pp. 1105–1106); (B.) an argument that the "Pensions" program did discuss the overall performance and the need for reform of the private pension plan system (170 U.S.

App.D.C. pp. ——–——, 516 F.2d pp. 1107–1112); and (C.) an argument that the court's methodology in determining that the broadcast did not discuss this issue, as that methodology is developed in Part B, is inconsistent with established FCC methodology in ruling upon Fairness Doctrine complaints (170 U.S.App.D.C. pp. ——–——, 516 F.2d pp. 1112–1114). The second part of the statement concerns itself with the constitutional overtones to Fairness Doctrine litigation under present law. This involves (A.) a discussion of the court's use of First Amendment interests in its decision and why that use is not a proper protection of the journalistic interests implicated by this case (170 U.S.App.D.C. pp. ——–——, 516 F.2d pp. 1114–1115) and (B.) a consideration of what I perceive as the true nature of judicial review of Fairness Doctrine decisions in light of the serious First Amendment interests concerned (170 U.S.App.D.C. pp. ——–——, 516 F.2d pp. 1115–1116). The third part of the statement considers the propriety of the court's decision to avoid rehearing *en banc* and the one argument which might justify that decision—the FCC's suggestion of mootness (170 U.S.App.D.C. pp. ——–——, 516 F.2d pp. 1117–1118).

## I. The Pensions Program Raised a "Controversial Issue of Public Importance"

### A. The Legal Test of Controversiality

The Commission, agreeing with the Broadcast Bureau, delineated the potential controversial issue of public importance at stake here to be this: "the overall performance and proposed regulation of the private pension system."[1] All parties seem to agree that this is indeed a controversial issue of public importance, although, as will be discussed below, 170 U.S.App.D.C. pp. ——–——, 516 F.2d pp. 1174–1177, there might be a

First Amendment objection to such a view and the passage the pension reform suggests mootness to the FCC. Passing these problems for the present, the question raised in this litigation is whether the "Pensions" documentary did present one side of this above-described controversial issue. NBC's position, adopted by this court, is that its documentary did not address this above-described controversial issue, but rather addressed a different issue it alleges is not a controversial issue of public importance, *viz.* "some problems of some pension plans."[2] The Commission, on the other hand, found that while the program did address the issue described by NBC, the program also presented one side of the controversial issue defined by the Commission.

Initially the court states that the FCC committed legal error in allegedly substituting its own judgment for that of NBC on the issue of whether NBC did present one side of the agreed upon controversial issue. Says the court:[3]

Thus the Commission ruled that even though NBC was reasonable in saying that the subject of "Pensions" program [sic] was "some problems in some pension plans," in determining that this was the essential subject of the program, its dominant force and thrust, nevertheless NBC had violated its obligation as a licensee, because the Commission reached a different conclusion, that the program had the effect "in fact" of presenting only one side of a *different* subject

The Commission's error of law is that it failed adequately to apply the message of applicable decisions that the editorial judgments of the licensee must not be disturbed if reasonable and in good faith.

My most serious difficulty with this statement by the court is that it simply misrepresents the Commission's opinion. Here is the Commission's language.[4] The reader may judge for himself.

1. Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1034 (1973), aff'g, 40 F.C.C.2d 958, 962–67 (1973) (Broadcast Bureau).

2. Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1034 (1973).

3. 170 U.S.App.D.C. at ——, 516 F.2d at 1118.

4. Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1039–40 (1973) (emphasis added). Furthermore, at the outset of its discussion, the Commission made this statement: "The basic issue

Given these facts and circumstances, we *cannot accept as reasonable* a judgment that the "Pensions" program did not present views advocating one side of a controversial issue . . ., that issue being the overall performance of the private pension system and the need for governmental regulation of all private pension plans.

. . . [In] light of the presentation of so many statements sharply criticizing the performance of the entire pension system and strongly recommending the regulation of all private pension plans, it would be an unrealistic oversimplification to characterize the program as one addressing only "some problems of some pension plans." *The program did examine such problems, but it would strain the most "permissive standard of reasonableness" past the breaking point to imply that the program was confined to such a limited examination.*

The court's error is one of simple logic, as the Commission insists in its brief filed in the abortive rehearing en banc : [5] the Commission found plainly that it was unreasonable to suggest the program was *limited* to *only* a discussion of "some problems of some pension plans." Since the parties were seemingly agreed that the only issue in the case was whether the program was limited to a discussion of "some problems", there can be no doubt that the FCC focused its attention

on exactly the problem the court now finds it misapprehended. It follows that the Commission meant exactly what it said when it found the licensee was unreasonable in concluding that the show was as limited as the licensee suggested. There is plainly no error of law in the Commission's opinion; all agree that the licensee's judgment must be unreasonable.

More extraordinary than this imaginary error of law is the fact that once discovering it, the court does not follow the proper path of remanding the case to the FCC for application of the correct legal standard. Rather the court on its own applies the correct standard to the facts of the case. This action could be a result of two possible conclusions. First, the court may be assuming that it should review the evidence in Fairness Doctrine cases *de novo* and hence there is no reason to remand the case. The court tells us that this is not its view,[6] although I cannot see how else its conclusions on the facts could even be plausible. There is, of course, no authority for this view and as will be discussed below there is no First Amendment cause for creating such authority, at least in the context of determinations of controversiality. Second, the court may be assuming that the FCC could not reasonably conclude that NBC was unreasonable in arguing that the "Pensions" broadcast dealt only

thus presented by the Application for Review is whether the Bureau erred in its ruling that NBC's judgment on these matters was unreasonable." *Id.* at 1034.

5. Brief for the Federal Communications Commission, at 28–29:

But the Commission did *not* substitute its judgment for that of the broadcaster. It was at pains throughout its order to make clear that NBC's reasonableness was the question. And it was *not* the reasonableness of NBC's characterization of the subject matter of the program. In fact, the Commission conceded that the program *did* treat that subject . . . .. Thus, the Commission found that NBC was unreasonable in denying that it had presented viewpoints on the controversial issue . . .—not that NBC's characterization of the *subject* matter was unreasonable.

And as the Commission's Brief notes, it is established that a broadcast dealing with X subject may in fact present one side of Y controversial issue of public importance. *See* Friends of the Earth v. FCC, 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Wilderness Soc'y, 31 F.C.C.2d 729 (1971). Thus the issue, as the Commission repeatedly recognized, was whether NBC was unreasonable in assuming that its broadcast on "some problems" of private pension plans *also presented one side of a controversial issue* other than "some problems", *viz.* that described in the text.

6. 170 U.S.App.D.C. at ———, 516 F.2d at 1122–1123.

with "some problems of some pension plans." This approximates the court's stated principle of review, if one adds an element of super-scrutiny, allegedly designed to protect First Amendment interests.[7] But as discussed below there are no First Amendment interests involved in a licensee's "discretion" to argue before the FCC that its program is not controversial. (Part II. B, *infra*) Even if we assume that this second explanation of the court's refusal to remand the case fully comprehends the actuality of the court's review of the evidence, I do not think, in the absence of First Amendment interests, that this court should assume the initial task of weighing evidence when the evidence has been improperly considered by the Commission and when the subject under review is one to which the Commission's expertise is relevant.[8] Assuming, however, that the court is correct in this, I do not believe the record supports its conclusion and hence NBC's position, whether the evidence is reviewed *de novo* or under a reasonableness with super-scrutiny standard.

7. *Id.* 170 U.S.App.D.C. at ——, 516 F.2d at 1122:
"But the court has a greater responsibility than is normally the case, when it reviews an agency's fairness rulings that upset the licensee's exercise of journalistic discretion . . . ."

8. It is settled by a steady stream of authority that "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration." FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 87, 97 L.Ed. 15 (1952); *see* NLRB v. Local 347 Food Store Employees, 417 U.S. 1, 9–10 (1974) (Brennan J.); Arrow Transportation Co. v. Cincinnati, N.O. & Texas Pac. Ry. Co., 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 145–46, 60 S.Ct. 437, 84 L.Ed. 656 (1940); National Ass'n of Motor Bus Owners v. FCC, 460 F.2d 561, 566 (2d Cir. 1972); Williams v. Washington Met. Area Transit Comm'n, 134 U.S.App.D.C. 342, 415 F.2d 922, 939–40 (1968) (en banc), cert. denied sub nom. D.C. Transit System, Inc. v. Williams, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). This principle of judicial review is but an extension of the familiar rule of SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) which prevents a court from affirming an agency's decision on a ground other than that offered by the agency. The corollary is that a court may not reverse on a ground other than that considered by the agency unless the agency's decision cannot be sustained on any set of facts, *see Williams, supra* at 940, or the matter were one "within the power of . . . an appellate court to formulate." Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699, 705, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962) *citing* Chae-Sik Lee v. Kennedy, 111 U.S.App.D.C. 35, 294 F.2d 231, 234 (1961). Whether an issue is within the power of an appellate court depends on whether the issue is one which is within the expertise and experience of the agency. *Id.* The decision whether an issue is controversial is clearly one within the expertise and experience of the Federal Communications Commission. *See* the discussion *infra,* 170 U.S.App.D.C. pages —— ——, 516 F.2d pages 1171–1172. The matter of controversiality is thus not meet for *de novo* judicial consideration. This same point applies to the court's exercise of administrative powers in determining that there is a "reasonable balance" of contrasting views on overall performance. *See infra* 170 U.S.App. D.C. page ——, 516 F.2d page 1163.

There is nothing in Office of Communication of United Church of Christ v. FCC, 150 U.S. App.D.C. 339, 465 F.2d 519, 523–24 & n.17 (1972) which is inconsistent with this view. There we considered a *legal* issue raised by certain dissenting Commissioners even though the intervenor had not officially presented those arguments to the Commission. We held that the matter had been considered and that it would be futile to require further review by the Commission. I do not think we can say further review of factual material considered under an allegedly erroneous principle of law would be futile in the same sense. Rather further review of factual material might lead the Commission to state the matter in a manner which could be upheld under the proper legal standard even though that manner of statement is not apparent at the time of appellate decision. This follows from the fact that this court is bound by the administrative record but the Commission on remand could re-open the record for further evidentiary presentations. Furthermore, it is proper in such circumstances to await the Commission's exercise of expertise in weighing and ordering the facts in light of the proper view of the law before engaging in judicial review. *See* L. B. Wilson, Inc. v. FCC, 83 U.S.App.D.C. 176, 170 F.2d 793, 805–07 (1948) (en banc). *Cf.* SEC v. Chenery Corp., 332 U.S. 194, 200–01, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Fidelity Voices, Inc. v. FCC, 155 U.S.App.D.C. 363, 477 F.2d 1248 (1973).

**B. *NBC's Argument That the Program Did Not Discuss Overall Performance and Proposed Regulation In a Significant Manner is Manifestly Unreasonable***

A determination of whether the "Pensions" broadcast raised the issue of overall performance and the need for reform is undoubtedly confusing. Much of this confusion is a result of the manner in which the court re-conceptualizes the nature of the agreed upon controversial issue of public importance and once having done so, prunes the evidence around this re-conceptualization to achieve the desired result. This is the business of administrative agencies not appellate courts and is a result of the fact that the court has taken upon itself to apply the correct legal standard instead of remanding to the Commission. But with some trepidation, I criticize the court's analysis of the evidence. First, "in aid of analysis" [9] the court divides the FCC's definition of the controversial issue in two parts: (1) the issue of over-all performance of private pensions plans and (2) the need for reform of private plans. This signals a "divide and conquer" tactic which I consider extremely inappropriate; the significance of this tactic may be seen after a review of the evidence. So, for the moment, I follow the court's new split definition.

**1. *Commentary on Overall Performance***

Before exploring this issue, the court again divides the issue. It first (1) considers how many statements in the broadcast comment on overall performance, thus weeding out most of the broadcast, and then (2) compares the statements discovered to be adverse on overall performance with the statements discovered to be favorable, and finds a "reasonable balance." In regard to point (1), I state first (a) the comments in the broadcast I think are manifestly relevant to overall performance but which are not mentioned by the court and then (b) criticize the court's process of pruning out many manifestly adverse statements on overall performance.

(1)(a). The most serious omission from the court's collection of statements regarding overall performance are the various remarks of Senator Schweiker.[10] Schweiker begins by telling the audience that his subcommittee had made a study of fifty-one pension plans covering 6.9 million workers since 1950. He states that only eight per cent of the workers in those plans received their pensions. He lists a variety of reasons why this has occurred. Later on, Schweiker returns and states that he believes the government should guarantee vesting at a certain point. This is not just a discussion of "some problems." A survey of a very substantial sample leads a legislator to conclude that government guarantee of vesting of presumably all plans is required. Schweiker uses no general rhetoric but his comments are clearly directed to the functioning of the entire pension system.[11]

The court does not mention the narrator's opening remark that the program is the story about the hopes of working people, but hopes that are "all too often not realized." [12] The court does not mention Newman's (the narrator's) further comments (i) on the "slick brochures", "most" of which "do make a pension seem a sure thing" but the "many restrictions and exclusions are buried in fine print or concealed by obscure language"; [13] (ii) on the discrimination against lower and middle level employees, particularly women; [14] (iii) on

---

**9.** 170 U.S.App.D.C. at ——, 516 F.2d at 1125.

**10.** App. A, 170 U.S.App.D.C. at ——–——, ——, 516 F.2d at 1137–1138, 1146.

**11.** On this point, *see infra* 170 U.S.App.D.C. ——–——, 516 F.2d 1166–1168.

**12.** App. A, 170 U.S.App.D.C. at ——, 516 F.2d at 1134.

**13.** *Id.* 170 U.S.App.D.C. at ——, 516, F.2d at 1136.

**14.** *Id.* 170 U.S.App.D.C. at ——–——, 516 F.2d at 1140–1141:

It's also common for workers to get smaller pensions than they expect partly because many plans treat highly paid executives much better than lower and middle level employees.

the existence of fraud and mismanagement in private pension plans.[15] There are a number of other omissions but I think it better to mention those in connection with the comments that were discussed by the court in order to criticize the court's handling of the ones it did discuss.

(b). The opening sequence of the program is in my view a commentary on the whole of the pension system. The court mentions from this sequence only one statement by an unidentified man and a segment of Newman's opening statement.[16] The court does not mention the statement by an unidentified woman that "thousands maybe millions of them that's getting the same song and dance that my husband got"; the statement by an unidentified man that Hoffa gets a large pension but he gets very little, suggesting discrimination; and Newman's statement that there is "a good deal of bewilderment about [the shattering of retirement dreams] and bitterness . . . ." [17] The court makes the re-

markable statement that Newman's suggestion that "very many of the hopes will prove to be empty" does not mean that all or even most will be unprotected.[18] But the simple fact that a substantial number of dreams are shattered is a comment on overall performance. We need not prove that every single American is bilked of his pension before we decide that the overall performance of the plans is inadequate. The opening sequence taken as a whole reveals an attack on the overall inadequacies and inequities of the present pension plans.

The court's discussion of Herbert Dennenberg's statements is incomplete. Dennenberg clearly states that most pension funds are inadequate and later in the broadcast makes a sharp comparison between the extent of regulation of insurance companies and the lack of regulation of pension plans and states generally that pension plan funds are not being used for the benefit of the employees to whom those funds belong.[19] The court attempts to disarm these criticisms

---

Women get the worst treatment. . . . What's wrong with the system is most evident to the social worker . . . and to a few labor leaders . . . . .

**15.** *Id.* 170 U.S.App.D.C. at ——, ——, 516 F.2d at 1143–1144:

Pension funds have outgrown the laws regulating them. No government agency has enough staff or authority to control them. The Justice Department's labor section believes it's common for the pension money to be incompetently or dishonestly invested.

*See id.* 170 U.S.App.D.C. at ——–——, 516 F.2d at 1143–1145.

**16.** 170 U.S.App.D.C. ——–——, 516 F.2d at 1127–1128.

**17.** These statements are in App. A, 170 U.S. App.D.C. ——–——, 516 F.2d 1134–1135.

**18.** 170 U.S.App.D.C. at ——, 516 F.2d at 1128 discussing App. A, —— U.S.App.D.C. ——–——, 516 F.2d 1134–1135.

**19.** App. A, 170 U.S.App.D.C. at ——, ——–——, ——–——, 516 F.2d at ——, 1136–1137, 1144:

When you get to be sixty-five, you're out of work and you need a source of money and that's what a pension plan is supposed to do. Unfortunately, it's woefully inade-

quate. Over half the people have nothing at all from pension plans and those that do typically have only a thousand dollars a year so even if you have social security most pension funds are inadequate.

It's [the process of attaining eligibility and vesting] almost an obstacle course and the miracle is when someone actually collects with the plan. There have been studies that indicate that most people won't collect. I think we need controls of the same type we apply to insurance companies . . .

You have to work for an employer, you have to stay with him, you have to stay in good health, you have to avoid layoffs, you have to take your money, turn it over to the employer, hope that he invests it safely and soundly, you have to hope that when you're age sixty-five the employer is still around and he's likely to be in terms of the high mortality of business [sic], so there's almost a sequence of miracles which you're counting on.

Can you imagine what would happen if we would let insurance companies do whatever they wanted to? We can't even protect the public with full regulation in insurance, but essentially we have a pension system which is precisely an insurance plan and which is almost unregulated.

of the overall performance of the private pensions by asserting the accuracy of his factual assertions. But as the court itself notes, one may assume the validity of the factual assertions, and yet reach a different conclusion on the "value question" of whether those factual assertions make out a case of failure in overall performance and a concomitant need for regulation.[20] Dennenberg's own statements indicate which value choice he has made. His statements plainly thus refer to the previously defined controversial question, the overall performance of the plans.[21]

The court next attempts to disarm Dennenberg's and certain other statements relating to the alleged "inadequacies" of pensions in combination with social security and to a lesser extent the difficulties in achieving vesting by stating that these individual subjects (that is, alleged inadequacy and problems of vesting) are not themselves controversial issues of public importance (or at least the FCC has not so proven).[22] By this the court is attempting in the middle of argument to shift the ground of argument from the question of whether there was commentary on overall performance to whether the issue of overall performance should be sub-divided into various sub-issues and each of those sub-issues justified as controversial. The court indicates no grounds for overruling the Commission's definition of the controversial issue and as will be indicated below (170 U.S.App.D.C. ———, 516 F.2d 1168–1171, *infra*) it would be manifestly improper in this case to do so. The attempted disarmament fails; Dennenberg's comments are clearly on overall performance.

The treatment of Senator Williams' statement is also defective. Williams clearly states that the private plans promise retirement security but do not deliver it. Then, with Newman, he demonstrates how legislation might reform this failure. The court again shifting ground seems to admit that this is a comment on overall performance but states that the fact that "eligibility requirements are not clearly defined" has not been identified as a controversial issue.[23] Of course, this is true, but the reason is, as noted above, that the Commission had expressly refused to sub-divide the controversial issue beyond overall performance of the plans and the need for governmental regulation. The fact is that Senator Williams, Chairman of the Senate Committee considering pension legislation, made directly ad-

---

**20.** 170 U.S.App.D.C. at ——, 516 F.2d at 1128.

**21.** *See* the excerpt quoted in note 19 *supra* in which Dennenberg calls the private plans "woefully inadequate" and proposes insurance-type regulation.

**22.** 170 U.S.App.D.C. at ———, 516 F.2d at 1128–1129. The further discussion of inadequacy is at App. A, 170 U.S.App.D.C. at ———, 516 F.2d at 1141–1143. The court responds to those comments by referring back to discussion of Dennenberg. Slip-page at 53, 170 U.S.App.D.C. at ——, 516 F.2d at 1129.

The court's chain of argument in this section of the opinion is somewhat opaque. As noted in the text, the main drift seems to be that the various sub-issues are not controversial issues of public importance. But there is also a suggestion that the "main thrust" of the program was not on these various sub-issues. This second point is clearly true but proves nothing since the Commission itself expressly refused to find that the broadcast raised any sub- or mini-controversial issues other than the general issue of overall performance. *See* the excerpt quoted on *infra* 170 U.S.App.D.C. pages ———, 516 F.2d pages 1167–1168. The court's burden then is to show that either the Commission could not reasonably find that the general issue of overall performance was a controversial issue or that the statements relating to adequacy and problems of vesting and eligibility—two of the sub-issues—are not in fact comments on overall performance. The court makes neither showing and could not on the former issues, as discussed on *infra* 170 U.S.App.D.C. page ——, 516 F.2d page 1165 and plainly could not on the latter since inadequacy and vesting problems are clearly aspects of overall performance and the criticisms voiced of them relate to the system as a whole. *Cf. infra* 170 U.S.App.D.C. pages ———, 516 F.2d pages 1162–1166.

**23.** 170 U.S.App.D.C. at ——, 516 F.2d at 1129.

verse comments on the overall performance of the plans.[24]

The court describes the favorable comments given at the end of the program but again fails to put these comments in perspective. After the statements by Anderson and Hubbard, the only favorable comments on the program, Dennenberg, Gotbaum and Schweiker rebut their favorable comments with impassioned language. These three all had previously discussed in general and in specific the failures of the private plans and their impassioned comments have more meaning therefor. The sequence is closed by the following statement of an unidentified man: [25]

What are they waiting for? What the hell are they waiting for? Do they have to give us a certain quota, a certain number of people that have to be victims? Do they have to give us a certain amount of money? How many billions must it take before they do something about this? How many people have to starve? How many people have to lay on the sidelines and just hope and pray? How much misery do they want before they actually act upon it?

This statement is not mentioned by the court. It culminates a powerful closing sequence. And this statement is followed by Newman's final remarks in which he states that the situation as he has seen it is "deplorable."

(2) The court takes the comments on over-all performance that it has collected and finds that there is a reasonable balance between the favorable and unfavorable comments. The court's error is in its pruning of the many unfavorable comments on overall performance down to a fraction. When the evidence is ex-

amined, it is clear that the court erred in weighing the number of adverse statements and hence the existence of reasonable balance. Again I question whether this court should ever make a judgment on reasonable balance before the FCC is given an opportunity to do so. In this case the Commission expressly found a lack of reasonable balance.[26] But absent established facts which conclusively demonstrate that no other reasonable conclusion is permissible, I think the proper course is to remand to the administrative agency for a re-determination.

The more general error of the court's analysis on reasonable balance is its view that it can segregate the commentary on overall performance from the commentary on reform and from the commentary on "some problems" and find reasonable balance on overall performance alone. Of this, more will be said below (170 U.S.App.D.C. ———————, 516 F.2d 1166–1167, *infra*).

2. *The Need for Reform of the Private Plans*

This is the second division of the Commission's controversial issue of public importance. The court's discussion of this also demonstrates an assumption of powers reserved to administrators. The court "in aid of analysis" has divided up the controversial issue of public importance into two parts. After discussing the first part, it turns around and finds that the "Commission wholly failed to document its premise that there is a controversial issue in the assertion that there is a need for some remedial legislation applicable generally to pension plans."[27] The evidence for this statement is a letter from NBC to the Com-

---

**24.** App. A, 170 U.S.App.D.C. at ——————, 516 F.2d at 1136–1137:

> *Newman*: Senator, the way private pension plans are now set up, are the promises real?
> *Williams*: The answer is, they are not.
> *Newman*: So you want to get some reality behind the promise, Senator?
> *Williams*: Exactly. . . .

**25.** *Id.* 170 U.S.App.D.C. at ——, 516 F.2d at 1146.

**26.** Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1040–41 (1973).

**27.** 170 U.S.App.D.C. at ——, 516 F.2d at 1130–1131.

mission which stated that a number of groups supported some form of remedial legislation and that in the 35 witnesses that testified in the recent Senate hearing, none opposed all legislative efforts in the field.[28] This is woefully incomplete. "We know as judges, as we knew as lawyers" that interest groups opposed to serious regulatory efforts often offer pale substitute measures to stem the reform tide. This is exactly what happened in regard to the pensions reform legislation. Groups opposed to any reform coalesced behind a weak substitute, not because they were in favor of reform necessarily, but because in political terms this was, they hoped, the least damaging alternative.[29] The "evidence" adduced

28. *Id.* slip-page at 59, 170 U.S.App.D.C. at ——, 516 F.2d at 1132.

29. This fact is demonstrated by the legislative history. That history also documents the link between one's conception of the seriousness of the "some problems in some pension plans" with one's concept of reform. *See infra* 170 U.S.App.D.C. at pages —— – ——, 516 F.2d at pages 1166–1167.

Recent pension reform efforts began with the President's Comm. on Corporate Pension Funds and Other Private Retirement and Welfare Programs, Public Policy and Private Pension Programs—A Report to the President (1965). That Report recommended a wide-ranging reform of the private pension system, including further disclosure of pension operations, strict fiduciary standards, mandatory vesting, mandatory funding requirements, portability protection and plan termination insurance. This reform package marked out the central reform effort. It was opposed vigorously from the beginning. Pressure from businessmen led President Johnson to refuse to recommend adoption of the Committee Report when the Report was transmitted to Congress. *See* Editorial, *Phantom Pensions in Industry,* N.Y. Times, Apr. 17, 1971; Kessler, *Lapses by Huge Pension Funds Bring Cries for Greater Control,* Wash. Post, Nov. 24, 1970, both reprinted in Hearings on Private Welfare and Pension Plans Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 1st Sess. 94–95, 105 (1971). Hearings on the Committee Report were held in 1968 but the reform effort did not pick up steam until the 91st Congress. At hearings held in the House of Representatives in late 1969 and early 1970, industry and labor groups entered strenuous objections to the proposed reform efforts. The National Association of Manufacturers (NAM) at that time opposed all reform efforts except a tightening of fiduciary standards. Hearings on Private Welfare and Pension Plan Legislation Before the Gen. Subcomm. on Labor of the House Comm. on Education and Labor, 91st Cong., 2d Sess. 291–327 (1970). The Chamber of Commerce took a position virtually identical to that of the NAM, calling only for some increase in disclosure and proposing a "positive alternative" of increasing tax deferral benefits on pension plans. *Id.* at 531–53. The AFL–CIO supported the reform package for single-employer pension plans but sought a virtually complete exemption for multi-employer plans. *Id.* at 102–16. The industry position at that time is succinctly stated in American Enterprise Instit., Issues Affecting Private Pensions (April, 1971). The chief complaint was, as discussed in the previously cited testimony and in *id.* at 25, that the cost of the reforms would deter the expansion of the private pensions system and that the evidence of abuses in the present system was not sufficient to justify such a constriction of development. For further discussion of industry action against the major reform effort, *see* N.Y. Times, Sept. 6, 1973, at 37, col. 1; 1971 Senate Hearings, *supra* at 102, 109–10.

The major breakthrough for reform came in the 92d Congress. Senators Williams and Javits, after a study by the Senate labor subcommittee, introduced reform legislation along the lines suggested by the President's Committee. At the hearings on this bill, the NAM and the Chamber now supported some minimum vesting provisions and limited changes in disclosure provisions, as well as an increase in tax benefits, but continued to oppose strong vesting standards, mandatory funding requirements beyond those already imposed by the IRS for tax benefits, portability provisions and term insurance. Hearings on S. 3598 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess. 811–33, 969–76 (1972). The push for reform in the 92d Congress was stilled by a jurisdictional dispute between the Senate Finance Committee and the Senate Labor and Public Welfare Committee. *See* S.Rep. No. 1224, 92d Cong., 2d Sess. (1972); Editorial, *Action on Pension Plans,* N.Y. Times, Jan. 5, 1973, at 30, col. 1; N.Y. Times, March 30, 1973, at 25, col. 6. This jurisdictional dispute paralleled the minor theme in the NAM and Chamber of Commerce testimony to the effect that the Treasury instead of the Labor Department should have authority to administer any reforms and that emphasis should be on tax deferral benefits rather than mandatory vesting, funding, portability and termination insurance requirements.

The battle was again joined in the 93d Congress. Senators Williams and Javits again introduced a complete reform package along the

by the court is not substantial. The Broadcast Bureau, which the Commission affirmed on this point, quite correctly found on the basis of AIM's submissions[30] that a major legislative battle was shaping up and whether Congress should enact the tough reform legislation proposed was an extremely controversial subject of public importance.[31] The court is clearly erroneous, even as a matter of *de novo* review, in concluding that the need for reform legislation was not a controversial subject. And I have said nothing about the anomalous consequences of defining controversiality by reference to what interest groups in Washington are willing to support as legislation. The FCC did not have to consider whether sentiment in the nation was sufficient to render the subject con-

troversial despite the stand of certain interest groups; the court's position, however, requires that it do so consider. At the very least, the matter should be remanded to the Commission for further consideration.

One reason why this issue was not thrashed out at the agency level was that the Commission and the parties quite reasonably considered the controversial issue to be *both* overall performance and need for reform, assuming I guess that one's view of overall performance defined one's attitude toward reform. This assumption is certainly true of the many statements in the broadcast. The court thus creates this "void" in the record by its own division of the controversial issue allegedly to aid in its analysis. The two may thus not be considered

---

lines already indicated. S. 4, 93d Cong., 1st Sess. (1973). The Administration then put in its reform effort, which approximated the industry position, as that position was to appear in the 1973 hearings. For a critique of the Administration bill in contrast with the Williams-Javits bill, *see* N.Y. Times, Apr. 12, 1973, at 34, col. 1. The bill was S. 1631, 93d Cong., 1st Sess. (1973) and it proposed a limited mandatory vesting and some funding requirements, along with more disclosure and higher fiduciary standards, but relied chiefly on a passle of tax deferral benefits. For the 1972 Administration position, *see* 1972 Senate Hearings at 94–139. In the 1973 hearings in the Senate and the House the NAM and the Chamber now supported basically the concept of S. 1631, with continued strong opposition to higher mandatory vesting, portability requirements and termination insurance and with insistence on enforcement by the Treasury and jurisdiction with the Finance Committee. The industry groups repeated their concern with the cost of reforms and argued that reform would constrain the growth and economic health of the private system. *See* Hearings on S. 4 and S. 75 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. 770–72 (1973); Hearings on Private Pension Plan Reform Before the Subcomm. on Private Pension Plans of the Senate Comm. on Finance, 93d Cong., 1st Sess. 397–409, 472–500 (1973); *see also* Hearings on H.R. 2 and H.R. 462 Before the Gen. Subcomm. on Labor of the House Comm. on Education and Labor, 93d Cong., 1st Sess. 620–22 (1973). Notably, the most detailed presentation of the industry views was before the Senate Finance Committee and in the House another jurisdictional dispute erupted between

the Education and Labor Committee and the Ways and Means Committee. *See* N.Y. Times, Nov. 29, 1973, at 48, col. 3. The Employee Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829, 29 U.S.C.A. §§ 1001–1381 (Supp.1974), was signed into law on September 2, 1974. Its provisions on vesting and portability reflected the intense pressure against the reform efforts but in large part enacted the proposals originally suggested by the President's Committee. Some groups, however, charged that industry pressure had succeeded in gutting the bill. *See* N.Y. Times, July 1, 1974, at 13, col. 2.

This survey points up the extreme naivete of the court's statement that "there was no indication of any meaningful view opposing the concept of some reform legislation . . . .", 170 U.S.App.D.C. at ——, 516 F.2d at 1132 stating NBC's position which the court upholds. I assume that the NAM and the Chamber of Commerce possess a "meaningful view" and that view was against the "concept" of reform legislation. As the push for reform became stronger, these two groups as did the Nixon Administration retreated but battled all the way. Their acceptance in 1973 of "some" reform legislation is simply meaningless in any realistic determination of whether the issue of reform was controversial.

**30.** The AIM submissions were really two letters that pointed out that the major pension bill, *see* note 29 *supra*, was opposed by a significant number of groups. Joint App. at 24, 52.

**31.** *See* Accuracy in Media, Inc., 40 F.C.C.2d 958–67 (1973) (Broadcast Bureau), aff'd, 44 F.C.C.2d 1027, 1034 n.3 (1973). *See also* note 29 *supra*.

separately unless the court is willing to reverse the FCC's determination of what the controversial issue of public importance is in this case. Once this concept of inseparability is recognized, all the statements in the broadcast relating to the overall need for reform must be considered as comments on the controversial issue defined by the Commission. With these additional comments on overall performance, there is really nothing of substance left to the court's effort to uphold NBC's contention that the broadcast did not present one side of a controversial issue.

### 3. The Impropriety of the Court's "Divide and Conquer" Tactics

Implicit in the preceding discussion have been the following two conclusions about the nature of the court's error. First, the court attempts to sub-divide the controversial issue and then declare that the FCC has not proven that its various subparts are controversial. Second, the court sees a neat distinction between a televised presentation of a problem, an isolated incident, if you will, and an overall criticism of the institution or citizens to whom that problem relates. I deal with the second of these errors first.

There is no such neat distinction. If one presents in graphic form, an isolated but extremely serious problem, there will be sentiment to remedy the whole, the overall structure, simply to eliminate this problem. The court enjoins us to remember that the statement that one policeman takes bribes does not mean that all policemen take bribes. This is surely an irrelevant analogy. We may accept the court's formulation but still contend that an expose of bribe-taking, if suffi-

ciently serious examples are given, is sufficient to call into question the overall performance of the police department and to suggest that serious reform efforts be made. We do not need to find that all or even most policemen are on the take to begin to question the present structure of the police department. So it is simply not meaningful to say that one is concerned only with "some problems" of the police force when the problems raised are so serious. And, of course, the Congress or any citizen when they decide to reform the overall structure of an institution will never "know" that the institution is "riddled" with problems but only that "some problems of some" members of the institution are serious enough to warrant an overhaul of the system.

This is particularly the case when one deals not with a linear argument, e. g. statistics about the number of workers who lose benefits, but with pictorial and extremely immediate depictions of the actual victims. Television as we all know operates by images and the image one gets when one is bombarded with "some problems of some plans" as serious as the ones described in this broadcast in issue here is that the overall performance of the pension plans leaves a great deal to be desired. The court would seemingly find that the broadcast raised an issue as to overall performance if it ran before our eyes the statistics on the operation of most private plans—which would bore the tears out of most of us—but in this case finds no controversial issue raised when we are given in stark terms the human tragedy of plan failures.

With this point in mind, the Commission's decision comes right into focus:[32]

---

**32.** Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1040 (1973). A similarly correct observation was made by AIM in its initial confrontation with this sophistical distinction between "some problems in some pension plans" and commentary on overall performance:

No one denies that a fraction of the private pension plans have failed, just as no one denies that airplanes sometime crash. What was wrong with the NBC program on

pensions was that it created the impression that failure was, if not the rule, very common.

. . . . .

. . . We don't object to a program which shows up the warts and the pimples, but we do object to a program which deliberately attempts to convince the audience that the warts and pimples are symptomatic of an underlying cancer.

Our conclusion is not based upon a singling out, "line-by-line" or "statement-by-statement", of isolated expressions . . . . Rather it appears to us to be the only conclusion which can be drawn upon a review of the program in its entirety, and one which could be avoided only by ignoring a significant and substantial part of the material presented. We note here that in light of the presentation of so many statements sharply criticizing the performance of the entire pension system . . . , it would be an unrealistic oversimplification to characterize the program as one addressing only "some problems of some pension plans."

This is clearly the kind of rational administrative judgment, by an agency with experience in the field, which courts do not disturb. In particular, I note several elements of the broadcast which in addition to the previous discussion support the Commission's determination. Evaluation of the opening and closing segments of the program reveal a well-timed series of general criticism (opening) and general calls for reform (closing). The final tape, prior to Newman's summation, was the previously quoted, eloquent statement by an unidentified man which even on a bare transcript has enormous impact. The organization of the broadcast is built upon examination of a series of general problems with specific and moving examples to buttress the discussion. Those problems are (1) problem of vesting and eligibility; (2) problem of understanding the vesting and eligibility; (3) problem of loss of benefits through bankruptcy or closing of a business; (4) problem of portability and loss of benefits on termination; (5) problem of insufficient amounts for poor and middle income workers and suggestion of discrimination; (6) problem of fraud, mismanagement and self-serving in the disposition of pension funds; (7) the need for reform. Once this structure of the show is perceived it may be seen how great is the court's error in segregating the specific comments on overall performance and balancing those comments among themselves: the journalistic interaction between the overall statements on performance and the specific examples ("some problems") *which illustrate those overall statements* makes any such neat segregation an "unrealistic oversimplification" indeed. The whole structure of the program belies NBC's assertions that the show concerned only "some problems of some plans." The program clearly argues for the overhaul of the private pension plan system.

This discussion leads to consideration of the court's second major error mentioned above. The FCC on the basis of its experience with the Fairness Doctrine correctly defined the controversial issue in a manner which would be relevant to television—the image of the private pension plans ("overall performance" and not a bunch of legal subdivisions of that general concept) *and* the relation of that image to reform efforts ("the need for reform" and not any specific bill). To attempt to conceptualize the issue in any other manner is simply irrelevant to television. The court appears to recognize this at one point [33] but fails to apply it in its analysis. The court in its apparent rejection of this general conceptualization of the controversial issue of public importance does not tell us why the Commission erred. Indeed, there is no overt argument advanced in support of the court's sub-division of the controversial issue. As will be discussed below 170 U.S.App.D.C. ——, 516 F.2d 1171–1172, *infra*), there is much to be said for leaving the delicate question of defining what a particular broadcast is really "about" to an administrative agency which has experience in making such judgments. But be that as it may, there

---

Joint App. at 51, 53. *I do not agree that there was anything "wrong" about the program and I do not "object" to it either. However, the Fairness Doctrine does.*

**33.** 170 U.S.App.D.C. at ——, 516 F.2d at 1131.

is no evidence in this opinion of the court that the FCC's determination was unreasonable or even that a contrary determination would have been more wise.

Of course, once the Commission has defined the issue as it has, the licensee, found to have presented only one side, is thus obligated only to present the other side of that issue and not all other issues that might be latent in the broadcast. I quote the Commission's decision: [34]

> We note in this regard that NBC cites a long list of subjects concerning the vesting and portability of pension rights, the adequacy of plan funding and payments upon retirement, and the fiduciary relationship in pension plan management, and claims that under the staff's analysis and ruling each of these might be considered a distinct controversial issue of public importance entitled to separate treatment under the Fairness Doctrine. However, neither the staff's ruling nor our decision here gives grounds for such an overly-broad interpretation. While each of the subjects cited is an aspect of overall pension plan performance, there is no information before the Commission to indicate that these subjects are by themselves independent controversial issues of public importance. . . . [T]he applicability of the Fairness Doctrine . . . does not require their wholly separate treatment or discussion.

There can be, therefore, no argument that the Commission's definition of the controversial issue prejudices the licensee in responding such that this court would be justified in treating the Commission's definition as a series of mini-issues.

C. *Relation of the Court's Analysis to Current Doctrine on the Definition of a "Controversial Issue of Public Importance"*

The previous discussion concerning the court's effort to re-define the potential issues raised by a broadcast and thereby to prevent a finding that the broadcast did raise any controversial issues of public importance leads to a discussion of the administrative and judicial decisions on this subject. Those decisions illustrate both the problems of administration of the "controversiality" standard and the extent to which the analysis of the court departs from established doctrine. The purpose of this discussion is to suggest the chaos that further application of the court's analysis will cause.

The most difficult problem in the Fairness Doctrine is the definition of what particular issues are raised by a broadcast program. This may be named the "implicit issue" problem. The FCC in its recent policy statement on the Fairness Doctrine had this to say about the "implicit issue" problem: [35]

> [A] broadcast may avoid explicit mention of the ultimate matter in controversy and focus instead on assertions or arguments which support one side or the other on that ultimate issue. . . .

> [We] would expect a licensee [in determining whether such a broadcast presented one side of the ultimate matter in controversy] to exercise his good faith judgment as to whether [a] spokesman had in an obvious and meaningful fashion presented a position on the ultimate controversial issue . . . . The licensee's inquiry should not focus on whether the statement bears some tangential relevance [to the ultimate issue], but rather on whether that statement, in the context of the ongoing community debate, is so obviously and substantially related to the [ultimate issue] as to amount to advocacy of a position on that question. If, for example, the arguments and views expressed over the air closely parallel the major arguments advanced by partisans on one side or the

---

34. Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1042–43 (1973) *citing* National Broadcasting Co., 25 F.C.C.2d 735, 736–37 (1970).

35. The Fairness Doctrine and The Public Interest Standards of the Communications Act, 48 F.C.C.2d 1, 12–13, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C.Cir. July 3, 1974).

other of the public debate it might be reasonable to conclude that there had been a presentation on one side of the ultimate issue . . . .

The Commission has followed this general principle of decision in numerous cases[36] and the principle has been affirmed by this court.[37] The Commission followed this principle here. And as we have seen and as the evidence discussed in Part B above indicates, the principle should control disposition of the instant litigation. The program did focus on specific assertions and arguments made by those in favor of reform of the present pension plan system. Even the court would be hard pressed to deny this.[38]

As noted in Part B, one tool which the court uses to avoid this conclusion is that many of the statements allegedly commenting on overall performance are in the court's view only comments on a specific issue—such as inadequacy of the plans, obscure vesting and eligibility requirements and the like. But it may be easily seen that this tool totally undercuts the very basis of the Commission's

principle for determining whether an implicit issue has been raised. The court, by placing the burden on the FCC to demonstrate that these sub-issues are themselves controversial and of public importance, ignores the implication these assertions have in the presentation of the ultimate issue. The FCC cannot prove and has no intention of proving that the various sub-issues are themselves controversial and of public importance. It uses them only as evidence of a presentation of an ultimate issue.

So, the court's own implicit message must be that the FCC may not resort to the implicit issue principle but may apply the Fairness Doctrine only to overt editorializing denominated as such. No reasons are advanced for such a holding. It would be inconsistent with previous cases in this Circuit[39] and would gut the Fairness Doctrine. This latter eventuality would occur in two ways. First, of course, elimination of the implicit issue principle would make application of the Fairness Doctrine totally dependent on the discretion of the licensee, who could communicate his messages implicitly

---

**36.** *See* Media Access Project, 44 F.C.C.2d 755 (1973); Mrs. Fran Lee, 37 F.C.C.2d 647 (1972); Thomas Slaten, 28 F.C.C.2d 315 (1971); Lincoln Smith, 23 F.C.C.2d 45 (1970); John Birch Soc'y, 11 F.C.C.2d 790 (1968); Richard B. Wheeler, 6 F.C.C.2d 599 (1965). *See also* Wilderness Soc'y, 31 F.C.C.2d 729 (1971); "Living Should be Fun" Inquiry, 33 F.C.C. 107 (1962). An instructive comparison is between the instant program and a panel discussion of the Little Rock crisis on a Southern station. In the latter case, the licensee argued the panel only cautioned the people of Mississippi to remain calm during the crisis; the NAACP on the other hand pointed out that the show was devoted to expressing the segregationist point of view. In an enigmatic letter to the NAACP, the FCC concluded that the show was not sufficient to deny the license of WLBT but suggested that a violation of the Fairness Doctrine had occurred. This was before the FCC began its practice of hearing individual Fairness Doctrine complaints. *See* Lamar Life Insurance Co., 18 P & F Radio Reg. 683 (1959).

The corollary to these cases are the decisions which hold that an isolated statement in a broadcast does not give rise to a Fairness obligation. *See* Elsie Bradberry, 28 F.C.C.2d 312 (1971); National Health Fed'n, 26 F.C.C.2d 920 (1970); *cf.* American Conservative Union,

23 F.C.C. 33 (1970). This is probably the better explanation of David I. Kaplan, 38 F.C.C.2d 1027 (1973) and Bernard T. Callan, 30 F.C.C.2d 758, 761 (1971). This principle melds into the sub-issue principle enunciated in National Broadcasting Co., 25 F.C.C.2d 735 (1970).

*See also* National Sportsman's Club, Inc., 30 F.C.C.2d 636 (1971).

**37.** *See* Neckritz v. FCC, 165 U.S.App.D.C. 409, 502 F.2d 411, 418–19 (1974); Friends of Earth v. FCC, 146 U.S.App.D.C. 88, 449 F.2d 1164, 1170 (1971); Green v. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323, 329–32 (1971); Local 880, Retail Store Employees v. FCC, 141 U.S.App. D.C. 94, 436 F.2d 248, 257–59 (1970); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

**38.** As the evidence discussed in Part B indicates, the program was in large part a presentation of the statements of the leading supporters of the stiff reform legislation. So, the licensee did more than merely present the arguments on one side; it also presented the partisans who were making those arguments. The court presents no evidence to counter this conclusion.

**39.** *See* cases cited note 37 *supra*.

without a Fairness obligation or explicitly, with such an obligation.

But more importantly, the court's method of analysis—its implicit holding against the implicit issue principle—changes the focus from "ultimate issues", such as overall performance of private pension plans and the need for reform, to the various components of those ultimate issues. These components are often statements of fact, not opinion, and in general are not the sort to meet the Commission's standards of "controversiality", standards I will discuss in a moment. Statements of fact are not the concern of the Fairness Doctrine. The FCC has shown very little interest, and rightfully so, in claims that broadcasts are factually inaccurate.[40] There are some Fairness obligations associated with the failure to report facts, but that is not in issue in this case.[41] If the Fairness Doctrine were centrally concerned with the factual accuracy of broadcasts, we would expect some body of administrative doctrine defining the limits of agency intervention. But the only doctrine that exists is to the effect that there will be no intervention short of a willful misrepresentation by the licensee.[42] Rather the concern of the Fairness Doctrine is with "viewpoints", which consist of arrangements of facts and perhaps opinion in a journalistic form.

With this understanding, we may proceed to consider the problem of defining "controversiality" and the extent to which the court's opinion departs from established practice in that area as well. First, it is necessary to distinguish between a determination of "controversiality" and a determination of "public importance."[43] The former is the issue relevant here. Of the latter more will be said below. 170 U.S.App.D.C. ——, 516 F.2d 1176, *infra*) The Commission had this to say about the determination of "controversiality":[44]

---

**40.** The leading case supporting this assertion is Neckritz v. FCC, 165 U.S.App.D.C. 409, 502 F.2d 411, 418 (1974), aff'g, Alan F. Neckritz, 37 F.C.C.2d 528 (1973):

> [It] was not unreasonable to conclude that the commercials did not raise a controversial issue of public importance, but rather made claims of a factual nature which the petitioners contended were false.

This explains best, I think, the rule of National Broadcasting Co., 25 F.C.C.2d 735 (1970). *Cf.* David I. Kaplan, 38 F.C.C.2d 1027, 1030–31 (1973); note 36 *supra*. The sub-issue present in the *National Broadcasting* case concerned the competence of private pilots, a subject which was not the main effort of the program. The sub-issue might have been a controversial issue if presented differently; but as it was presented, it was merely one factual sub-issue in a general discussion of airport safety.

The Commission recognized this point when it stated in Storer Broadcasting Corp., 11 F.C.C.2d 678, 679 (1967) that a licensee could not "aver that the attack [was] true and therefore there is no need to let the public hear the other side; that rather the other side must be given an opportunity to reach the public." *See also* Accuracy in Media, Inc., 39 F.C.C.2d 22, 23–24 (1973) note 42 *infra*.

**41.** *See* Public Communications, Inc., 32 P & F Radio Reg.2d 319 (1974); Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249–51 (1949); Comment, Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine, 10 Harv.Civ. Rights—Civ.Lib.L.Rev. 137 (1975).

**42.** *See* Columbia Broadcasting System, Inc., 30 F.C.C.2d 150 (1971); Columbia Broadcasting System, Inc., 20 F.C.C.2d 143 (1969); Note, The First Amendment and Regulation of Television News, 72 Colum.L.Rev. 746 (1972). *Cf.* New York Times, Inc. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**43.** The Commission itself so distinguishes between the two issues, although the standards for decision overlap. *See* The Fairness Doctrine and The Public Interest Standards, 48 F.C.C.2d 1, 11–12, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C.Cir. July 3, 1974); note 70 *infra*. The court, 170 U.S.App.D.C. at ——, 516 F.2d at 1124, appears to confuse the two issues, using an argument essentially relevant to the public importance issue ("newsworthiness" does not equal "public importance") to control the definition of "controversiality." The court's cited authority, Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 922 (1972), on the other hand, is clearly concerned with the "public importance" issue and thus correctly applies the "newsworthiness" test.

**44.** The Fairness Doctrine and The Public Interest Standards, 48 F.C.C.2d 1, 13, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C.Cir.

The question of whether an issue is "controversial" may be determined in a somewhat more objective manner [than is the case with the "public importance" determination]. Here, it is highly relevant to measure the degree of attention paid to an issue by government officials, community leaders and the media. The licensee should be able to tell . . . whether an issue is the subject of vigorous debate with substantial elements of the community in opposition to one another.

This standard is built upon the nature of public debate and public debate is by definition a conflict of *viewpoints*, arrangements of fact and perhaps opinion, within a community. The standard is not basically concerned with factual disputes.

The court's analysis both in its splitting of the controversial issue into various sub-issues and in its discussion of the controversiality of the "need for reform" is not consistent with the Commission's standard. By re-defining the issue, the court has in effect reduced the issue from a generalized viewpoint on a public issue to a series of factual disputes. These factual disputes could not meet the standards of controversiality just mentioned because they are not viewpoints which contrast with other viewpoints in public debate. Furthermore, by considering only the actions of various interest groups in determining whether an issue is controversial, the court side-steps the issues of whether public debate over the need for reform is "vigorous" and whether "substantial elements of the community" are opposed in that debate. Instead of viewing Congressional attention to the issue as evidence of "controversiality", the court uses it as evidence of non-controversiality. The court has *sub silentio* overruled the Commission's standard for determining "controversiality."[45]

I think there is a proper role for Commission "expertise" or experience in the administration of the treacherous problems of determining what issues are raised by a broadcast and whether those issues are "controversial." The FCC has by now had 40 years of experience in dealing with telecommunications broadcasts and we may assume that it has gained the institutional experience which aids in the sifting and weighing of evidence in the application of the above-stated standards relating to the "implicit issue" problem and "controversiality." Furthermore, under present judicial organization, appellate courts have only a limited role in the evaluation of evidence. Finally, we must recognize that application of the "controversiality" standard and the "implicit issue" standard involve to a large extent an evaluation of the impact of a television message and a concomitant evaluation of the nature of a television communication. As noted previously, television communi-

July 3, 1974). This standard was applied in National Ass'n of Gov't Employees, 39 F.C. C.2d 1019 (1973); Mrs. H. B. Van Velzer, 38 F.C.C.2d 1044 (1973); The Center for Auto Safety, 32 F.C.C.2d 926 (1972); Lincoln Smith, 23 F.C.C.2d 45 (1970); Ted Bullard, 23 F.C. C.2d 41 (1970). Dr. John H. DeTar, 32 F.C. C.2d 933 (1972) is probably best viewed as a holding on the "public importance" question. *See also* Media Access Project, 44 F.C.C.2d 755 (1973); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 600–04 (1964). The corollary to these cases are those cases which hold that the licensee has no obligation to be fair to "insignificant" viewpoints. *See* Black United Front, 48 F.C.C.2d 1013, 1015 (1974), *citing* Dr. Benjamin Spock, 38 F.C.C.2d 316 (1972).

**45.** The Commission's standard for determining controversiality was implicitly approved in Green v. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323, 329–32 (1971); Local 880, Retail Store Employees v. FCC, 141 U.S.App.D.C. 94, 436 F.2d 248, 257–59 (1970); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). The data in note 29 *supra* amply demonstrates that in this case there were "significant" groups in the community and in a legislative body which held differing viewpoints on the overall performance of the private pension plan system and the need for reform.

cates by images and not linear argumentation. The manner in which the medium presents issues and participates in public debate is shaped by this mode of communication. Thus, the very concept of a "viewpoint" presented on television is defined by the nature of the medium. This fact magnifies the necessity of an appellate court to defer to the evidence-organizing functions of an experienced administrative agency. The court's opinion foregoes this necessity in favor of a super-scrutiny of the evidence. This is inconsistent with sound appellate practice and prior case law.[46]

The Commission has in one sense brought this mistaken decision upon itself. It has cried "wolf" too many times, avoiding serious scrutiny of programming under the guise of deferring to licensee discretion.[47] But at least the Commission knew there was a line to be drawn.[48] Now the court has erased it and the "reasonableness" standard of review of licensee discretion is therefore devoid of meaningful content. The Commission could, perhaps, avoid the consequences of application of the court's analysis in the daily run of Fairness Doctrine litigation. It will do so, however, only by ignoring the broader impact of the court's opinion on its traditional tools of analysis. We may be cer-

tain that the licensees will bring this fact to the Commission's attention. There is thus no way in which this court or the Commission can long prevent a conflict between this decision here and established Fairness Doctrine analysis. I think that potential conflict should be resolved now, by the court sitting *en banc.*

II. *The Court Has Misapprehended the Substantial First Amendment Issues Raised by Application of the Fairness Doctrine in this Case*

A. *There is No Exercise of Protected Journalistic Discretion in a Representation That a Program Is Not Controversial*

At various points in its opinion, the court reminds us that journalistic or editorial discretion in the presentation of news or public information is the core concept of the Free Press guarantee.[49] On this there can be no dispute. What can and should be disputed is whether a legal judgment by the licensee that a Fairness obligation does or does not attach to a particular program is such an exercise of "journalistic discretion." I know of no aspect of First Amendment doctrine that supplants the primary role of the courts and various censoring agencies in the definition of whether certain speech is fully protected *vel non.*[50]

---

**46.** *See* cases cited note 37 *supra. Cf.* Democratic Nat'l Comm. v. FCC, 156 U.S.App.D.C. 368, 481 F.2d 543 (1973); Democratic Nat'l Comm. v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891, cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 42 (1972); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971). *See generally* Greater Boston Television Corp. v. FCC, 143 U.S.App. D.C. 383, 444 F.2d 841, 850–52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**47.** *Cf.* San Francisco Women for Peace, 24 F.C.C.2d 156, 162 (1970) (Johnson, Comm'r dissenting); Note, The Regulation of Competing First Amendment Rights: A New Fairness Doctrine Balance After CBS?, 122 U.Pa.L.Rev. 1283, 1296–97, 1302–04 (1974). The FCC at times uses the magic slogan of deference to the licensee to avoid a statement of reasons for its actions. *See* Amalgamated Meat Cutters of North America, 25 F.C.C.2d 279 (1970).

**48.** *See* David S. Tillson, 24 F.C.C.2d 297, 298 (1970).

**49.** *See* 170 U.S.App.D.C. ——, —— ——, —— ——, 516 F.2d 1110, 1112–1113, 1119–1120, *citing* Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); Columbia Broadcasting Systems, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

**50.** There is, of course, the doctrine of *mens rea* which limits the government's ability to impose criminal-type punishment on someone who makes an erroneous judgment as to a mixed question of law and fact in the First Amendment area. *See* Mishkin v. New York, 383 U.S. 502, 510–11, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); Smith v. California, 361 U.S. 147, 80 S.Ct. 21, 4 L.Ed.2d 205 (1961). However, it was expressly held in Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 2908–11, 41

Therefore, a legal judgment by a licensee that its programming is or is not subject to the Fairness Doctrine cannot be legally binding upon the FCC or this court, in any form, as a true exercise of journalistic discretion must be. The issue in Fairness Doctrine litigation is whether an exercise of journalistic discretion is to be protected, not whether the licensee could reasonably conclude that it is. This follows from the fundamental precept of the Fairness Doctrine that only overall programming must be balanced and not each individual program. The legal argument thus in a very real sense turns on future obligations and not on past practice alone. In short, it is for the courts and not the licensee to define the licensee's future obligations under the Fairness Doctrine

and we cannot subvert this legal issue and our responsibility to resolve it by terming the issue itself an exercise of journalistic discretion.

As discussed in Part A above, the Commission does have a requirement that a licensee's judgment as to the existence of a controversial issue of public importance in a particular broadcast will be overruled only if unreasonable. However, the purpose of this requirement is apparently the need to reduce the burden of Fairness Doctrine litigation.[51] The requirement of licensee unreasonableness coupled with the strict pleading requirements necessary to make out a prima facie violation of the Fairness Doctrine [52] operate as "sensitive tools" [53] to reduce litigation with censoring agen-

L.Ed.2d 590 (1974) that a mistake of pure law could not be a defense. Even if it were, for First Amendment reasons, it would only operate to excuse an offender from punishment and not to permit an erroneous error of law to stand as the proper view of the law. *See* United States v. Barker, 168 U.S.App.D.C. 312, at 333, 514 F.2d 208, at 227 (1975) (Bazelon, C. J., concurring).

The court makes a rather extraordinary use of Commission dicta in American Broadcasting Co., 16 F.C.C.2d 650, 657–58 (1969). 170 U.S. App.D.C. at ——, 516 F.2d at 1123. There it confuses Commission review of a journalistic image to determine whether the licensee has distorted the facts and Commission review to determine whether a broadcast raises a controversial issue of public importance, lumping both together under the concept of "judgment as to what was presented." In the former, the Commission is reviewing a journalistic judgment as to the proper manner to present a factual picture but in the latter, as discussed in the text, the Commission is reviewing only a litigation judgment.

51. On this burden, *see* Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16, 69–70 (1972) (Bazelon, C. J. dissenting), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149, (1973); Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 923 (D.C.Cir. 1972); The Fairness Doctrine and Public Interest Standards, 48 F.C.C.2d 1, 8, 19–21, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No.. 74–1700 (D.C. Cir. filed July 3, 1974); H. Geller, The Fairness Doctrine in Broadcasting 23, 40–43 (Rand Corp. 1973). *Cf.* Grosjean v. American Press Co., 297 U.S. 233, 246–47, 56 S.Ct. 444, 80

L.Ed. 660 (1936). Fourteen such Fairness Doctrine proceedings involving recent newscasts are cited in Brief for National Broadcasting Co., at 22–23 n. *.

As the court discusses, 170 U.S.App.D.C. at ——, 516 F.2d at 1115–1117 *amicus* Henry Geller would have us force the Commission to return to review of Fairness Doctrine decisions only at license renewal time, relying on certain expressions in Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 110, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973) ("License renewal proceedings, in which the listening public can be heard, are a principal means of . . . regulation.") *See* the discussion of *CBS infra* 170 U.S.App.D.C. at page ——, 516 F.2d at pages 1174–1176. The court fails to rule on this issue because it had not been raised at the Commission level. However, shortly before the court's opinion issued, the FCC rejected the *amicus* contention in The Fairness Doctrine and Public Interest Standards, *supra*, 170 U.S.App.D.C. page ——, 516 F.2d pages 1112–1113. Thus, since the issue he raises is one of pure law within the power of a court to decide in the first instance, I think consideration at this time is proper. *See* Office of Communications of United Church of Christ v. FCC, 150 U.S.App.D.C. 339, 465 F.2d 519, 523–24 (1972); note 8 *supra*. This question should be appropriately considered *en banc*.

52. *See* Allen C. Phelps, 21 F.C.C.2d 12 (1969).

53. Blount v. Rizzi, 400 U.S. 410, 417, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), *quoting* Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *see* Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct.

cies in this delicate area. The First Amendment overtones to the reasonableness standard thus lie in this. But these First Amendment interests are rooted in controlling the process of distinguishing protected from unprotected speech and only with protecting journalistic discretion to the extent journalistic discretion might be hampered by the prospect of constant litigation. And these First Amendment interests have nothing to do with the "journalistic discretion" to represent to the censoring agent that a past exercise of journalistic discretion is something other than what it appears.

Two conclusions follow from a recognition of the court's error in granting First Amendment protection to a licensee's legal judgment. First, any expansion of traditional concepts of judicial review of agency action, such as that suggested by the court in this case,[54] cannot be justified by First Amendment interests, at least when the issue involves whether a broadcast raises a controversial issue of public importance. It follows that the extraordinary process of judicial review utilized by the court was improper. Second, it is abundantly clear that any possible insensitivity by the Commission, and I certainly perceive none, to the requisites of the "reasonableness" standard does not involve an intrusion into journalistic discretion but rather into the procedural guarantees that surround administration of the Fairness Doctrine. I do not think that any reasonable argument could be made that the Commission decision in this case in any manner infringed these procedural guarantees, as those procedural guarantees are presently understood. The fact that the Commission overruled the licensee's judgment in this case does not by itself raise any First Amendment issues.

## B. Constitutional Review of Fairness Doctrine Decisions After Red Lion

The constitutionality of some FCC regulation of broadcast journalism under present assumptions of scarcity of broadcast frequencies is settled by Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).[55] However, as the court notes,[56] the Court there approved only the personal attack and the political editorializing rules and expressly stated that it did not "approve every aspect of the fairness doctrine." [57] The language of the decision was more broad than the holding and provided the theoretical basis for a broadscale regulatory effort. In the more recent case of Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) the Court appeared to retreat from the more expansive dicta of Red Lion and stated that under the Federal Communications Act: "Only when the

---

1239, 1246–48, 43 L.Ed.2d 448 (1975); cf. id. 95 S.Ct. at 1243–44, citing Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). See also Starr WNCN, Inc., 48 F.C.C.2d 1221, stay denied sub nom. WNCN Listeners' Guild v. FCC, No. 74–1925 (D.C.Cir. Oct. 25, 1974). As is discussed *infra* 170 U.S.App.D.C. page ——, 516 F.2d page 1175, the Supreme Court in Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) recognized this constitutional base for the reasonableness requirement.

**54.** 170 U.S.App.D.C. at ——, 516 F.2d at 1122.

**55.** The Supreme Court reaffirmed the concept of scarcity in Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 101, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). I

have suggested that the Commission should reconsider this scarcity concept before it denies a broadcast license on that basis. See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16, 75–76 (1972), cert. denied 412 U.S. 922, 93 S.Ct. 273, 37 L.Ed.2d 149 (1973) (Bazelon, C. J. dissenting). My suggestion was not accepted. However, the FCC purported to re-examine the concept of scarcity in its recent report on The Fairness Doctrine and Public Interest Standards, 48 F.C.C.2d 1, 6–7, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C.Cir. July 3, 1974). See generally Bazelon, FCC Regulation of the Telecommunications Press, 1975 Duke L.J. 213, 223–29.

**56.** 170 U.S.App.D.C. at ——, 516 F.2d at 1111–1112.

**57.** 395 U.S. at 396, 89 S.Ct. at 1809.

interests of the public are found to out-weigh the private journalistic interests of the broadcasters will government power be asserted . . .." [58] Furthermore, in the case of Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court held that the Free Press guarantee protects the exercise of journalistic discretion in the presentation of a particular issue. Statutory-constitutional review after *CBS* and *Red Lion* thus requires us to define the contours of the "public interest" which may over-balance the protected journalistic discretion of the licensees.

In *CBS* itself, the Court held that the interests of the public in direct, paid access was not sufficient to overcome the protected journalistic [59] discretion of the licensees. However, the Court in dicta reaffirmed the concept of the Fairness Doctrine and seemed to suggest that the Fairness Doctrine was a permissible public interest obligation which might out-weigh the interest in protected journalistic discretion. The distinction between the Fairness Doctrine, which requires

presentation of contrasting views, and paid access, which accomplishes the same result, is that in the former journalistic discretion is placed between the holder of the contrasting view and the audience.[60] Thus, the Fairness Doctrine is, the Court suggests, a less limited governmental intervention into the process of journalistic discretion.[61] The key to this statutory-constitutional holding of *CBS*, extremely relevant to the case under review here, is that a system of paid access would give rise to an indeterminable number of Fairness obligations and other sorts of governmental regulations which will intrude into the journalistic process.[62] It is this sort of governmental oversight of day-to-day broadcast operations that is basis of the infringement of protected journalistic discretion. An expansive view of the number of issues to which a Fairness Doctrine obligation attaches would have a similar result. For expressly this reason, this court in Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 923 (1972) warned that the definition of a "controversial issue of public importance" should not be so expansive.[63]

---

**58.** 412 U.S. at 110, 93 S.Ct. at 2090.

**59.** The Court's reasoning on this point is not entirely clear. There is no exercise of "journalistic discretion" in deciding whether to accept an advertisement for broadcast time already set aside for such purposes. See Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S. App.D.C. 305, 473 F.2d 16, 75 n. 51 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973) (Bazelon, C. J. dissenting). Rather the intrusion would be caused by (1) the increased number of Fairness Doctrine complaints caused by the editorial advertisements shown, see 412 U.S. at 124, 93 S.Ct. 2080, and by (2) the effort to comply with the "reasonable regulations" which would be necessary to implement and control a paid access system, id. at 125–27, 93 S.Ct. 2080. The Court's decision is also based in part on alleged government involvement in speech in deciding who shall be permitted to purchase time and on the desirability of having a responsible public trustee exercise journalistic discretion rather than letting a multitude of speakers report their own views. Id. at 124–26, 93 S.Ct. 2080. The two intrusions into journalistic discretion suggested by the Court seem unduly magnified. Indeed, upon reflection, one could

seriously argue that the Fairness Doctrine is a much more intrusive intervention into journalistic discretion than a regulated paid access scheme. Compare Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 255–56, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) with Pittsburg Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

**60.** 412 U.S. at 124–25, 93 S.Ct. 2080.

**61.** Cf. 412 U.S. at 110–14, 125, 93 S.Ct. 2080. For reasons discussed in note 59 supra, I am not entirely convinced of this conclusion. I perceive no other way to read the case, however. Perhaps the element of deference to the Commission, 412 U.S. at 102–03, 121–22, 93 S.Ct. 2080, supplies the needed buttress to the Court's reasoning.

**62.** See 412 U.S. at 124–27, 93 S.Ct. 2080.

**63.** By elevating this [subject] to the dignity of a "controversial issue of public importance," we would insure that the licensees and the FCC would be swamped by complaints under the fairness doctrine, and that the licensees' only defense would be to eliminate everything controversial from the air. Obvi-

The issue thus presented is: how may a non-vague [64] line be drawn between those issues to which a Fairness Doctrine obligation attaches and those to which it is not. *Red Lion* held that the personal attack and editorial reply rules (the latter being a backstop to the equal time provisions of 47 U.S.C. § 315 (1970)) do represent a sufficiently significant public interest to outweigh protected journalistic discretion. These suggest that individual privacy [65] and the protection of the electoral process from undue influence [66] are compelling public interests and there is much doctrine outside of the broadcasting area to support that determination. This court in Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969) extended the definition to matters of public health where there existed a documented public health danger and a risk that persons might be uninformed about it.[67] A further element in the *Banzhaf* balance was the fact that the speech involved was commercial speech and thus entitled to less protection.[68] Presumably, a further element in the balance, to be weighed on the side of journalistic freedom, is whether the particular government intervention is information control, *i. e.* the licensee must present a contrasting view, or absolute censorship, *i. e.* the broadcaster is forced off the air.[69]

The post *Red Lion* constitutional-statutory issue perfectly framed by this case is whether the careful definition of a "controversial issue of public importance" outlined in the decided appellate

ously, the American public would be the loser.

*See also* note 51 *supra.*

64. *Cf.* Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 1243–44, 43 L.Ed.2d 448 (1975); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). *See also* Citizens Comm. to Save WEFM v. FCC, 165 U.S.App. D.C. 185, 506 F.2d 246, 252, 281–82 (D.C.Cir. 1974) (en banc) (Bazelon, C. J. concurring in the result); Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 450 F.2d 642, 659–61 (1971), rev'd sub nom. Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 128–30, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). The need for consistency in Fairness Doctrine decisions, a requirement concomitant with attempts to formulate non-vague standards, was recognized in Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971); Friends of Earth v. FCC, 146 U.S.App. D.C. 88, 449 F.2d 1164 (1971).

65. Because of the all-pervasive, immediate nature of telecommunications speech, Citizens Comm. to Save WEFM v. FCC, 165 U.S.App. D.C. 191, 214, 506 F.2d 252, 275 (1974) (en banc) (Bazelon, C. J. concurring in the result), attacks on a person's reputation via TV are more devastating. Speech that injures interests in reputation or privacy occupies a position on the lower range of the scale of protected speech. *See* Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Particularly when the remedy is only a right of reply, instead of a damage action, the privacy interests outweigh the interest in journalistic discretion. *Cf.* Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 258–59, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (Brennan J., concurring). A different result might obtain when the damaging information is already public. *See* Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). Of course, the personal attack rule exempts attacks made during commentary which is part of a bona fide newscast. Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 920 (1972).

66. *Cf.* Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); United States Civil Service Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Local 562, Pipefitters v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); NLRB v. Gissel Packing Co., 395 U.S. 575, 616–20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); United States v. International Union, UAW, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); United States v. Finance Comm. to Re-Elect the President, 165 U.S.App.D.C. 371, 507 F.2d 1194 (1974).

67. 405 F.2d at 1089–90, 1096–99, *citing* KFKB Broadcasting Ass'n v. Federal Radio Comm'n, 60 App.D.C. 79, 47 F.2d 670 (1931); *see* Friends of Earth v. FCC, 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971).

68. 405 F.2d at 1101–02; *see* Local 880, Retail Store Employees v. FCC, 141 U.S.App.D.C. 94, 436 F.2d 248 (1970); note 65 *supra.*

69. *Compare* 405 F.2d at 1103 *with* Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S. App.D.C. 305, 473 F.2d 16 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

cases should be extended to include major legislation pending before a significant legislative body [70] when the journalistic interest is at its height, *i. e.* investigatory journalism.[71] Is a "balanced" discussion of those sorts of issues a sufficiently important public interest to justify curtailment of journalistic discretion in such circumstances? I think this a very serious constitutional question which is obscured by the court's decision and now avoided since the court has decided not to reconsider the case *en banc.*

### III. *No Justification. Exists for Vacating the Previous Order Granting Rehearing* En Banc

I had thought when the court originally decided to rehear the case *en banc* that at least some of the questions I have raised about the panel opinion were sufficient to justify rehearing *en banc.* The only event between the issuance of the order granting rehearing *en banc* on December 13, 1974 and the order vacating that order on March 18, 1975 has

---

**70.** In The Fairness Doctrine and The Public Interest Standards, 48 F.C.C.2d 1, 12, appeal docketed sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C. Cir. July 3, 1974), the Commission stated that the "principal test of public importance . . is not the extent of media or governmental attention, but rather a subjective evaluation of the impact that the issue is likely to have on the community at large." In filling content into this standard, the Commission has often focused on the extent of governmental attention, largely the existence of legislative action. *See* Mrs. H. B. Van Velzer, 38 F.C.C.2d 1044 (1973); Dr. John H. DeTar, 32 F.C.C.2d 933 (1972); American Vegetarian Union, 38 F.C.C.2d 1024 (1973); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 600–04 (1964); Note, *supra* note 47, at 1320–21. *See also* The Center ,for Auto Safety, 32 F.C.C.2d 926 (1972). By so limiting the "public importance" standard, the FCC has made application of the Fairness Doctrine to programs raising such issues much more manageable. First, the crucible of the legislative process by its own dynamic produces certain groupings of viewpoints. So the Fairness obligation lies in presenting those viewpoints and not being "fair", whatever that might mean, to one viewpoint, or to be factually accurate in presenting a viewpoint. Both of these latter two possibilities raise severe First Amendment problems. *See* New York Times, Inc. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Since the viewpoints are produced by the legislative battle by itself, the licensee is not forced to choose between which "sides" it must present; the sides are produced naturally and the licensee need only report them. Under this view, the obligation to present contrasting viewpoints is really no different from the first branch of the Doctrine: the obligation to report significant events. *See* sources cited note 41 *supra.* When so viewed, the Fairness obligation is much less vague and much more easily ascertained, *see* note 64 *supra* and sources cited. Indeed, it is virtually no different than a requirement that licensees must ex-

ercise their journalistic discretion in regard to significant legislative battles, a requirement close to the "equal time" rule and similar to a requirement that Congress almost imposed on licensees, *see* Note, *supra* at 1320 n. 198. *Cf.* authorities cited note 66 *supra. Compare* the Fairness obligation associated with Presidential speeches, *see* Democratic Nat'l Comm. v. FCC, 156 U.S.App.D.C. 368, 481 F.2d 543 (1973); Democratic Nat'l Comm. v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891, cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 42 (1972); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971); Comm. for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283 (1970).

However, the ultimate test is that the American public not be left uninformed. *See* Green v. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323, 329 (1971). Here we have no evidence that the American public was not informed through all sources of information about the debate over the pensions plan reform, only evidence that they were not informed by the licensees owned by the National Broadcasting Company. *Cf.* Fidelity Television Co. v. FCC, 170 U.S. App.D.C. ——, at ——, 516 F.2d 1101 at 1118–1119 (1975); Citizens Comm. to Save WEFM v. FCC, 506 F.2d 252, 284 n. 79 (D.C.Cir. 1974) (en banc) (Bazelon, C. J. concurring in the result). *But see* Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16, 28 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). There is further more no evidence that the telecommunications media in general is likely to abuse its power to inform the people because of a private economic interest in one side of the pensions reform debate. *Cf.* Local 880, Retail Store Employees v. FCC, 141 U.S.App.D.C. 94, 436 F.2d 248 (1970); Lincoln Co. Broadcaster, Inc. 32 P & F Radio Reg.2d 928 (1975). *See generally* Bazelon, *supra* note 55 at 229–34.

**71.** *See* 170 U.S.App.D.C. at ——— ———, 516 F.2d at 1123–1124, *citing* Accuracy in Media, Inc., 44 F.C.C.2d 1027, 1041 (1973):

We have previously stated our recognition of the value of investigative reporting. . . .

been the Commission's Suggestion of Mootness. I am led to the conclusion that this must be the cause for the March 18 order, although the order does not so state, simply referring the Suggestion to the panel. If this is the cause, I am at a loss to understand the court's action.

First, the basis for the suggestion of mootness is the passage of the legislation which was the partial subject of the broadcast;[72] but that act was passed before the issuance of the panel opinion. The panel expressly confronted the issue of mootness in footnote 88 and rejected it for the obvious reasons. The fact that the FCC now presses the argument adds nothing to the potential mootness question. The issue is equally frivolous in my view whether considered *sua sponte* or upon the Suggestion of the Commission. The mere fact that the Commission now wishes to vacate its order in this case is, of course, no addition either since the *reason why* it does not wish to enforce its previous order is the erroneous conception of mootness. If the Commission is wrong on the mootness point, then it must enforce its order upon application by the intervenor or suffer reversal in this court.

Second, there is no reason to believe the panel will reverse itself on the mootness question. As the panel itself

notes,[73] even if the cause is now moot in regard to enforcement—and I see no reason why it would be—the stay pending disposition in this court must be explained. And surely the panel opinion is the vehicle for doing that. Thus, the panel opinion will remain the law. Furthermore, the Suggestion of Mootness is frivolous since controversiality in this case was never premised entirely on the fact that a majority of Congressmen might agree with the concept of overall performance and the need for reform presented by NBC. I certainly hope we have not yet reached the stage where a majority of Congressmen can by their votes determine that an issue is no longer "controversial." And presumably the definition of "controversial" does not mean 'that whatever a majority of citizens believe is *per se* non-controversial.[74] We might certainly question whether the interest groups that fought the pension legislation have now been converted and believe the Congressional action has become magically non-controversial by a movement of the Presidential pen. The argument is not substantial.[75]

The Commission in its brief on rehearing *en banc* tells us that it did not seek rehearing because it felt the panel opinion resulted "from a difference in interpretation of this particular case." [76] As discussed in Part I *supra,* I think the Commission is unduly sanguine about its

---

72. *See* Employee Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829, 29 U.S.C.A. §§ 1001–1381 (Supp.1974).

73. 170 U.S.App.D.C. at —— n. 18, —— - —— n. 88, 516 F.2d at 1109 n. 18, 1133–1134 n. 88.

74. *See supra* 170 U.S.App.D.C. page ——, 516 F.2d page 1170.

75. Furthermore, of course, if an issue made controversial by pending legislation, *see* note 70 *supra,* could be made non-controversial simply by passage of the legislation, we would have a case where the controversy is capable of repetition (further shows on legislative issues) but evading review (passage of the legislation makes the case moot). *See* Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 125–26, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498,

515–16, 31 S.Ct. 279, 55 L.Ed. 310 (1911); Alton & So. Ry. Co. v. International Ass'n of Machinists, 150 U.S.App.D.C. 36, 463 F.2d 872, 877–80 (1972).

76. Brief for Federal Communications Comm'n at 2 n. 1. The Commission also makes its recurring suggestion that we defer all Fairness Doctrine litigation until we review its report on The Fairness Doctrine and Public Interest Standards, 48 F.C.C.2d 1, appeal pending sub nom. National Citizens Comm. for Broadcasting v. FCC, No. 74–1700 (D.C.Cir. filed July 3, 1974). This we cannot do. NBC and AIM have through their actions presented a live controversy which requires resolution of certain issues. We cannot ignore those issues until a later appeal involving different parties. Resolution of *this* controversy requires their present consideration.

ability to ignore the panel's analysis in future cases. Perhaps the Court too can confidently consign this opinion to the judicial boneyard. I cannot. And this says nothing about the potential constitutional issues the court's opinion obscures. The court was right the first time, when it ordered rehearing *en banc.*

I suspect the court's action in reinstating the panel's opinion and denying rehearing *en banc* will be seen in some quarters as a vindication of the First Amendment rights of the telecommunications press. But it is not, appearances notwithstanding. The court has rather provided licensees with a litigation strategy for avoiding adverse Fairness Doctrine rulings—*i. e.* hassling complaining parties and the FCC about the definition of the controversial issue and whether a particular broadcast raises that issue. I see no purpose in providing such a litigation strategy but if that were all that occurred, we would only, as Roscoe Barrow notes in his commentary on the panel opinion, "have resorted to extracting some of [*Red Lion's*] teeth." [77] But the greater fear is that this litigation strategy will back up into the journalistic process itself and lead to the manipulation of programming in a manner designed to avoid the Fairness Doctrine through contortions in the subject matter of the program. If this occurs, we would be faced with the ironic consequence of the court's action having a greater chilling effect on broadcasters than a forthright, open application of the Fairness Doctrine.[78] The court will have granted the broadcaster the right to make non-controversial speech and in the name of the First Amendment, broadcasters may seek to embrace this "right." I seem to recall that it is controversial speech and not the right to assert that one's speech is not really controversial which should be protected. A corollary to this fear is my concern that invoca-

tion of the right to assert one's speech is not really controversial will only serve to denigrate and compromise a genuine journalistic achievement. I wonder what the professional journalists who prepared the "Pensions" program think about NBC's litigation position in this case that their program was not really controversial. My own thought is that NBC has by its litigation position done more to attack and undercut the "Pensions" program than anything AIM could have done through the FCC. This is the saddest commentary of all.

A further serious drawback to the court's approach is that it increases rather than decreases the ambiguity of the Fairness Doctrine. The uncertainty of operation of the Fairness Doctrine both heightens its chilling effect and increases the possibilities of Commission abuse of the Doctrine through "raised eyebrow" harassment as an alternative to overt enforcement and judicial review. The uncertainty also serves as a potential cover for politically motivated applications of the Fairness Doctrine. As the standards of the Doctrine become increasingly subjective, the direction in which the court points us, the possibility of political biases infecting decision-making of both Commissioners and appellate judges becomes a more serious concern. I had thought it agreed that if we must have a Fairness Doctrine, we should be as concise and definite as humanly possible in its administration. The court takes us in the opposite direction. The corollary to this point is that, as I noted in another context,[79] the First Amendment must always rely on rational analysis and constitutional command to support its invocation when its majority support is fragile, such as in the case of controversial and unpopular speech. The point applies as well to the licensees whose litigation judgments, it would appear, will now have much to do with how the Fairness

---

77. Barrow, The Fairness Doctrine: A Double Standard for Electronic and Print Media, 26 Hast.L.J. 659, 677 (1975).

78. *Cf.* Illinois Citizens Comm. for Broadcasting v. FCC, No. 73–1652 (D.C.Cir. March 13,

1975), 170 U.S.App.D.C. at ——–——, 516 F.2d at 1157–1161 (Statement of Bazelon, C. J.).

79. *Id.* 170 U.S.App.D.C. at ——, 516 F.2d at 1120.

Doctrine is administered. If they exploit the ambiguities of the Doctrine in lieu of a forthright attack on its constitutionality in particular applications, they will find the First Amendment less strong than before and may one day reap the harvest of that ambiguity being used in an unauthorized manner to control their expression.[80]

The court's opinion leads me to recall a favorite Lincoln story. He was asked by a delegation of constituents to make a public statement which he knew the people would never accept. After countering several arguments in favor of the statement, he asked the group: How many legs will a sheep have if you call the tail a leg? Five, answered the group. No, said Lincoln, he would have only four. Because a tail is not a leg.

I dissent.

On respondent's suggestion of mootness and oppositions filed in response thereto.

Before FAHY, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of respondent's suggestion of mootness and the oppositions filed in response thereto, it is

Ordered by the Court that the judgment of the court entered September 27, 1974, is hereby vacated, and it is

Further ordered that the case is remanded to the Federal Communications Commission in order for it to vacate its order of December 3, 1973, and to dismiss the complaint which led to the order.

FAHY, Senior Circuit Judge, filed an opinion in support of the order.

TAMM, Circuit Judge, filed an opinion in support of the order.

LEVENTHAL, Circuit Judge, filed an opinion concurring in part and dissenting in part.

FAHY, Senior Circuit Judge:

On September 27, 1974, this division of the court,[1] Judge Tamm dissenting, remanded this case to the Federal Communications Commission to vacate its order of December 3, 1973. The order grew out of proceedings before the Commission initiated by the public interest organization Accuracy in Media, Inc. (AIM). It had filed a complaint with the Commission that the National Broadcasting Company, Inc. (NBC) by its broadcast on September 12, 1972, of a documentary entitled "Pensions: The Broken Promise" had presented a one-sided picture of private pension plans. The Commission's Memorandum Opinion and Order affirmed the findings of its staff that NBC should afford a reasonable opportunity in its over-all programming for the public to be informed of the opinions of groups or individual spokesmen opposed to the viewpoint that the private pension system has performed poorly and should be regulated. The decision rested upon the Fairness Doctrine. NBC was ordered to submit a statement within 20 days indicating how it intended to fulfill its "fairness doctrine obligations."

NBC petitioned the court for review and for a stay. The panel granted the stay and, in an opinion disagreeing with the Commission that by the broadcast NBC had violated the Fairness Doctrine, remanded the case as we have noted, the Commission's order to be vacated.

### I

Prior to issuance of the panel's mandate the court en banc, on the suggestion of AIM filed October 29, 1974, ordered the case to be reheard en banc. Thereupon, in accordance with usual practice, the en banc court vacated the opinions and judgment of the panel, but continued the stay in effect. With the case in this posture the Commission on

---

**80.** *See generally id.*

**1.** Sometimes referred to as a panel, but see 28 U.S.C. § 46.

March 6, 1975, suggested to the en banc court that the case was moot. The Commission pointed out, as it had previously stated in its brief before the en banc court, "NBC is no longer under any duty to comply" with the order of December 3, 1973, because "that order contemplated compliance prior to enactment of pension reform legislation." The Commission continued,

Thus, an order of this court affirming the Commission will not result in the broadcast of additional views on the pensions issue. Similarly, an order reversing the Commission will not relieve NBC of any obligation to air additional material. Neither of the original adversaries in this dispute (NBC and AIM) nor the Commission stands to gain or lose by this Court's resolution of the case.

The Commission requested the court to remand the case to enable the Commission to vacate its order of December 3, 1973, as moot.

NBC, on March 13, 1975, opposed the suggestion of mootness, pointing out that in the decision of September 27, 1974, the panel had held that the enactment of the Employee Retirement Income Security Act of 1974,[2] had not mooted the case, and also that the controversy remained alive as involving two distinct, if related, issues:

the overall performance of the private pension system *and* the need for governmental regulation of all private pension plans. (Emphasis added by NBC in thus quoting from the Commission's opinion.)

NBC also relied upon the "important and recurring controversy" category as defined by decisions of the Supreme Court and of this court.

On March 18, 1875, in light of the representations of the Commission, the en banc court vacated its order of December 13, 1974, granting rehearing en banc, reinstated the panel's opinions and judg-

ment, and ordered that the suggestion of mootness and all responsive pleadings filed with respect thereto be referred to the panel for consideration.[3] The case is now before the original panel pursuant to that order.

## II

Memoranda have been filed by NBC, Amicus Curiae Columbia Broadcasting System, Inc. (CBS), and Intervenor AIM, all opposing the suggestion of mootness. The position of NBC has been noted above.

AIM supports the views of NBC and also contends that the suggestion of mootness is a disservice to licensees, the public and the Commission, reflecting a discouraging reluctance by the Commission to resolve the pivotal questions that are at the heart of effective regulation. AIM urges also that if one were to assume that the narrow factual controversy has somehow been resolved by the new legislation, the court properly may exercise discretion to decide the question of public interest, stated to relate "to the manner in which the Fairness Doctrine is to apply to 'investigative journalism' and the standards for assessing Commission review of broadcast journalists."

In response to the views of AIM and NBC opposing mootness the Commission disputes the "two-issue" arguments raised by them. It characterizes its decision as dealing with a single issue: "the issue of the overall performance and proposed regulation of the private pension system," language used in its Memorandum Opinion and Order. The Commission states that its decision "was rendered under the circumstance and in consideration of the existence of both aspects of the issue," and not as though they were separate issues.

CBS emphasizes, in its opposition, that the mootness question turns upon,

---

2. Pub.L. 93–406.

3. Chief Judge Bazelon dissented from this order and from denial of rehearing, and filed a statement of his reasons on June 2, 1975.

whether the matter which the Commission originally identified as "the controversial issue of public importance" treated in the broadcast has, by virtue of the intervening passage of legislation, ceased to be the controversial issue it was originally perceived to be.

CBS asserts it has not. The Commission responds,

The Commission had before it a fact situation which involved both parts of the issue and it is clear that its decision was based upon the existence of both.

The question, the Commission urges, "must be resolved in the context of the absence of facts material to the Commission's decision."

For reasons now to be stated I agree to remand the case to the Commission to vacate its order of December 3, 1973, and to dismiss the Fairness Doctrine complaint. At the same time I agree to vacate the panel's judgment of September 27, 1974, since the order to which it was directed is to be vacated.

### III

It cannot reasonably be disputed that the situation has materially changed since the Commission's decision and order of December 3, 1973, and, also, since this panel's decision and order of September 27, 1974. Moreover, largely to avoid the question of mootness which NBC suggested might be raised were it required to comply with the order of the Commission pending its review, we stayed the order between the two dates, and on the latter date reversed the Commission on the merits. NBC accordingly has never been required to comply with the order of the Commission. Between the two dates, on September 2, 1974, legislation regulating private pension plans was signed by the President, thus in large part, if not entirely, undermining the reason the Commission had ordered NBC to meet what the Commission considered NBC's obligation under the Fairness Doctrine, namely, to have the other side of the issue publicly aired as it might enlighten and influence the public and the legislative process. Positing this changed situation the Commission contends that "Any decision on the merits at this point would be an abstract ruling" and that compliance with its order would be "meaningless". While continuing to adhere to the position that when it decided the case it did so correctly, the Commission no longer seeks enforcement of its order.

Thus the Commission would have the decisional quality of its order removed by allowing it to be vacated, with the result that the ruling against NBC would be erased as it were, although the reasons given for it by the Commission, and the views advanced in the opinions of Judge Leventhal for the majority of the panel and of Judge Tamm in dissent would remain for their influence in the development of the law.

The Commission seeks the remand on the theory of mootness. It is clear, however, that this theory is simply the medium advanced by the Commission to enable the case to be ended without a definitive decision on the merits. The essence of the matter is that the Commission seeks permission to vacate its order.

### IV

There resides in the court a discretion to grant the permission, whether or not some peripheral aspects of the case may reasonably be considered to remain alive. Certainly the intellectual and legal points of view regarding the controversy aroused by the broadcast do not of themselves amount to an Article III controversy. Certainly, also, I think, the recurrence category under which a controversy is kept alive is not a compelling reason for holding that this case must continue as such a controversy, for it is almost if not entirely certain that any recurrence which might be envisaged would be in circumstances so different factually from the present that the differences would materially color the legal problems then to be decided. And if it be assumed, *arguendo*, that the

other side of private pension plans has a reasonable complaint that its views were not fairly presented in the NBC broadcast, it is true also that the Commission has a reasonable position that its decision and order would not have been made because of that alone, and apart from the legislative situation.

In the changed situation which has arisen—due to the stay of the Commission's order, the enactment of the new regulatory legislation before the order could be complied with, and, therefore, the failure of the proceedings to accomplish their main purpose—there resides authority in the court to respect the Commission's desire to vacate its order. The main purpose of the order cannot now be satisfied. The understandable desire of NBC that our majority decision remain effective is not a legal right to bind the Commission to an order which this panel considers should never have been entered, which our stay relieved NBC of the obligation of complying with, and which the Commission itself desires now to vacate because of changed circumstances. Nor do the important interests represented by intervenor AIM constitute a legal barrier to the grant by the court of the Commission's request, based as it is on developments which have drained the objective of the Commission, sought by AIM, of its major substance. Amicus Curiae CBS has no greater right than AIM.

The equity powers of a court in reviewing an agency order enable the court to "adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." Ford Motor Co. v. Labor Board, 305 U.S. 364, 373, 59 S.Ct. 301, 307, 83 L.Ed. 221 (1939).[4] Application of these equitable principles in different circumstances is illustrated by Mobil Oil Corp. v. F.P.C., 417 U.S. 283, at 311, 94 S.Ct.

2328, 41 L.Ed.2d 72 (1974), and Burlington Truck Lines v. United States, 371 U.S. 156, at 172, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Indiana & Michigan Electric Co. v. F.P.C., 163 U.S.App.D.C. 334, 502 F.2d 336, at 346 (1974); Sindicato Puertorriqueno de Trabajadores v. Hodgson, 145 U.S.App.D.C. 238, 448 F.2d 1161, at 1170 (1971); American Importers Association v. C.A.B., 154 U.S.App.D.C. 38, 473 F.2d 168, at 173 (1972).

The equitable principles embodied in the relationship between agency and reviewing court, utilized under a judicially controlled discretion, I think enables this panel to grant the Commission permission to vacate its order even though on remand for that purpose no other proceedings are to be had by the Commission in this matter. Surely in *Ford* the remand would not have been denied had the Board represented it intended to vacate its order and take no further action against the Ford Company. It is true that in *Ford* the Circuit Court had not passed upon the validity of the order of the Board before the motion to remand was made. This factual difference between *Ford* and our case while not insignificant is not controlling. The Commission is not being allowed to wipe the slate clean in order to escape the consequence of an adverse judicial decision. To allow it to do so would be to abuse both the administrative and the judicial functions. As the Supreme Court said in *Ford*, "we are unable to conclude that the Board has an absolute right to withdraw its petition at its pleasure." 305 U.S. at 370, 59 S.Ct. at 305. But the discretion to permit the withdrawal was held to reside in the Court. Such discretion would not seem to be rendered unavailable by the circumstance here that an adverse decision of the panel, subject to further judicial scrutiny,[5] has been rendered on the mer-

---

4. The Court there upheld the Circuit Court's grant of the Labor Board's motion to remand a cause to the Board to enable it to set aside its findings and order, to issue proposed findings, with permission to the parties to file exceptions and present argument, the Board to

make its decision and order upon a reconsideration of the entire case.

5. The adverse decision here was brought in question by the court en banc ordering a rehearing of the panel decision and vacating its order. The situation was restored only aft-

its. Developments other than the decision of the panel have intervened to animate a controlled discretion to permit the litigation to be ended. The Commission I think acts in good faith and is well justified in its position that intervening events have drained the controversy of much if not all of its substance, so that the Commission's hope and purpose of vindicating the Fairness Doctrine cannot be achieved in this case, with the consequence that the reality of the present situation would best be served by permitting the Commission to vacate its order.

TAMM, Circuit Judge:

I must conclude that the controversy concerning the *Pensions* program has been mooted by subsequent events. Consequently, I support the order vacating the prior judgment and remanding the case to the Commission to dismiss the fairness doctrine complaint.

The Commission argues that the enactment by Congress of pension reform legislation has mooted the case and that even if its position on the merits were vindicated, it would no longer order NBC to discharge its fairness doctrine obligations. Undeniably, the need for legislation was not the only controversial issue identified in the *Pensions* program, the Commission also asserted that the current overall performance of the private pension system was such an issue. Accuracy in Media, 44 F.C.C.2d 1027, 1039 (1973). However, the context of that latter determination must be understood. As NBC concedes, the idea for the program was principally generated by Senate hearings and reports detailing abuses in the pension industry and calling for reform. J.A. 24, 124. The NBC crew was in contact with the relevant Senate staff, the show was broadcast the week of the reports' release, and the program was seized upon by reform leaders as

further evidence of the need for legislation. *Id.* at 24.

Since the controversial nature of the performance of the pension system was inexorably intertwined with the controversial issue of the need for legislation, resolution of the latter question must have a significant impact on the controversial nature of the former. In essence, while passage of the legislation does not eliminate the possibility of inquiry into pension performance, it does transform what may have been a controversial issue into merely a newsworthy one. *See* Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 922 (1972). In such circumstances, it would be unrealistic for the Commission to continue to press for further programming on the issue.

It is axiomatic that in federal jurisdiction, an actual controversy must exist at all stages of appellate review, not simply at the date the action is initiated. *See* DeFunis v. Odegaard, 416 U.S. 312, 319, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). Here, the Commission's position has destroyed the adverseness between the parties required for the exercise of Article III jurisdiction. Moreover, since events have eliminated the possibility of relief, dismissal is the appropriate remedy. *See* Alton & So. Railway Co. v. International Ass'n of Machinists and Aerospace Workers, 150 U.S.App.D.C. 36, 463 F.2d 872 (1972).

In its September 27th opinion, the majority briefly considered the mootness issue. Upon reflection, I find all the arguments against mootness, advanced either in the September 27th opinion or today, unpersuasive. The argument that legislation is always subject to reconsideration is little more than specious; by this line of reasoning, the passage of legislation could never end a dispute because the legislature might in the future rescind it. Second, the principle of Southern Pacific Terminal Co. v. ICC,

---

er the mootness issued was suggested, which the en banc court apparently thought not of sufficient importance to remain with it for disposition. In the circumstances we have no reason to suppose the Commission's desire to

"wipe the slate clean" now is due to other than the changed factual situation rather than to avoid the possibility of an ultimately adverse court decision.

219 U.S. 498, 515–16, 31 S.Ct. 279, 55 L.Ed. 310 (1911) is certainly not applicable. While the controversy is undoubtedly capable of repetition, I doubt whether it will continue to evade review. If the history of this country tells us anything, it is that not all controversial issues will be expeditiously resolved by congressional action. Finally, although the majority opinion may be used to explain why two members of the division voted to maintain a stay, that does not give us license to effectuate a judgment in a case that is moot.

Judge Leventhal, in his first new argument today, maintains that the case is not moot because NBC has "continuing contacts" with the Commission. This new "continuing contacts" test seems to be little more than one-half of the *Southern Pacific Terminal* test discussed above; specifically, since NBC maintains "continuing contact with the Commission," the controversy is capable of repetition and therefore should be adjudicated. However, that the controversy before us is capable of repetition does not mandate invoking an exception to the mootness doctrine; to avoid a finding of mootness the moving party must also demonstrate that the issue involved evades review. There has been no such showing in this case.

The cases on which Judge Leventhal relies do not stand for the proposition that a case remains "live" because the parties to the controversy will in the future have "contact" with each other. In the two class action cases cited by Judge Leventhal, Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), and Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), members of the class had, *at all times*, an actual controversy with the state officials involved, even though the named plaintiffs no longer had such controversies. In the case *sub judice*, NBC, the only party adversely affected by the Commission's decision, no longer has an actual controversy with the Commission. Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1

(1974) is similarly unsupportive of Judge Leventhal's position. In *Super Tire*, the plaintiffs sought declaratory and injunctive relief on the ground that the receipt of public welfare benefits by striking employees was an invalid interference with national labor policy. Although the strike that precipitated that suit was settled before an adjudication of the merits, the Supreme Court concluded that an actual controversy existed for two reasons. First, the Court noted that the plaintiffs were seeking *declaratory*, as well as injunctive relief:

> Clearly, the District Court had "the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusions as to the propriety of the issuance of the injunction." Thus, even though the case for an injunction dissolved with the subsequent settlement of the strike and the strikers' return to work, the parties to the principle controversy, that is, the corporate petitioners and the New Jersey officials, may still retain sufficient interests and injury as to justify the award of declaratory relief.

*Id.* at 121–22, 94 S.Ct. at 1698 (citations omitted). Moreover, the Court stated that the case fell within the purview of the *Southern Pacific Terminal* principle: "If we were to condition our review on the existence of an economic strike, this case most certainly would be of the type presenting an issue 'capable of repetition, yet evading review.'" *Id.* at 125, 94 S.Ct. at 1700. However, the case before us is not one for declaratory relief and does not raise the unique issues present in a declaratory judgment context, nor does it present issues "capable of repetition, yet evading review." In short, *Super Tire* does not explain either directly or analogously why the case *sub judice* is not moot.

Judge Leventhal's second new argument, the existence of so-called "collateral consequences", is unavailing. Since the court has today ordered the Commission to dismiss the fairness doctrine complaint against NBC, it cannot be used adversely at license renewal time.

Moreover, any "chill" that Judge Leventhal perceives stems from a gross misinterpretation of the Commission's opinion and the fairness doctrine itself, which will be discussed later. In short, I support the court's order for I believe that the case is moot.

Despite the conclusion we reach today, circumstances peculiar to this case compel me to supplement my previously expressed views. Since I cast the only vote on jurisdictional grounds, this undertaking, notwithstanding Judge Leventhal's astonishment, is far from unprecedented. *See, e. g.,* Chambers v. Maroney, 399 U.S. 42, 54–55, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (Stewart, J., concurring); Evans v. Newton, 382 U.S. 296, 315–16, 86 S.Ct. 486, 15 L.Ed.2d 373 (1969) (Harlan, J., dissenting). First, it would be less than candid not to take note of the exceptional interest and attention that has been paid this case; it is an important case simply because it has been regarded as one. Both affirming or overruling the Commission has been viewed as having a "chilling effect," either on the Commission's enforcement of the fairness doctrine or on the broadcasters' continued discharge of their journalistic responsibilities; in this atmosphere, I believe I should set out my views with more particularity. Moreover, I also feel a responsibility to express my views in more detail in light of the exceptional procedural circumstances surrounding this case; the eleventh hour suggestion of mootness has been sufficient to drain the case of its "exceptional importance" which prompted the original decision to rehear the case *en banc.* Finally, I am convinced that the majority opinion represented such a severe departure from existing fairness doctrine jurisprudence that it demands extended scrutiny.

I

The question before this court has been the correctness of the Commission's December 3, 1973 decision. There are several reasons why I did not join, nor can I now endorse, the majority's September 27, 1974 reversal of that decision.

My first source of disagreement is my firm belief that the majority either mischaracterized or misperceived the thrust and holding of the Commission's decision. While, as I shall demonstrate, the majority compounded its error by applying to this distorted perception an incorrect standard of review and a tortured interpretation of the fairness doctrine, much of the majority's error stemmed from this defective factual foundation.

No one disputes that the Commission must not overturn a licensee's determination unless the licensee acted in bad faith or was unreasonable. The majority accused the Commission of making a "mistake of law" by departing from that standard. 170 U.S.App.D.C. ——, 516 F.2d 1118. It focused with microscopic precision on the following sentence in the Commission's opinion:

> The specific question properly before us here is therefore *not whether NBC may reasonably say* that the broad, overall "subject" of the "Pensions" program was "some problems in some pension plans," but rather whether the program did *in fact* present viewpoints on one side of the issue of the overall performance and proposed regulation of the private pension system. [emphasis added.]

*Id.* ; *see* 44 FCC 2d at 1035. The majority then concluded:

> Thus the Commission ruled that even though NBC was reasonable in saying that the subject of "Pensions" program was "some problems in some pension plans," in determining that this was the essential subject of the program, its dominant force and thrust, nevertheless NBC had violated its obligation as a licensee, because the Commission reached a different conclusion, that the program had the effect "in fact" of presenting only one side of a *different* subject.

170 U.S.App.D.C. ——, 516 F.2d 1118. Later in its opinion, the majority attempted to buttress its characterization of the Commission's "erroneous" holding by asserting that "[t]he staff's ruling that NBC was unreasonable in this judg-

ment [the proper standard] was not sustained by the Commission." *Id.* 170 U.S. App.D.C. ——, 516 F.2d 1125–1126.

In fact, the Commission never overruled NBC's characterization of the program's theme while conceding that the characterization was reasonable. Moreover, it is patently incorrect that the Commission failed to sustain its staff's crucial ruling. Finally in contrast to the majority's myopic embrace of a single quoted-out-of-context sentence as demonstrating both the Commission's holding and error, a fair reading of the Commission's entire opinion reveals that the Commission applied the proper standard and found NBC's characterization of the subject of the program to be unreasonable.

Apparently, the majority found its mistake of law in the sentence set out above. Concededly that sentence is prone to the majority's inference, *but only if read in a vacuum as the majority was content to do.* In the same paragraph of its opinion, the Commission clearly stated that its role was "to determine whether the licensee can be said to have acted reasonably . . . ." 44 FCC 2d at 1034, *quoting* Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 FCC at 599. In performing that role and rejecting NBC's characterization as unreasonable, the Commission found:

> it would be an unrealistic oversimplification to characterize the program as one addressing only "some problems of some pension plans." The program did examine such problems, but it would strain the most *"permissive standard of reasonableness"* past the breaking point to imply that the program was confined to such a limited examination.

44 FCC 2d at 1040 (emphasis added). To base reversal on that one sentence would be simply blinking reality.

Similarly, the Commission never overruled its staff's finding of unreasonableness, for it explicitly held:

> The basic issue thus presented by the Application for Review is whether the [staff] erred in its ruling that NBC's judgment on these matters was unreasonable. For the reasons which follow, we affirm the [staff's] ruling.

*Id.* at 1034. Further, the Commission ruled that:

> we cannot accept as reasonable a judgment that the "Pensions" program did not present views advocating one side of a controversial issue of public importance within the meaning of the fairness doctrine, that issue being the overall performance of the private pension system and the need for governmental regulation of all private pension plans.

*Id.* at 1039.

In sum, the majority proceeded to its conclusion armed with a complete misperception of the decision we were called upon to review.[1] If that alone did not produce the error of its ultimate holding, the majority exacerbated its difficulties by applying woefully inappropriate legal standards of review.

Without adequate justification, the majority refused to follow decades of consistent application of the standards used by courts to review determinations of administrative agencies. The function of the reviewing court has been and still is to ensure that the agency's determination is supported by substantial evidence, that the agency has not exceeded its powers, and that it has engaged in reasoned decision making. *See, e. g.,* Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). No person had more forcefully articulated the

---

**1.** I am quite frankly surprised that Judge Leventhal can claim, in his opinion accompanying our order to vacate, that the majority opinion was not solely based on paragraph 17 of the Commission's opinion. Curiously, Judge

Leventhal has not further identified the Commission's "error", undoubtedly, because he cannot; the Commission's opinion remained wholly faithful to past precedent.

court's limited role in reviewing agency determinations than Judge Leventhal. In WAIT Radio v. FCC, 135 U.S.App. D.C. 317, 418 F.2d 1153, 1156 (1969), he recognized:

> Of course busy agency staffs are not expected to dot "i's" and cross "t's." Our decisions recognize the presumption of regularity. We adhere to "salutary principles of judicial restraint." Courts are indulgent toward administrative action to the extent of affirming an order where the agency's path can be "discerned" even if the opinion "leaves much to be desired."

(citations omitted).

The majority reaffirmed the court's limited role when the Commission upholds a licensee's actions against a fairness doctrine challenge. However, the majority then departed from its proper role and held that where the Commission determines that the licensee has *not* discharged its fairness doctrine obligations, a stricter standard of review must be applied "because the area is suffused with First Amendment Freedoms . . . ." 170 U.S.App.D.C. ——, 516 F.2d 1122. Citing a phrase from the opinion I authored in Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973), the majority concluded that the court must take a "hard look" at the case. *See id.* 170 U.S.App.D.C. ——, 516 F.2d 1122. I can find no justification in reasoning or in precedent for a new and unwarranted "hard look" standard of judicial review.

The scope of our review is limited here to established standards; Congress had delegated the function of regulating the broadcast industry to the Commission,

not to this court. Specifically, the Supreme Court in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 379, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), emphasized that the Commission is invested with the power to promulgate rules and regulations as the "public convenience, interest, or necessity requires," and that "[t]his mandate to the FCC to assure that broadcasters operate in the public interest is a broad one, a power 'not niggardly but expansive.'" Moreover, in Columbia Broadcasting System v. Democratic National Committee, the Court stated:

> Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half century. For, during that time, Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned. . . .
>
> Thus, in evaluating the First Amendment claims of respondents, we must afford great weight to the decisions of Congress and the experience of the Commission.

412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). The more stringent standard of review to which the majority gave birth utterly ignored congressional judgments and Supreme Court precedent, and failed to give any weight, let alone great weight, to the "experience of the Commission."[2]

---

**2.** In his opinion today, Judge Leventhal now has dropped all protective coloration and explicitly states that the case *sub judice* merits an exception to the normal standard of judicial review of agency action because the licensee's journalistic discretion is "suffused with First Amendment values." I am constrained to join with Chief Judge Bazelon in concluding that there is "no aspect of First Amendment doctrine that supplants the primary role of the courts and the various censoring agencies in

the definition of whether certain speech is fully protected *vel non*." NBC v. FCC, 170 U.S. App.D.C. ——, 516 F.2d 1156 (1975) (Statement of Chief Judge Bazelon, dissenting from the order vacating the previous order granting rehearing *en banc.*) Judge Leventhal's restatement of the principles upon which he relied further strengthens my belief that the majority impermissibly attempted to void *sub silentio* congressional and Supreme Court judgments affirming the efficacy of the fairness doctrine.

Not only do I question the majority's departure from established standards of judicial review, but I also challenge the standard that the majority applied. The majority maintained that the court must take a "hard look" at this ruling because of the first amendment implications, and that this doctrine was allegedly made a part of our jurisprudence by Brandywine-Main Line Radio, Inc. v. FCC, *supra*. I do not agree. The "hard look" doctrine was not used in *Brandywine* to justify a stricter standard of review of Commission findings. Before the case *sub judice*, I knew of no other that had used the hard look doctrine as a rule of judicial review. Heretofore, "hard look" has been used as a shorthand designation for the requirement that an agency engage in reasoned decision making. *See, e. g.*, Greater Boston Television Corp. v. FCC, *supra*, 444 F.2d at 850–52. Since a court must always diligently examine the record to determine whether the agency's determinations are supported by substantial evidence, stating that we must take a "hard look" at the Commission's actions is mere surplusage. Moreover, when I stated in *Brandywine*[3] that we must take a hard look at the case, I was referring to the contention that the Commission's decision was unconstitutional; after a careful scrutiny of first amendment precedent I concluded that the Commission's decision fully respected first amendment principles. Unlike my *Brandywine* opinion, the majority opinion, eschewed the need to decide the first amendment challenge to the fairness doctrine. 170 U.S.App.D.C. ——, 516 F.2d 1109. In short, the majority did not offer any reasoned explanation for departing from the normal standard for judicial review of agency action.

Accoutered with an interpretation of the Commission's opinion so misguided that it strained credulity, and a profoundly incorrect legal standard, the majority proceeded to substitute its own judgment for that of the Commission concerning the content of NBC's program and the reasonableness of NBC's position. Although the majority opinion was replete with disclaimers such as "the court is not given carte blanche or an authority to interpolate its own discretion or judgment as to what should be done by the agency . . . ", 170 U.S. App.D.C. ——, 516 F.2d at 1122, the majority's actions belied its words. An examination of part VI of the majority opinion illustrates that the majority substituted its own view of the record by applying a methodology for analyzing the content of the program and the licensee's judgment as to whether a controversial issue of public importance was raised that was fraught with error. In so doing, the majority rejected the Commission's approach, the agency Congress designated to regulate the broadcast industry, without ever concluding that it was arbitrary, capricious, or otherwise an abuse of the agency's discretion.

The majority's first error was its uncritical acceptance of snippets of reviews *selected by NBC* to support NBC's conclusion that no controversial, issue of public importance had been presented. *Id.* 170 U.S.App.D.C. ——, 516 F.2d 1125–1127. The Commission refused to consider the reviews as "substantial factors" because:

> Such brief and general one-line summaries provide no information as to what particular views on the subject of pensions may have been presented in the one-hour documentary, and hence are of little value in determining the applicability of the fairness doctrine and the validity of the arguments of the parties with respect to the actual substance of the program.

44 FCC 2d at 1035 n. 4. This statement indicates a healthy skepticism toward placing too much reliance on excerpts prepared by the licensee from longer reviews both with regard to the descrip-

---

**3.** Although I wrote the opinion of the court in *Brandywine*, Judge Wright concurred in the Commission's actions solely on the ground that the licensee had misrepresented the content of its program to the Commission. Chief Judge Bazelon dissented.

tion of the program itself and the valid inferences that reasonably could be drawn from it. However, without any concern for the potential deficiencies inherent in such exhibits, the majority afforded them significant probative value.

The majority's second error lay in its selection of isolated adverse and favorable comments concerning the overall performance of the pension system without considering the impact of the entire program. The majority claimed that throughout the entire show only a "handful" of comments on the overall functioning of the pension system were made, and maintained that some of these comments were favorable, thereby giving the program reasonable balance. However, the impact of these comments cannot be considered in isolation, but must be viewed as a whole. For example, the majority cited the following excerpt as a specific reference to a good pension plan:

> NEWMAN: . . . [I]n most respects, the pension programs run by the Chicago teamsters union locals are among the best. Benefits are generous and a teamster can retire as early as age fifty-seven.

170 U.S.App.D.C. ——, 516 F.2d 1130. However, when this comment is read in the context of the entire program, it appears to be part of an attack on the entire system. Noting that the Chicago plan is among the best, the serious problems with the plan are then considered in great detail, covering three pages in the appendix. 170 U.S.App.D.C. ——, 516 F.2d 1139–1141. I do not understand how the majority could characterize this comment as favorable, when the so-called "best" plan was subjected to severe criticism, thus implying that others were even worse. To isolate these comments from the program as a whole and attempt to label them as favorable or unfavorable was not only poor methodology, but disingenuous.[4]

4. "Fairness cannot be achieved when the expression of one view is deliberately treated in an antagonistic manner while the opposing view is given the opportunity for expression

Equally troubling as the majority's significant methodological errors is the fact that it chose to test the program on a statement-by-statement basis without ever holding that the Commission's approach was arbitrary, capricious, or an abuse of discretion. In National Broadcasting Co., 25 FCC 2d 735 (1970), the Commission, ruling in favor of the licensee on another fairness doctrine complaint, recognized that the reasonableness and good faith of the licensee's judgment can only be discerned by viewing the impact of the program as a whole. The Commission reaffirmed its method of analysis in the case sub judice:

> Our conclusion is not based upon a singling out, "line-by-line" or "statement-by-statement," of isolated expressions of viewpoints, a procedure we rejected in National Broadcasting Co., 25 FCC 2d 735 (1970). Rather it appears to us to be the only conclusion which can be drawn upon review of the program in its entirety, and one which could be avoided only by ignoring a significant and substantial part of the material presented.

44 FCC 2d at 1040. I have searched the majority opinion in vain for a holding that the Commission's method of analysis was arbitrary or other reasons for not adopting it. There are none; to reach its holding the majority totally supplanted its view of the record for that of the Commission without ever explaining the Commission's error.

By so doing, the majority failed to heed or even to acknowledge the doctrine first enunciated in Red Lion and reiterated in CBS involving the guiding standards when considering an application of the fairness doctrine:

> And here this principle is given special force by the equally venerable principle that the construction of a statute by those charged with its execution should be followed unless there are

without any interference, harassment or even opposing argument." Brandywine-Main Line Radio, Inc., 24 FCC 2d 18, 24 (1970).

compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction. Here, Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation.
Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at 381–82, 89 S.Ct. at 1802 (footnotes omitted); *see* Columbia Broadcasting System, Inc. v. Democratic National Committee, *supra*, 412 U.S. at 121, 93 S.Ct. 2080.

I have been unable to discover any compelling indications that the Commission was wrong in determining that viewed as a whole the *Pensions* program imposed upon NBC a fairness obligation that it had not discharged, nor can I find any recognition in the majority opinion of this command by the Supreme Court.

Finally, I can find no justification for the *de novo* review of the record that the majority undertook. The majority never claimed that the Commission's conclusions were unsupported by substantial evidence or were otherwise inadequate. The entire course taken by the majority was predicated upon its holding that the Commission applied an improper legal test. Even if the majority were correct—which I dispute—the proper disposition of the case would have been to remand it to the Commission to make new findings given the proper legal standard. The majority's decision to review the record *de novo* failed to accord proper deference to the expertise of the Commission, *see* Columbia Broadcasting System v. Democratic National Committee, *supra*, 412 U.S. at 102, 93 S.Ct. 2080, and is compelling evidence that the majority simply substituted its own judgment for that of the Commission.

I have strained to find a reasoned explanation for the majority's tortured reading of the Commission's opinion, its departure from established standards of appellate review, and its failure to remand the case to the Commission under

what the majority considered to be appropriate legal principles. Of course, if the majority's point was merely that the Commission did not adhere to the test of reasonableness, then such an elaborate opinion would have been unnecessary. I must conclude that the majority's rationale of Commission error was a ploy to stalk bigger game. Unfortunately, only one reason explicates the majority's action—an obvious antipathy to the fairness doctrine suggesting that, given a free hand, it would have struck down the doctrine as unconstitutional. However, since the Supreme Court unanimously upheld the fairness doctrine in Red Lion Broadcasting Co. v. FCC, *supra*,[5] the majority could not do so directly, and thus, did so indirectly. It so limited the doctrine that, as a practical matter, the licensee's obligation of fairness would have been a dead letter. I believe that the majority prematurely attempted to lay the doctrine to rest because of fears that it infringes upon broadcast journalists' first amendment rights and inhibits their expression and creativity. The majority misunderstood the fairness doctrine and attempted to destroy it from ignorance. Had the majority properly viewed the role of the doctrine, its fears would have been assuaged, and it would not have reached its holding.

## II

### A

The role of the fairness doctrine cannot be understood without a brief consideration of the precepts and circumstances which led to its creation. Fundamental is the recognition that the electromagnetic spectrum which broadcast licensees use to transport their message is not the private property of any individual or group; rather, it is a public resource in which every citizen has an interest. Almost from the infancy of broadcasting, the government has been forced to play the role of umpire or arbi-

---

**5.** Justice Douglas did not participate in the decision, and stated in CBS v. DNC that he would not support it.

ter in determining who will be permitted use of the spectrum. Because the number of persons who wished to broadcast their message far exceeded the capacity of the spectrum:

> It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard.

Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at 376, 89 S.Ct. at 1799; *see* National Broadcasting Co. v. United States, 319 U.S. 190, 210–14, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Thus, the government's role is that of trustee of the public's interest in this critically important resource, and when the government authorizes private parties to broadcast on a frequency within the spectrum, the parties are invested with the public's interest. In sum, as this court has made clear,

> [b]y whatever name or classification, broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept. The Fairness Doctrine plays a very large role in assuring the public resource granted to licensees at no cost will be used in the public interest.

Office of Commun. of United Church of Christ v. FCC, 138 U.S.App.D.C. 112, 425 F.2d 543, 548 (1969).

From the start, the first amendment rights of licensees have been specifically recognized by Congress in the Federal Communications Act, and by the courts. *See* United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). However, these rights are not absolute. "There is nothing in the First Amendment which prevents the Government from requiring a licensee to share his frequency with others and to conduct himself as a proxy or fiduciary with obligations to present those views and voices which are representative of his community and which would otherwise, by necessity, be barred from the airwaves." *Red Lion, supra*, 395 U.S. at 389, 89 S.Ct. at 1806. In the final analysis, "[i]t is the right of the viewers and listeners, not the broadcasters, which is paramount." *Id.* at 390, 89 S.Ct. at 1806.[6]

Properly understood, the fairness doctrine is a balancing influence between the public's right of access to the broadcast media and the right of licensees to transmit their own message. It is a compromise designed to enhance first amendment rights rather than to detract from them. This notion is implicit in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the first Supreme Court test of the constitutionality of the fairness doctrine. At issue in *Red Lion* were the Commission's personal attack and political editorializing rules, *see* 170 U.S.App. D.C. ——, 516 F.2d 1111, corollaries of the licensee's fairness obligation. The Court not only upheld the constitutionality of these rules, but also adopted the premise on which the general fairness obligation is based—that the scarcity of frequencies requires the licensee to devote some of its broadcast time to the messages of others.

---

**6.** The government's role in regulating the airwaves is analogous to actions that it has taken in other areas. For example, in Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the publisher members that made up the Associated Press wire service argued that the application of the antitrust laws to the association would violate the first amendment. Rejecting this argument, the Court responded:

> It would be strange indeed however if the grave concern for freedom of the press

which prompted the adoption of the First Amendment should be read as a command that government was without power to protect that freedom. . . . Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon constitutionally guaranteed freedom.

*Id.* at 20, 65 S.Ct. at 1424.

The importance of the fairness doctrine was made explicit by the recent case of Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), in which the Court upheld a licensee's refusal to accept paid editorial advertising. Reversing this court's conclusion that the first amendment gave a limited right of access to responsible members of the public, the Supreme Court concluded that such a limited right of access was not mandated by the first amendment because the fairness doctrine, part of an "independent statutory obligation to provide full and fair coverage of public issues," was sufficient. *Id.* at 129–31, 93 S.Ct. at 2100. Thus, while recognizing the necessity for licensee discretion, the Court saw the fairness doctrine as the primary protector of the public's interest in "the widest possible dissemination of information from diverse and antagonistic sources . .." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945).

As administered by the Commission, the fairness doctrine reflects the spirit of compromise and tension implicit in competing first amendment rights. As I shall discuss in more detail *infra,* the balance has been struck by affording the licensee great deference in deciding upon the mechanics to achieve fairness, *see* Letter to Mid-Florida Television Corp., 40 FCC 598 (1964) and then judging its exercise of that discretion by a test of good faith and reasonableness. *See* Fairness Doctrine Primer, 40 FCC 598 (1964). As we have noted, the fairness doctrine "nowhere requires equality but only reasonableness." Democratic National Comm. v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891, 905, cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972). The Commission has explicitly endorsed this axiom:

> The fairness doctrine deals with the broader question of affording reasonable opportunity for presentation of contrasting viewpoints on controversial issues of public importance. Generally

speaking, it does not apply with the precision of the "equal opportunities" requirement [the rule at issue in *Red Lion*]. Rather, the licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation . . . [t]here is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the "equal opportunities" requirement.

Fairness Doctrine Primer, *supra*, 40 FCC at 599.

Before leaving these general considerations, I am constrained to comment upon the Supreme Court's recent decision in Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), where a carefully drawn "right to reply" law—analogous to the fairness doctrine's personal attack rule—was held to be an unconstitutional infringement of freedom of the press. The majority invoked *Tornillo* to demonstrate the general prohibition against the Government "compelling editors to include state approved material." 170 U.S. App.D.C. ——, 516 F.2d 1110. Even more interestingly, in briefs filed in anticipation of the *en banc* rehearing of this case, several parties argued that despite the Supreme Court's decisions in *Red Lion* and *CBS, Tornillo* raises substantial doubts over the continuing constitutional vitality of the fairness doctrine. *See, e. g.,* CBS' Br. at 17–18; Radio Television News Directors' Br. at 9–16. In fact, petitioner opined that "the decisions appear flatly inconsistent." NBC's Br. at 13.

I cannot conclude that *Tornillo* has any effect on the constitutionality of the fairness doctrine; I find the decisions "flatly consistent." Arguments advanced to the contrary are only reflective of broadcasters' desires to become indistinguishable from the print media and to be freed of their obligations as public trustees. While the relevancy of *Red Lion* was fully briefed in *Tornillo,* that decision contained no reference to *Red Lion* or to implications for the

broadcast media. I read the Court's striking down a reply rule for newspapers in *Tornillo* after upholding a similar rule for broadcasters in *Red Lion* as demonstrating the Court's continuing recognition of the distinction between the two media, which is primarily manifested in the unique responsibilities of broadcasters as public trustees. As we observed in United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994, 1003 (1966):

A broadcaster has much in common with a newspaper publisher, but he is not in the same category in terms of public obligations imposed by law. A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations. A newspaper can be operated at the whim or caprice of its owners; a broadcast station cannot. After nearly five decades of operation the broadcast industry does not seem to have grasped the simple fact that a broadcast license is a public trust subject to termination for breach of duty.

*See also* CBS v. Democratic National Comm., 412 U.S. at 111, 118, 93 S.Ct. at 2090.

### B

Both under applicable judicial precedent and Commission administration of the fairness doctrine, the licensee is charged with primary responsibility in fulfilling the doctrine's mandate and is given broad discretion as to how best to meet that obligation. As Chief Justice Burger noted in *CBS* "[t]he broadcaster . . . is allowed significant journalistic discretion in deciding how best to fulfill its Fairness Doctrine obligations . . . ." 412 U.S. at 111, 93 S.Ct. at 2091; "the initial and primary responsibility for fairness, balance, and objectivity lies with the licensee." *Id.* at 117, 93 S.Ct. at 2094. This court has endorsed time and again the primacy of the licensee's role. *See, e. g.,* Neckritz v. FCC, 163 U.S.App.D.C. 334, 502 F.2d 411, 418

(1974); Democratic National Comm. v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891, 903, cert. denied, 409 U.S. 843, 93 S.Ct. 42 (1972); Green v. FCC, 144 U.S.App. D.C. 353, 447 F.2d 323, 329–30 (1971). The Commission has also consistently affirmed the primacy of the licensee's role:

We firmly believe that the public's need to be informed can best be served through a system in which the individual broadcasters exercise wide journalistic discretion . . . .

Fairness Doctrine Primer, 40 FCC 598, 599 (1964); *see* Fairness Report, 48 FCC 2d at 8–9 (1974). The Commission recognizes that "[i]n passing on any complaint in this area, the Commission's role is not to substitute its judgment for that of the licensee as to any of the above programming decisions . . . . *Id.*

However, the licensee's discretion is not absolute, but "is bounded by rules designed to assure that the public interest in fairness is furthered." CBS v. Democratic National Comm., *supra,* 412 U.S. at 111, 93 S.Ct. at 2091. The Commission tests the exercise of the licensee's discretion under the standards of good faith and reasonableness. *See, e. g.,* Neckritz v. FCC, *supra,* 502 F.2d at 418; Fairness Report, *supra,* at 8–9; Fairness Primer, *supra,* 40 FCC at 599. Thus, "the Commission acts in essence as an 'overseer' . . . ." CBS v. Democratic National Comm., *supra,* 412 U.S. at 117, 93 S.Ct. at 2094. "Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act." *Id.* at 110, 93 S.Ct. at 2090. The inherent tension in protecting the public's rights while not impermissibly interfering with licensee discretion has made the Commission walk "a tightrope between saying too much and saying too little." Banzhaf v. FCC, 132 U.S.App. D.C. 14, 405 F.2d 1082, 1095 (1968), cert. denied sub nom., Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). As the Chief Justice recognized in *CBS*:

This role of the Government as an "overseer" and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic "free agent" call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a "tightrope" to preserve the First Amendment values written into the Radio Act and its successor, the Communications Act.

412 U.S. at 117, 93 S.Ct. at 2094.[7]

Thus, under this scheme it becomes important to delineate precisely the extent of both the licensees' discretion and the Commission's role as protector of the public interest. In the case at bar, we are concerned only with that portion of the fairness doctrine dealing with controversial issues of public importance. Since it is physically impossible to provide time for all issues and viewpoints, the right to exercise editorial judgment was granted to the broadcasters. *See* CBS v. Democratic National Comm., *supra*, 412 U.S. at 111, 93 S.Ct. 2080. Broadcasters, therefore, must make a series of reasonable judgments in good faith—as to which controversial issues to present; as to whether a program raises a controversial issue of public importance; and if so, as to the format and spokesmen to present the necessary range of viewpoints. *See* Fairness Primer, *supra*, 40 FCC at 599. As the majority emphasized, these are all editorial judgments. However, they are also judgments that broadcasters are obligated to make under their responsibilities as fiduciaries and public trustees and for which the licensees are accountable to the public's designated guardian, the Commission.

Clearly, the discretion afforded the licensee must be the greatest as to its determinations of which and how many controversial issues it presents—both to avoid censorship and intolerable infringements on broadcasters' first amendment rights. The Commission's role is consequently limited to ensuring that the licensee reasonably and in good faith devotes sufficient time to coverage of such issues. The Supreme Court has recognized this; it is the true significance of this much misapplied passage from *CBS*:

> For better or worse, editing is what editors are for; and *editing is selection and choice of material.* That editors—newspaper or broadcast—can and do abuse this power is beyond doubt, but that is no reason to deny the discretion Congress provided. Calculated risks of abuse are taken in order to preserve higher values.

412 U.S. at 124–125, 93 S.Ct. at 2097 (emphasis added).[8]

Similarly, the broadcasters' range of reasonableness to determine spokesmen and formats in providing the reasonable opportunities for contrasting views must be broad to prevent unnecessary govern-

---

7. While in this portion of the opinion, the Chief Justice was only speaking for himself and Justices Stewart and Rehnquist, as the majority recognized, this passage is not contrary to the views of the other justices. *See* 170 U.S.App.D.C. —— at n. 59, 516 F.2d 1119 at n. 59.

8. NBC in its *en banc* brief to this court cites the passage three times. First, it is cited as supporting the proposition that the Commission should not become too involved in broadcast journalism. NBC's Br. at 19. Five pages later, it is invoked to argue that we must become conditioned to the possibility of biased documentaries without recourse. *Id.* at 24. Finally, it is advanced in NBC's conclusion as representing what is at issue in this case. *Id.* at 49. All of these citations miss its actual meaning—latitude as to what issues, formats, and spokesmen to present, not whether there exists an obligation to present such matters at all. *See also* CBS' Br. at 15, 30; Radio Television News Directors Ass'n's Br. at 10.

In a similar vein, the majority attempted to transform the Supreme Court's *CBS* decision into support for its holding. *See, e. g.,* 170 U.S.App.D.C. ——, 516 F.2d 1119. In *CBS*, the Court rejected a governmental role of ensuring access to all who could pay. However, in strong terms, the Chief Justice reaffirmed the constitutionality of the fairness doctrine and endorsed the Commission's overseeing role to protect the public. He undoubtedly would be amazed at the transmogrified way his careful analysis has been used by the majority.

mental encroachment. That is clearly another teaching of *CBS.*

However, a different situation is presented by the question of whether a broadcast discussed a controversial issue. This is the fundamental question posed by the case *sub judice,*—whether petitioner by broadcasting *Pensions: The Broken Promise* incurred any fairness doctrine obligations at all. While the Commission must still show deference to a licensee's judgment here, recognition of the broadcaster's position as a public trustee dictates that the latitude afforded the licensee be significantly less. In no other situation must the rights of the public be more paramount than when determining whether the public may receive contrasting views on a subject. In ensuring that the licensee reasonably performs its obligation as public trustee, the Commission does not override first amendment judgments, but furthers the first amendment foundation of the fairness doctrine—the right of the public in a free society to be informed. *See* Red Lion Broadcasting Co. v. FCC, *supra,* 395 U.S. at 389, 89 S.Ct. 1794; Report on Editorializing, *supra,* 13 FCC at 1249.

Instead of recognizing the public's compelling interest, the majority resolved this problem by standing the teaching of *Red Lion* on its head. In essence, the majority asserted that the licensee's determination of whether a particular program deals with a controversial issue must be upheld as reasonable unless reasonable men could not agree with the broadcaster's characterization of the program. 170 U.S.App. D.C. ——, 516 F.2d 1121. I have two criticisms of this "substantial burden" the majority placed upon the Commission. While admitting that the standards are good faith *and* reasonableness, the majority defined the latter so that it is indistinguishable from good faith, for certainly if no reasonable man could concur in a licensee's characterization, it could not have been advanced in good faith. My more fundamental objection is that the majority's test clearly represented an erosion of the public's right and ability to receive full information on vital issues, under the stringent test the majority expounded, controversial issues, undoubtedly would have been presented without the triggering of any fairness obligations, because this "substantial burden" places the broadcaster, not the public, on a pedestal. The majority, by worshipping at the alter of editorial judgment, attempted to strip the American people of a large part of their ability to ensure access to full, free and robust discussion of controversial issues over the airwaves.[9]

9. In part III of its opinion, The Fairness Doctrine: General Considerations, the majority relied on Green v. FCC, 144 U.S.App.D.C. 353, 447 F.2d 323 (1971) and Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917 (1972) for the proposition that the licensee has great discretion in all decisions made under the fairness doctrine, including the determination whether an issue is a controversial issue of public importance. While both cases reaffirm the licensee's discretion in determining the manner in which conflicting viewpoints of a controversial issue of public importance shall be presented, neither case offers *any* support for the majority's holding in this case—that a licensee's determination that a program did not present a controversial issue of public importance must be upheld unless no reasonable man could agree with the licensee's conclusion.

In *Green,* television stations in Washington, D. C., and San Francisco, California, refused to air messages opposing military service after the stations had broadcast recruiting announcements on behalf of the Armed Forces.

Upon petitioner's complaint, the Commission ruled that no fairness doctrine violation had occurred, and this court affirmed. However, neither the Commission nor the court adopted the reasoning that the majority used in the case *sub judice.* In *Green,* the Commission's holding was twofold; the recruitment announcements in themselves did not present controversial issues of public importance, but were controversial only if they were intertwined with the conduct of the Vietnam War. However, opposition to the Vietnam War had received ample treatment by the licensees. Thus, any fairness doctrine obligation had been discharged. Green v. FCC, *supra,* 447 F.2d at 326 n.5. The court's treatment of the scope of the issue demonstrates even less deference to the licensee. Judge Wilkey, writing for a unanimous division, identified five issues that various parties maintained had been raised by the recruiting announcements. Treating each separately, he concluded that one was noncontroversial, and opposing sides of the other four issues had already received

If the majority had properly understood that the licensee's discharge of its fiduciary obligations would not pose an intolerable strain upon journalistic discretion, it would not have attempted to redefine those obligations out of existence. As I have set out above, the burden placed upon the licensee is not onerous, nor does it represent government censorship. The Commission need not force the licensee to place one minute of programming on the air; the broadcaster must realize, however, that his trusteeship will be best discharged and the public interest best served if a liberal interpretation is given to what is meant by a controversial issue. Thereafter, the licensee is accorded extensive latitude and journalistic discretion in fulfilling his obligation of reasonable opportunity. Equal time is not required nor, is unlimited access to all spokesmen. Journalistic control over views, format, and spokesmen is retained. Moreover, the licensee's ability to engage in investigative journalism and present news documentaries is not impaired. As Henry Geller, who participated as amicus curiae in this proceeding, has stated:

> It is clear that an investigative program can be as hard-hitting and one-sided as the broadcast journalist wishes; the only requirement is that

at some time the opposing side be given the opportunity to appear.

H. Geller, The Fairness Doctrine in Broadcasting 39 (1973).

That this perception of the fairness doctrine is realistic is buttressed by reference to the Commission's actual administration of the doctrine. For example, in fiscal year 1973, the year AIM's complaint in this case was filed, the Commission received 2,406 fairness complaints; only 94 warranted submission to the licensees for comment. Of these, only five rulings adverse to the broadcasters eventually resulted. Of the five, three involved the personal attack rule, while only two were general fairness rulings. *See* Fairness Doctrine and Public Interest Standards, 39 Fed.Reg. 26372, 26375, 26379 (1974). These statistics belie any impression that the Commission does not recognize its limited overseeing role or the discretion to be afforded the licensee.

In sum, when making the determination whether a particular program generates any fairness doctrine obligation, a licensee must recognize his fiduciary obligation to the paramountcy of the public interest. This case presents such a determination. Application of the proper definition of that obligation, and the Commission's role in enforcing it, leads

---

adequate coverage thus discharging any fairness doctrine obligations that might have been incurred. *Id.* at 329–31. *Green* simply does not support the majority's holding; rather, its teaching is almost diametrically opposed to the majority. The division recognized that a broadcast can present *more* than one issue, and when issues thus presented are controversial issues of public importance, they must be dealt with in a serious way.

Despite the majority's characterization of *Healey*, its holding is similar to *Green*. Judge Wilkey, again writing for a unanimous division, noted that the broadcast in question could reasonably be viewed as raising three issues. As to one issue the majority correctly noted the *Healey* court's conclusion that it was newsworthy but noncontroversial. However, the majority failed to note that the *Healey* court considered the two other issues to be controversial issues of public importance, but found no fairness doctrine violation because the petitioner had failed to show that the licensee's programming was otherwise inadequate.

Thus, a teaching of both *Healey* and *Green* is that a broadcast can reasonably present more than one issue.

The broadcasts, in *Green* and *Healey*, raised more than one issue, a fact that both courts took pains to recognize. However, the licensee's determination that further treatment of the issues involved was unnecessary were upheld by the Commission and the court because the licensee had already discharged its fairness doctrine obligations or because the licensee's programming had not been proven unfair. The *Healey* and *Green* divisions' serious treatment of the myriad of issues a program may present is another indication that the majority's sacrosanct deference to the licensee's designation of a broadcast's theme is both a new and improper approach. In fact, *Healey* and *Green* represent further evidence that broadcast licensees operate within a much narrower zone of reasonableness in deciding whether they have a fairness doctrine obligation on a particular issue.

to the inescapable conclusion that the Commission's decision in this case was correct.

## III

NBC characterized the subject of the *Pensions* program as a study of "some problems of some pension plans." 44 FCC 2d at 1035. The Commission found that NBC's characterization was unreasonable:

we cannot accept as reasonable a judgment that the "Pension" program did not present views advocating one side of a controversial issue of public importance within the meaning of the fairness doctrine, that issue being the overall performance of the private pension system and the need for governmental regulation of all private pension plans.

*Id.* at 1039. Applying the proper standard, and granting, as we must, deference to the Commission's expertise in administering the statutory scheme, I believe that the Commission's judgment should have been affirmed.

Invoking the proper standard—judging the impact of the program as a whole, the Commission concluded that a finding that no controversial issue was presented "could be avoided only by ignoring a significant and substantial part of the material presented: "

it would be an unrealistic over-simplification to characterize the program as one addressing only "some problems of some pension plans." The program did examine such problems, but it would strain the most "permissive standard of reasonableness" past the breaking point to imply that the program was confined to such a limited examination.

*Id* at 1040. The Commission found that the "overwhelming weight of the . . program supported the view that the overall performance of private pension plans was 'deplorable' and that the pension system should be regulated to rectify that situation . . . ." *Id.* at 1041.

There appears to be substantial evidence to support these conclusions. The Commission reached its holding by carefully reviewing the transcript of the entire program. *Id.* at 1035. The program itself was a highly effective mix of interviews with workers who had been damaged in some way by a private pension plan, interspersed with narration and comments by various spokesmen. The unavoidable impression the program leaves is a clear sense of the inadequacy of the then-prevalent system and of the need for reform.

Perhaps the most striking evidence that the program's point was more ambitious than merely to describe "some abuses in some plans" is the title petitioner itself placed upon the program: the broadcast was entitled "Pensions: *The* Broken Promise," not "Pensions: Broken Promises" or "Pensions: Some Broken Promises." In fact, I wonder whether any dispute would exist over the existence of fairness obligations if NBC had telecast a program entitled "Pensions: The Kept Promise."

The majority, of course, did not attack the Commission's conclusions head-on, but attempted to undermine them in two ways. First, it drew extensively upon the newspaper reviews of the program, the limited probative value of which I have discussed earlier. Second, the majority detailed the function and need for latitude in investigative journalism. The majority opined that "investigative reporting has a distinctive role of uncovering and exposing abuses" which "would be undermined if the government agency were free to review the editorial judgments" and to conclude that "the expose had a broader message than that discerned by the licensee . . . ." 170 U.S. App.D.C. ——, 516 F.2d 1123. The majority argued that "[a] report that evils exist within a group is just not the saae thing as a report on the entire group, or even on the majority of the group." *Id.* 170 U.S.App.D.C. at ——, 516 F.2d at 1124. These twin themes—that a licensee must be afforded extra discretion for investigative journalism and that "effec-

tive presentation of problems in a system does not necessarily generate either comment on the performance of the system as a whole, or a duty to engage in a full study," *id.* 170 U.S.App.D.C. at ——, 516 F.2d at 1127 dictated the majority's conclusion to reverse the Commission.

These arguments were but another manifestation of the consequences the majority feared in affirming the Commission. However, such fears are unfounded. Certainly the Commission does not believe that every investigative report's look at abuse or corruption is in reality a commentary on an entire industry or branch of government. Similarly, the majority surely did not believe that an investigative documentary never attempts to or in reality never indicts an entire industry; such an assumption would deny the existence of inductive reasoning. Thus, labelling the program an investigative report does not erase the Commission's findings as to its content and petitioner's fairness obligation.[10]

Even more fundamentally, any special exception for investigative reporting is unwarranted. Petitioner, joined by several of the amici, has consistently argued that the Commission's ruling must be overturned to avoid a chilling effect on broadcasters, the net result being blandness in programming. *See, e. g.*, 44 FCC 2d at 1041; NBC's Br. at 20–21; CBS' Br. at 13. In affidavits submitted in this litigation, NBC newsman Bill Monroe opined that the ruling could only have "a serious inhibiting effect on broadcast journalism." J.A. 138. NBC News President Reuben Frank asserted that "almost all the great television documentaries . . . would have been impossible under this rule." J.A. 127. Finally, the majority referred to the "inhibitory dimension" of the Commission's actions. 170 U.S.App.D.C. at ——, 516 F.2d at 1133.

These allegations have been repeatedly rejected, by the courts, *see* Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at 393, 89 S.Ct. 1794; Brandywine-Main Line Radio, Inc. v. FCC, *supra*, 473 F.2d at 157–58, and by the Commission:

> A number of commentators have argued that, in spite of its worthy purposes, the actual effect of the fairness doctrine can only be to restrict and inhibit broadcast journalism. Far from inhibiting debate, however, we believe that the doctrine has done much to expand and enrich it.

Fairness Report, *supra*, 48 FCC 2d at 7. Nothing in this case should generate reevaluation of those assessments. Far from deprecating investigatory journalism, the Commission reaffirmed its "recognition of the value of investigatory reporting and [its] steadfast intention to do nothing to interfere with or inhibit it." 44 FCC 2d at 1041. The Commission commended NBC "for airing such an 'uninhibited, robust, and wide open' presentation of one side of the pensions issue." *Id.*

Moreover, as the Commission recognized, its ruling does not make impossible the sort of program NBC had already presented, as the licensee remains free to determine format, spokesmen, and time within which to discharge its fairness obligations. *Id.* at 1042. As a final protection against any chilling effect, the fairness doctrine itself requires the licensee to devote time to presentation of controversial issues, *see* Red Lion, *supra*, 395 U.S. at 393, 89 S.Ct. 1794; Fairness Report, *supra*, 48 FCC 2d at 7–8.

In response to the argument that investigatory journalism lies at the heart of the press' first amendment freedoms and that therefore the area demands even greater deference, I can only endorse the Commission's reply:

---

10. As Henry Geller noted,

> No responsible journalist would argue, for example, that after an investigative report on gambling and police corruption in Boston, or Watergate, or the "Selling of the Pentagon," the viewpoint of the Boston police or the Administration should not be given some reasonable opportunity at sometime.

H. Geller, The Fairness Doctrine in Broadcasting 39 (1973).

If the broadcaster's First Amendment interest in freedom of journalistic expression is greatest in the area of the presentation of news and news documentaries, then the right of the public to have access to the various competing viewpoints on controversial issues discussed in such presentations is certainly no less compelling. News and news documentaries usually treat of public affairs, and for this reason perhaps no other vehicles of broadcast speech should function more consistently with the First Amendment's purpose of fostering "uninhibited, robust, and wide open" debate with respect to the public issues which they present and discuss. *NBC has a journalist's role; it has an additional role as a public trustee of providing a forum for diverse views on public issues. The two roles are not incompatible.*

44 FCC 2d at 1043 (emphasis added). In sum, there is no need for a special exception to the fairness doctrine for investigatory journalism, nor would the public interest be furthered by one.[11]

There is one final issue to discuss—whether the *Pensions* program itself discharged petitioner's obligations under the fairness doctrine. As I have indicated, the fairness doctrine nowhere requires equality, only reasonableness. The majority after examining and labelling individual passages from the transcript concluded that the program contained reasonable balance. 170 U.S.App. D.C. at ———, 516 F.2d at 1127–1132; *see id.* 170 U.S.App.D.C. at ———, 516 F.2d at 1130. As I have demonstrated in part I, that methodology contained substantial factual inaccuracies. Moreover, it represented another instance of the majority substituting its judgment for that of the Commission without ever finding agency error.

The Commission analyzed petitioner's contentions that the program carried sufficient favorable comments to be bal-

anced. However, it concurred in its staff's conclusions that while those three pro-pension statements "could be taken to present a contrasting view, they alone cannot be said to have afforded the reasonable opportunity contemplated by the fairness doctrine when compared to the views presented during the remainder of the Program." 44 FCC 2d at 1041. In light of the overwhelming negative tenor of the entire program, I cannot conclude that this finding was not supported by substantial evidence. Moreover, since NBC had informed the Commission that aside from the *Pensions* program it had not "telecast any program dealing with private pensions" and had no definite plans to present such a future program, *id.* at 1040, the Commission's order to petitioner to discharge its fairness obligations was clearly proper.

## IV

As the majority correctly noted "[t]his is the first case in which a broadcaster has been held in violation of the fairness doctrine for the broadcasting of an investigative news documentary that presented a serious social problem." 170 U.S.App.D.C. at ———, 516 F.2d at 1125. The majority attempted to ensure that it would be the last. To do so, as we have seen, the majority started from erroneous premises concerning the Commission's decision, applied an incorrect standard of review, and substituted its judgment for that of the Commission. All of the errors stemmed from an unwarranted fear that the fairness doctrine (and the Commission) impermissibly intrudes upon journalistic freedom and expression.

One commentator has opined that if the Commission had been upheld in this case:

the court would have legitimized the idea that the Government could in effect substitute its judgment for that of the network as to what issue was involved in a broadcast documentary

---

11. Moreover, creating a special exception for investigative journalism destroys the fairness doctrine. All discussions of public or controversial issues could be cast in terms of "spe-

cial reports" or "investigatory documentaries". The only first amendment interest *that* would destroy is the public's right to full, complete, and robust discussion on the airways.

and order that more air time be given to elements that the journalist never thought central to the story. This, the broadcasters feel, would genuinely restrict their efforts at investigative reporting. It would mean that every assertion of wrongdoing by persons or groups would have to be balanced with an *equal* statement of their claims to innocence—however unbelievable they might be. The result would be confusion and, more often then not, outright misinformation. In addition, the broadcasters feared, a decision for the government would make it difficult to air any program that took a point of view.[12]

That is exactly what this case is *not* about. The Commission did *not* substitute its judgment for the licensee's; it found the broadcaster's judgment to be unreasonable. It did *not* order equal time; it only required reasonable opportunity. The Commission did *not* tell petitioner whom to put on the air; journalistic discretion as to format and spokesmen remains intact. The Commission's decision does not preclude programming with a point of view; the fairness doctrine encourages such programming. What the Commission has done here is acted in the public interest to ensure that the licensee fulfills its obligation as public trustee. This role has been endorsed and reendorsed by the Supreme Court.

This court has stated in no uncertain terms: "*the American people must not be left uninformed.*" Green v. FCC, *supra*, 447 F.2d at 329. Standing applicable principles on their heads and reacting to an unwarranted spectre of Armageddon advanced by broadcasters, the majority would have virtually eliminated the broadcaster's trusteeship; the licensees would have been given an unbounded and unsupervised discretion, so that the American public would be left either ill- or only half-informed. I think both the fairness doctrine and the American people deserve a better fate. The ma-

jority's holding left the public interest "no longer 'paramount' but, rather, subordinate to private whim . . . ." *CBS, supra*, 412 U.S. at 124, 93 S.Ct. at 2097. Fortunately after today, the September 27th opinion is no longer precedent, but must stand or fall on the weight of its own reasoning. I am confident, under that standard, its influence will be evanescent.

LEVENTHAL, Circuit Judge (concurring in part and dissenting in part):

### I.

This has been a Big Case with issues large in law and judicial approach. This is the way it ends: All the judges on the panel that drew this case agree on the dissolution of the order of the Federal Communications Commission that the National Broadcasting Company's Pensions telecast violated the Fairness Doctrine. But the reason for the result differs from judge to judge.

The panel has for consideration, following the withdrawal of the court en banc, a suggestion of mootness filed by the FCC. Judge Fahy declines to accept that suggestion of mootness, which would, if entertained, have meant that the FCC was required to dismiss the proceeding, as a matter of jurisdiction, and without regard to its own discretion. I agree with Judge Fahy as to this ruling, for reasons set forth in part III of this opinion responding to Judge Tamm's view that the mootness doctrine is applicable.

### II.

Judge Fahy has written an opinion which remands the proceeding, to permit the FCC to vacate its order in the exercise of its discretion, on an equitable doctrine rooted in considerations of administrative and judicial discretion. While I disagree as to this course, I do not undertake to enlarge on my reasons, for this disposition ordered by Judge Fahy is not as objectionable as a dismissal for

---

12. Friendly, *What's Fair on the Air?*, *N. Y. Times Magazine* 11, 46 (Mar. 30, 1975) (emphasis added).

mootness. Indeed I would be ready to join affirmatively in the order implementing Judge Fahy's opinion if necessary to break an impasse.[1]

### III. MOOTNESS

1. The Commission's suggestion of mootness contends that "the case has become moot as a result of the enactment of legislation dealing with pension reform, leaving NBC no longer under a duty to comply with the Commission's order."[2] It says that "[n]either of the original adversaries in this dispute (NBC and AIM) nor the Commission stands to gain or lose by this Court's resolution of the case." *Id.* at 5. However the Commission takes care to emphasize that it continues to adhere to its determination that NBC violated the fairness doctrine.[3] And both NBC and AIM contend that the case has not become moot.

2. The FCC's claim of mootness presents the same issue that this court considered *sua sponte*—as it was bound to do, on a matter of jurisdiction—in our opinion of September 27, 1974. In holding that our jurisdiction 170 U.S.App. D.C. at ——, 516 F.2d at 1133–1134 n.88) had not been undermined by mootness we said:

> We conclude our opinion on the merits with a brief comment explaining that it has not been mooted by the passage of the Employment Retirement Income Security Act of 1974 (Public Law 93–406) signed by the President on Labor Day, September, 2, 1974, while this opinion was being distributed to our colleagues for information, and readied for publication. First, the passage of the act does not technically moot any aspect of this case because legislation is always subject to reconsideration and modification. Second, we think the principle

of Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515–16 [31 S.Ct. 279, 55 L.Ed. 310] (1911) on recurring controversies is properly invoked.

Third, this opinion sets forth the reasons for maintenance of the stay pending appeal (*see* note 18 and text thereto). The case was expedited because the pensions bill was on a current legislative time table. Following oral argument on the merits the panel voted, with one dissent, that it would vacate the Commission's order, and continue the stay pending preparation of the opinion. All votes are subject to reconsideration, and if in the course of preparation of the opinion it had become evident that an opinion for reversal "would not write," the court would have reversed course. But the court continued to adhere to its vote, and this opinion on the merits is also, therefore, an opinion explaining why the court continued its stay in effect.

On this issue, there was no dissent. Judge Tamm did not contend that the case should be dismissed, but that the FCC's order should be affirmed.

3. The FCC takes note that NBC, when it sought and obtained a stay from the Commission and this court, voiced the concern that if it complied with the FCC's order it might be confronted with the claim that the appeal was rendered moot. The FCC continues: "Ironically *DeFunis* subsequently established that issuance of a stay would also moot the case."[4] And the FCC explains[5] that DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), issued after it filed in this court its opposition to NBC's motion for stay, wherein it stated that "this Court has full discretion to consider questions of continuing importance to the public interest even though the immediate controversy which gave

---

1. *See* Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597 (1969).

2. FCC's Suggestion of Mootness at 1.

3. As it states, "[o]ur [en banc] brief addresses the merits in this case and we need not retreat from the positions stated in it to raise what we

consider a sound procedural question." FCC's Reply to Responses in Opposition to Suggestion of Mootness at 4.

4. Suggestion of Mootness at 8.

5. FCC's Reply to Responses in Opposition to Suggestion of Mootness at 2, n. 1.

rise to the case may have been resolved." [6]

*DeFunis,* however, was a case where the plaintiff-petitioner was scheduled, by the mere passage of time, to lose all pertinent contact with the governmental authority whose practice was being challenged. The significance of the loss of contact is sharpened by the Court's virtually simultaneous decision in *Super Tire Engineering* to be discussed presently, and with its rulings in class action cases. The Court noted that DeFunis had not brought his case as a class action. There are several class action cases where the Court exercises jurisdiction because the class may continue to have contact with the governmental entity although the original litigating member of the class loses such contact.[7]

In striking contrast with *DeFunis* is the case of NBC, which remains subject to FCC's monitoring and doctrines. NBC's continuing contacts with FCC present the reasons for review that arise for orders evading review and orders with collateral consequences. As Judge Tamm has recently pointed out, the former doctrine has application when officials maintain in effect the program under challenge, even though any future violations will not present "identical circumstances." Carlson v. Schlesinger, 167 U.S.App.D.C. 325, 511 F.2d 1327, 1338 (D.C.Cir., 1975). Here, the FCC has not recanted, or disavowed as rooted in error its specific ruling that NBC has violated the fairness doctrine, or its general approach to application of the fairness doctrine.

Fairness rulings raise the problem of a chilling effect on broadcast journalism. And specifically NBC, with its owned and operated stations, faces the possibility that the Pensions broadcast will haunt their renewal applications.[8] AIM, or members of the public of the same view, may oppose renewal on the ground of past non-compliance with licensee obligations. Indeed, AIM had notified each station carrying the "Pensions" program, that it intended to enter notice of the fairness doctrine violation in the station's file and warned that the licensee "may have this used against him in any challenge to a license renewal."

In sum, this case is governed not by *DeFunis* but by the decision rendered by the Supreme Court one week earlier in Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). There the Court found that an

---

**6.** Opposition to Motion for Stay at 17.

**7.** *See* Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); Note, The Mootness Doctrine in the Supreme Court, 88 Harv.L.Rev. 373, 386–95 (1974).

**8.** The FCC's opinion and order addressed this matter, noting that although the licensees "may initially look to network action for compliance," they "remain ultimately responsible for the programming which they carry." 44 FCC 2d at 1044. The Commission has emphasized that the fairness doctrine applies primarily to individual licensees rather than to networks. It has refused to apply the doctrine to *ad hoc* networks and applies it to the three commercial networks in part because they each own and operate five major market stations. *See* Phillip H. Schott, 29 FCC 2d 35, 36 (1971). The Commission's opinion denying renewal of WXUR's license rested primarily on the station's fairness doctrine violations and stated that fairness violations alone would be

sufficient to deny license renewal. On appeal the FCC's fairness ruling was upheld by Judge Tamm. It was not passed upon by Judge Wright, who upheld the FCC on the ground of licensee's misrepresentation, a ground also approved by Judge Tamm. *See* Brandywine-Main Line Radio, Inc., 27 FCC 2d 565, 577 (1971), aff'd on other grounds, 153 U.S.App. D.C. 305, 473 F.2d 16, cert. denied, 412 U.S. 992, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

The Supreme Court's observation in its *CBS* opinion clearly indicates that the challenged FCC ruling may have "a substantial adverse effect" on NBC. The Court noted that "[f]ailure [to comply with the fairness doctrine] puts continuation of the license at risk—a sanction of tremendous potency, and one which the Commission is under increasing pressure to employ." Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 100, 93 S.Ct. 2080, 2085, 36 L.Ed.2d 772 (1973), *quoting* Business Executives' Move for Vietnam Peace v. FCC, 146 U.S.App.D.C. 181, 205, 450 F.2d 642, 666 (1971) (McGowan, J., dissenting).

employer's challenge to state grants of public assistance to striking workers was not mooted by the resolution of the strike prior to decision in the district court. The Court ruled that the controversy persisted because "the challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." Id. at 122, 94 S.Ct. at 1698.

4. I have referred to the "collateral consequences" doctrine as part of the total picture of the case. While this doctrine has usually been employed in criminal cases, it applies with equal force to civil actions.[9] In accordance with this rule, Judge Tamm observed in In re Ballay, that the existence of collateral consequences provides "yet another independent reason why the present appeal is not moot." 157 U.S.App.D.C. 59, 62, 482 F.2d 648, 651 (1973).

5. This complex of factors produces an ongoing resonance in fairness doctrine rulings, especially when no definite life span has initially been set for the ruling. Thus it was that the Supreme Court proceeded to the merits in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), although the personal attack, that was held to trigger the "right of reply" aspect of fairness, had been broadcast as long as five years prior to the Supreme Court decision.

The Commission did not limit its 1973 order to NBC in the fashion its counsel now say was what it "contemplated," that NBC's fairness broadcast be made prior to the legislative battle. If anything, a personal attack is more likely to recede in mists of time than presentation on a public issue. Pensions, and what to do about them, are matters of continuing concern.[10]

6. Finally, any diminution in practical consequence of the FCC order does not establish mootness for lack of adversary posture. Even if the FCC had wholly lost interest in the cause, complainant AIM—which triggered the FCC proceeding and consideration—has a continuing interest. Such a complainant must be given status, at the appellate level, of an intervenor in support of the government position, who may appeal even when the government agency wants submission to the court. United Automobile, Aerospace and Agricultural Implement Workers v. Scofield, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965). More important, the very premise of Southern Pacific jurisprudence is that adversariness may

9. For decisions that criminal cases remain alive after the sentence in question has been served because of the debilitating collateral effects of a criminal conviction, see, e. g., Sibron v. New York, 392 U.S. 40, 55–58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Carafas v. LaVallee, 391 U.S. 234, 237, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); Ginsberg v. New York, 390 U.S. 629, 633 n. 2, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The doctrine has been extended to include challenges to arrests which do not lead to prosecutions in view of the potential consequences of an arrest record. See, e. g., Carlson v. Schlesinger, 168 U.S.App. D.C. ——, 511 F.2d 1327, 1338 (D.C.Cir., 1975); Sullivan v. Murphy, 156 U.S.App.D.C. 28, 52, 478 F.2d 938, 962, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

This court has adopted the same test of mootness in civil litigation, in cases dealing with the collateral consequences of a prison disciplinary action, Hudson v. Hardy, 137 U.S. App.D.C. 366, 424 F.2d 854 (1970), a commitment under the Sexual Psychopath Act, Justin v. Jacobs, 145 U.S.App.D.C. 355, 449 F.2d 1017 (1971), and a commitment for mental illness, In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973). The Ninth Circuit has recently found that the collateral consequences of a denial of tax exempt status prevented a mootness ruling. See Church of Scientology v. United States, 485 F.2d 313, 317–18 (9th Cir. 1973) (finding "no distinction" between a civil and a criminal case for purposes of the collateral consequences doctrine). See also Kates & Barker, Mootness in Judicial Proceedings: Toward a Coherent Theory, 62 Calif.L.Rev. 1385, 1391–94 (1974).

10. As of this writing, most regulations to implement the Act have not been issued; some regulations have been noticed for comment; some regulations have been re-noticed, with amendment following a first round of comment. And the Act itself provides for a study of the portability problem, which is apparently still "up for grabs."

flow not from the particular order but from the underlying principle at stake. While a "common law mootness" falling short of "constitutional mootness" may lead a court to exercise discretion to abstain from considering a case, in the allocation of limited time and energy,[11] here we have already had full and deliberate reflection and preparation and publications of opinions, and considerations of judicial administration run against obliteration of what has been done.[12] We do not rescind an opinion even where the factual record underlying the opinion has been established on remand to require correction. Allen v. United States, 131 U.S.App.D.C. 358, 404 F.2d 1335 (1968).

## IV. THE MERITS

Curiously, Judge Tamm, while professing to say that the case is now moot, which would mean lack of jurisdiction, seizes the occasion to enlarge on his views of the merits, and to unwind an extended critique of the opinion on the merits of a majority of the panel. Without engaging in a point by point rejoinder, which might prompt the kind of sur-rebuttal that flourished in the days of common law pleading, it may be useful to identify the salient premises of the court's opinion.

1. The court's opinion rejects the premise—however permissible logically, or sound psychologically—that an effective depiction of abuses in an institution is pro tanto an attack on the institution, which calls for a full perspective in order to comply with the fairness doctrine. That doctrine calls for more than strict logic or balance. It calls for respecting the public's right to know but without stifling investigatory journalism.

2. The vice in the Commission's opinion was that in deciding that NBC had presented only one viewpoint on a "controversial issue of public importance" it used the approach of ascertaining what issue or issues had been presented in fact, instead of approaching the case from the viewpoint of whether NBC had been reasonable in its view of the issue or issues being presented. The court's ruling is not based solely on the telltale formulation in paragraph 17 of the Commission's opinion of the "specific question properly before us," but on the approach underlying and pervading its opinion.

3. It is said that the court's function is to sustain an administrative agency if its determination is supported by substantial evidence. That rule is subject to a special gloss when the primary responsibility is not in the agency, as is normally the case, but in a private licensee with public aspects, who has a discretion suffused with First Amendment values. In such a case when there is substantial evidence for both results it is the licensee who prevails—under an exception to the normal rule that when there is substantial evidence both ways the agency must prevail. While the court's opinion was not couched in these precise terms, it rests on the predicate that there is substantial evidence to support the licensee's determination as reasonable, and consequently the FCC's determination rejecting the licensee's determination cannot be valid in law.

To avoid any possible misunderstanding, I wish to emphasize that the court's decision did not rest on the majority's own analysis of the issue presented in the broadcast—on our own, we might very well have expressed a view closer to that of the FCC—but on our conclusion that there was plainly substantial evidence to support the licensee's approach as reasonable.

To say that the FCC must be affirmed so long as there is substantial evidence to support its judgment that the licensee was unreasonable, in its characterization of the issue presented by a program or its evaluation of the controversiality of an issue, would require affirmance even if the licensee's characterization was not

11. *See* Alton & S. Ry. v. International Ass'n of Machinists and Aerospace Workers, 150 U.S. App.D.C. 36, 463 F.2d 872 (1972).

12. *See* Kates and Barker, *supra* note 9, at 1412–34; Note, *supra* note 7.

only reasonable but more reasonable than that of the Commission. This application of the conventional standard of review would subject the licensee to intolerable second-guessing by the FCC, and undermine the carefully balanced scheme adopted by Congress to protect licensees from undue governmental interference. Instead of looking to see whether the Commission's conclusion is supported by substantial evidence, the court must ask whether the licensee's judgments are based on "such relevant evidence as a reasonable mind might accept as adequate."

It bears reiteration, for emphasis, that "a court is properly exercising the high judicial function of assuring that agencies respect legislative mandates when it studies the record to make certain that the Commission has not interpolated its own judgment and wrested the primary discretion Congress placed in the licensee, without making the requisite showing of abuse of the licensee's journalistic discretion." 170 U.S.App.D.C. at ——, 516 F.2d at 1123.